UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                   :

UNITED STATES OF AMERICA,       :

                                 :      Case No. S2 21 Cr. 706 (JPO)

      - against -           :

                                 :

BRIAN BENJAMIN,            :

                                 :

               *Defendant*.     :

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BRIAN BENJAMIN'S PRETRIAL MOTION TO
## DISMISS THE INDICTMENT, COMPEL DISCOVERY FROM THE GOVERNMENT,
## AND ORDER A BILL OF PARTICULARS

Barry H. Berke
Dani R. James
Darren A. LaVerne

KRAMER LEVIN NAFTALIS & FRANKEL
1177 Avenue of the Americas
New York, NY 10036
Telephone: 212.715.9100

*Counsel for Defendant Brian Benjamin*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................5

I.   The Allegations In The Indictment .....................................................................5

II.   ███████████████████ ..........................................................11

ARGUMENT ............................................................................................................14

I.   Counts One, Two, And Three Should Be Dismissed Because The Indictment
     Fails To Allege An Explicit *Quid Pro Quo* .....................................................14

     A.   An Indictment Must Be Dismissed When The Facts Alleged Do Not
          Constitute a Crime ..................................................................................17

     B.   Bribery Charges Based On Campaign Contributions Must Allege An
          Explicit *Quid Pro Quo* To Constitute A Crime And Avoid Violating
          Bedrock Democratic And First Amendment Principles ...........................18

     C.   The Rule In *McCormick* Applies Here .................................................24

     D.   The Indictment Does Not Allege the Requisite Explicit *Quid Pro Quo*.....26

II.   Counts Four And Five Fail To Allege A Violation Of § 1519 And Should
      Therefore Be Dismissed............................................................................33

     A.   Background To Counts Four and Five........................................................34

     B.   Argument .................................................................................................36

III.  The Government Must Provide Further Discovery Regarding █████████
      ████████████████████████████████████.......................40

     A.   Background ..............................................................................................42

     B.   Argument .................................................................................................51

IV.   The Government Must Identify Co-Conspirators And Provide Particulars
      Concerning Count One ...............................................................................65

     A.   Background To Count One ........................................................................66

     B.   Argument .................................................................................................68

CONCLUSION...........................................................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arthur Anderson LLP v. United States*,
    544 U.S. 696 (2005)................................................................40

*Brady v. Maryland*,
    373 U.S. 83 (1963).......................................................... *passim*

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310, 359 (2010)...........................................................19

*Dowling v. United States*,
    473 U.S. 207 (1985)................................................................17

*Empress Casino Joliet Corp. v. Johnston*,
    763 F.3d 723 (7th Cir. 2014) ................................................30, 31

*Evans v. United States*,
    504 U.S. 255 (1992)................................................................24

*Fed. Election Comm'n v. Ted Cruz for Senate*,
    142 S. Ct. 1638 (2022)..................................................... *passim*

*Giglio v. United States*,
    405 U.S. 150 (1972)................................................................52

*Kolender v. Lawson*,
    461 U.S. 352 (1983)................................................................40

*McConnell v. Fed. Election Comm'n*,
    540 U.S. 93 (2003)................................................................20

*McCormick v. United States*,
    500 U.S. 257 (1991)...................................................... *passim*

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014)................................................................19

*Strickler v. Greene*,
    527 U.S. 263 (1999)................................................................51

*United States v. Aguilar*,
    515 U.S. 593 (1995)................................................................38

*United States v. Ahuja and Shor*,
   No. 18-Cr-328 (KPF) (S.D.N.Y. Dec. 17, 2021) .............................................................. *passim*

*United States v. Akhavan*,
   No. S3 20-CR-188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) .............................70

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012)..............................................................................................17

*United States v. Allen*,
   10 F.3d 405 (7th Cir. 1993) ......................................................................................25, 28

*United States v. Barnes*,
   158 F.3d 662 (2d Cir. 1998)........................................................................................68, 69

*United States v. Barrett*,
   153 F. Supp. 3d 552 (E.D.N.Y. 2015) ..............................................................................72

*United States v. Bin Laden*,
   92 F. Supp. 2d 225 (S.D.N.Y. 2000)..................................................................................72

*United States v. Bodmer*,
   342 F. Supp. 2d 176 (S.D.N.Y. 2004)................................................................................17

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987) (per curiam)..........................................................................68

*United States v. Catapano*,
   No. 05-Cr-229 (SJ), 2008 WL 2222013 (E.D.N.Y. May 22, 2008) ....................................74

*United States v. Chen*,
   378 F.3d 151 (2d Cir. 2004)..............................................................................................68

*United States v. Covington*,
   395 U.S. 57 (1969)...........................................................................................................17

*United States v. Crowley*,
   236 F.3d 104 (2d Cir. 2000)..............................................................................................17

*United States v. Donagher*,
   520 F. Supp. 3d 1034 (N.D. Ill. 2021) .......................................................................... *passim*

*United States v. Fattah*,
   223 F. Supp. 3d 336 (E.D. Pa. 2016) ................................................................................37

*United States v. Feola*,
   651 F. Supp. 1068 (S.D.N.Y. 1987), aff'd 875 F.2d 857 (2d Cir. 1989)................................70

*United States v. Ferrara*,
   990 F. Supp. 146 (E.D.N.Y. 1998) ...................................................................................75

*United States v. Fumo*,
   628 F. Supp. 2d 573 (E.D. Pa. 2007) .............................................................................39

*United States v. Ganim*,
   225 F. Supp. 2d 145 (D. Conn. 2002)..............................................................................74

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007).......................................................................................16, 24

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993).............................................................................................24

*United States v. Goldberg*,
   756 F.2d 949 (2d Cir. 1985).............................................................................................17

*United States v. Gray*,
   642 F.3d 371 (2d Cir. 2011).............................................................................................38

*United States v. Gupta*,
   No. 11-Cr-907 (S.D.N.Y. Apr. 9, 2012) ..........................................................................69

*United States v. Heicklen*,
   858 F. Supp. 2d 256 (S.D.N.Y. 2012).........................................................................17, 18

*United States v. Jain*,
   No. 19-CR-59 (PKC), 2020 WL 6047812 (S.D.N.Y. Oct. 13, 2020)....................................63

*United States v. Johnson*,
   No. 16-CR-457-1 (NGG), 2017 WL 11490480 (E.D.N.Y. May 24, 2017)...........................70

*United States v. Kaplan*,
   No. 02-Cr-883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003)..................................72

*United States v. Kerik*,
   615 F. Supp. 2d 256 (S.D.N.Y. 2009)..............................................................................17

*United States v. Kernell*,
   667 F.3d 746 (6th Cir. 2012) ......................................................................................37, 39

*United States v. Krug*,
   198 F. Supp. 3d 235 (W.D.N.Y. 2016).............................................................................39

*United States v. Lavidas*,
   No. 19-cr-716 (DLC) (S.D.N.Y. Dec. 4, 2019) .................................................................69

iv

*United States v. Lino*,
   No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........................70, 71, 72, 74

*United States v. Martoma*,
   No. 12-Cr-973 (PGG) (S.D.N.Y. May 20, 2013) .....................................................................69

*United States v. McCarthy*,
   292 F. Supp. 937 (S.D.N.Y. 1968) ........................................................................................74

*United States v. McGuinness*,
   764 F. Supp. 888 (S.D.N.Y. 1991) ...................................................................................71, 74

*United States v. Menendez*,
   132 F. Supp. 3d 635 (D.N.J. 2015) .................................................................................. *passim*

*United States v. Menendez*,
   291 F. Supp. 3d 606 (D.N.J. 2018) ........................................................................................29

*United States v. Miah*,
   546 F. Supp. 3d 407 (W.D. Pa. 2021) ....................................................................................39

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................................71, 72

*United States v. Nejad*,
   487 F. Supp. 3d 206 (S.D.N.Y. 2020) ....................................................................................64

*United States v. Nejad*,
   521 F. Supp. 3d 438 (S.D.N.Y. 2021) ....................................................................................65

*United States v. Oruche*,
   No. 07-Cr-0124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008) ..............................71, 72

*United States v. Panza*,
   750 F.2d 1141 (2d Cir. 1984) .................................................................................................69

*United States v. Pawlowski*,
   351 F. Supp. 3d 840 (E.D. Pa. 2018) ................................................................................25, 26

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018) ....................................................................................70

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) .....................................................................................................17

*United States v. Pizarro*,
   No. 17-Cr-151 (AJN) (S.D.N.Y. May 17, 2018) ...................................................................63

*United States v. Rajaratnam*,
No. 09-cr- 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ................................. 70

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) ................................................................................58, 60

*United States v. Savin*,
No. 00-Cr-45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) .......................................71

*United States v. Scott*,
979 F.3d 986 (2d Cir. 2020) ................................................................................37, 38

*United States v. Schulte*,
No. 17-Cr-548 (PAC) (S.D.N.Y. Feb. 12, 2020) ....................................................................61

*United States v. Siddiqi*,
No. 06 CR. 377 SWK, 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ................................73, 74

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017) ................................................................................67, 76

*United States v. Taylor*,
17 F. Supp. 3d 162 (E.D.N.Y. 2014) ................................................................................63

*United States v. Triumph Cap. Grp., Inc.*,
544 F.3d 149 (2d Cir. 2008) ................................................................................52

**Federal Statutes**

18 U.S.C. § 201 ................................................................................................25

18 U.S.C. § 371 ................................................................................................2, 6

18 U.S.C. § 666 ................................................................................ *passim*

18 U.S.C. § 1343 ................................................................................ *passim*

18 U.S.C. § 1346 ................................................................................ *passim*

18 U.S.C. § 1512 ................................................................................................39

18 U.S.C. § 1519 ................................................................................ *passim*

18 U.S.C. § 1951 ................................................................................................22

**Rules**

Fed. R. Crim. P. 7(f) ................................................................................................66

Fed. R. Crim. P. 12(b) .................................................................................................. 17

**Constitutional Provisions**

First Amendment ................................................................................................. *passim*

**Other Authorities**

Eric Holder, *James Comey Is A Good Man, But He Made A Serious Mistake*,
  Wash. Post (Oct. 30, 2016) ................................................................................ 48 n.15

*Gov. Benjamin Resigns Following Campaign Finance Indictment*, N.Y. Times
  (Apr. 12, 2022) .................................................................................................. 49 n.15

Grace Ashford, *Brian Benjamin Won't Be on the New York Ballot After All*, N.Y.
  Times (May 2, 2022) .......................................................................................... 49 n.15

Jamie Gorelick and Larry Thompson, *James Comey is Damaging Our
  Democracy,* Wash. Post (Oct. 29, 2016) ........................................................... 49 n.15

Luis Ferre-Sadurni & Grace Ashford, *N.Y. Governor Candidates Flood the
  Airwaves With $20 Million in Ads*, N.Y. Times (May 23, 2022) ..................... 49 n.15

Office of the Inspector General, A Review of Various Actions by the Federal
  Bureau of Investigation and Department of Justice in Advance of the 2016
  Election at 18 (June 2018), https://www.justice.gov/file/1071991/download ................ 49 n.15

*Pre-Election Disclosures: How Does, and Should, DOJ Analyze Edge Cases*,
  Lawfare Blog (Nov. 8, 2016), https://www.lawfareblog.com/pre-election-
  disclosures-how-does-and-should-doj-analyze-edge-cases ............................. 49 n.15

Statement on the Investigation into City Hall Fundraising (Mar. 16, 2017),
  https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-
  statement-investigation-city-hall-fundraising ....................................................... 22

Defendant Brian Benjamin respectfully submits this memorandum of law in support of his motions (i) to dismiss Counts One through Three of the Indictment for failure to allege an explicit *quid pro quo*; (ii) to dismiss Counts Four and Five of the Indictment for failure to allege a violation of 18 U.S.C. § 1519; (iii) to compel the government to provide further discovery regarding █████████████████████████████████████████ █████; and (iv) to compel the government to identify co-conspirators and provide particulars regarding Count One.

## PRELIMINARY STATEMENT

A bribery case requires not simply a *quid* and a *quo*, but most critically, a *pro* – that is, an agreement to exchange one thing for another.  In the context of this case, where the government alleges that the "bribe" consisted of campaign contributions rather than personal payments to Mr. Benjamin, the Supreme Court has required an even higher standard:  that the *pro* be explicit.  For decades, and as recently as last month, the Supreme Court has warned that the government must tread most carefully when it regulates or prosecutes alleged activities involving campaign contributions to ensure there is no infringement of the core principles underlying our democracy, and the essential values protected by the First Amendment. Accordingly, to be unlawful, an alleged agreement to exchange campaign contributions for official action must be explicit:  not inferred from ambiguous statements or a chronology of events, but *explicit*, meaning actually, clearly, and unambiguously expressed by the parties.

Yet in this case – which the government rushed to bring against a sitting Lieutenant Governor shortly before a primary election – there is no *pro* at all, much less one that meets this standard.  This is a case that is so aggressive, so lacking in precedent or support in the facts or law, that if allowed to stand it will effectively criminalize, and certainly chill, the kinds of lawful interactions between our elected officials and their constituents that happen every day

in this country, and which the Supreme Court has said are a "central feature of our democracy." *Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022).  The alleged "bribe" (the *quid*) consists solely of campaign contributions (as opposed to cash, gifts, or other personal benefits), and the official action allegedly procured (the *quo*) is legitimate constituent services, namely a $50,000 state grant to a nonprofit benefiting underserved schoolchildren in Mr. Benjamin's district.  The alleged *pro* tying these two lawful acts together depends entirely on strained inferences the government tries to draw from the timeline of events set forth in the indictment and the highly ambiguous alleged statement by Mr. Benjamin at a meeting in March 2019, also described in the indictment, "Let me see what I can do."  This is precisely the kind of case that the Supreme Court, and many other courts following its seminal decision in *McCormick v. United States*, 500 U.S. 257 (1991), have said cannot and should not be prosecuted.

There are five counts in this indictment, all of them contingent on the government's core allegation of a bribery scheme involving Mr. Benjamin and Gerald Migdol, the government's principal cooperating witness.  Count One charges conspiracy to commit bribery and honest-services wire fraud (18 U.S.C. § 371); Count Two charges bribery (18 U.S.C. § 666(a)(1)(B)); and Count Three charges honest-services wire fraud (18 U.S.C. §§ 1343 and 1346).  The government has acknowledged that its bribery theory and the relevant allegations purportedly supporting it are laid out in the indictment.  Accepting those allegations as true for purposes of this motion, the government has failed to allege a *quid pro quo*, let alone, an explicit *quid pro quo*.  Accordingly, the prosecution has failed to allege a bribery scheme under the relevant statutes, and the Court should dismiss these counts pursuant to *McCormick* and its progeny, as other courts have done at the indictment stage, even in cases where the allegations of a *quid pro quo* were much stronger than they are here.

Counts Four and Five also should be dismissed.  Both charge falsification of records in violation of 18 U.S.C. § 1519, under the theory that Mr. Benjamin falsified records with the intent to impede or obstruct an investigation that was within the jurisdiction of the United States Department of Justice.  The alleged investigation Mr. Benjamin purportedly intended to obstruct was a federal bribery investigation, which the indictment alleges was "contemplated" by Mr. Benjamin, but did not yet in fact exist.  Count Four is predicated on the allegation that Mr. Benjamin did so by accepting campaign contribution checks that Migdol had made out in the name of close family members so as to conceal Migdol's connection to the alleged bribery scheme, and by directing Migdol to fill out forms relating to those contributions. Count Five is based on the allegation that Mr. Benjamin did not mention his interactions with Migdol on a form Mr. Benjamin filled out in connection with his appointment as Lieutenant Governor.  Neither act, as alleged, has any demonstrable connection to a bribery investigation. Moreover, as the indictment fails to allege that Mr. Benjamin committed bribery in the first place, it provides no basis for the claim that Mr. Benjamin believed he was committing bribery, much less that he contemplated or knowingly intended to obstruct a potential future investigation into a non-existent bribery scheme by the Department of Justice.  The allegations underlying Counts Four and Five, therefore, are far too vague and attenuated to support a violation of § 1519, and those counts should also be dismissed.

We respectfully submit that this case should proceed no further given the fatal deficiencies of the charges in the indictment.  If it is permitted to proceed, however, the government must provide additional information and discovery so that the defense may adequately prepare for trial.  In particular, we ask that the Court compel the government to provide ███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████.

       Clearly, these events are highly relevant to the case and Mr. Benjamin's defense,

and any information (whether written or otherwise) in the government's possession, custody, or

control ███████████████████████████████████████████████

█████████████████ constitute *Brady* material to which Mr. Benjamin is entitled. ██████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████. The government has nonetheless refused to produce

materials in response to our requests, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. Should the Court decline to dismiss the indictment in

its entirety, we respectfully request that it compel the government to produce this information.

Finally, while the conspiracy alleged in Count One is presumably tied to the same

allegations underpinning Counts Two and Three, the government has refused to confirm as

much, and thus left open the possibility that they will attempt to unfairly surprise the defense at

trial.  The government has thus far produced to the defense nearly eight-hundred thousand

documents and 2.6 terabytes of data, dating back more than 10 years, and identified dozens of

potential witnesses.  Yet the prosecution has declined to identify the alleged conspirators (as is

regularly done in this District where, as here, there are no allegations of violence or security

concerns), forcing the defense to comb through a massive data dump to try to speculate who, if

anyone, the prosecution alleges was a co-conspirator beyond Migdol and Mr. Benjamin.  The

government has similarly refused to say whether they will seek at trial to prove up as "bribes"

any contributions or benefits other than those identified in the indictment, or as "official acts"

anything other than the state grant to a nonprofit that the indictment alleges Mr. Benjamin

procured for Migdol.  All of this is information that courts have required the government to

produce as part of a bill of particulars in similar circumstances, and should be produced here.

## **BACKGROUND**

### I.      **The Allegations In The Indictment**

On April 12, 2022, a mere 67 days before early voting was scheduled to begin in

the New York State primary election, the government filed a five-count indictment against Mr.

Benjamin (the "Indictment"), then sitting Lieutenant Governor and candidate for that office on the primary ballot. (*See* Dkt No. 18). The charges in the Indictment stem from a purported bribery scheme relating to Mr. Benjamin's 2021 primary campaign for New York City Comptroller. At the time of that campaign, Mr. Benjamin was serving as a New York State Senator, representing District 30, which includes Harlem and surrounding neighborhoods. Mr. Benjamin solicited contributions to his Comptroller campaign from Gerald Migdol – a longtime supporter of Mr. Benjamin and Harlem businessman and philanthropist. Around the same time, in his capacity as a state senator, Mr. Benjamin allocated a grant of state funds to a nonprofit organization supported by Migdol, which provided sorely needed school supplies and other resources to public school students in Mr. Benjamin's senate district. The Indictment purports to allege this was a corrupt exchange – campaign contributions for state funding – and based on that premise charges Mr. Benjamin with, among other things, conspiracy to commit bribery and honest services fraud (Count One – 18 U.S.C. § 371), bribery (Count Two – 18 U.S.C. § 666), and honest-services wire fraud (Count Three – 18 U.S.C. §§ 1343 and 1346).

Yet nowhere in the 20-plus page speaking indictment is there any allegation of an explicit *quid pro quo* between Mr. Benjamin and Migdol. Instead, the claim there was a corrupt exchange of campaign contributions for grant funding is based on an ambiguous statement purportedly made by Mr. Benjamin and an alleged chronology of events spanning several months that shows only that Mr. Benjamin allocated funding for the grant long before he received any contributions from Migdol for his Comptroller campaign.

According to the Indictment, the bribery scheme was set in motion during a meeting on March 8, 2019 between Mr. Benjamin and Migdol in the latter's home. During that

meeting, the Indictment alleges that Mr. Benjamin told Migdol[1] he planned to run for New York City Comptroller and asked Migdol to "procure" small dollar contributions for his Comptroller campaign.  (Ind. ¶ 9).  When Migdol seemingly demurred – allegedly advising Mr. Benjamin that (i) he "did not have experience bundling political contributions in this manner;" (ii) his "fundraising efforts were focused" on his nonprofit;[2] and (iii) his "ability to procure" contributions for Mr. Benjamin's Comptroller campaign "was limited, in part because potential donors" from whom he was "likely to solicit contributions were the same donors" from whom he had "solicited and intended to further solicit contributions" for his nonprofit organization – the Indictment alleges that Mr. Benjamin offered the vague response, "Let me see what I can do." (Ind. ¶ 9).

There is no allegation in the Indictment – nor could there be – that at that meeting either man contemplated, much less explicitly agreed, that Mr. Benjamin would allocate state funds to Migdol's nonprofit in exchange for Migdol procuring contributions for Mr. Benjamin's Comptroller campaign.  Indeed, as the Indictment alleges, it was not until May 30, 2019 that Mr. Benjamin learned he had additional discretionary funding to allocate to nonprofits in his district (such as Migdol's) for educational purposes.  (Ind. ¶ 13).  On that day, according to the Indictment, "the senate's Majority Leader and senate staff informed certain senators," including Mr. Benjamin, "that they had been awarded additional discretionary funding that each could allocate to organizations in their districts for specified purposes."  (*Id.*).  That funding included, among other things, "up to $50,000" that Mr. Benjamin "could allocate to school districts, libraries, or non-profit organizations for educational purposes."  (*Id.*).  When he purportedly

---

[1]     Migdol is identified in the Indictment as "CC-1."

[2]     The nonprofit is identified in the Indictment as "Organization-1."

advised Migdol the following day that he "intended to procure a $50,000 grant" for Migdol's nonprofit, (Ind. ¶ 14), the Indictment does not allege that Mr. Benjamin placed any conditions on his effort to obtain the grant or otherwise linked it to the Comptroller campaign contributions the two men purportedly had discussed in March, nearly three months earlier.

Nor is there any allegation that Mr. Benjamin made any demands of Migdol when he notified him weeks later on June 20, 2019 that the senate had approved a resolution reflecting the $50,000 grant.  (Ind. ¶¶ 16, 17).  When Mr. Benjamin allegedly sent Migdol a screenshot of the resolution asking, "Do you recognize the 3rd entity on the list," Migdol responded, "I do very much – does it mean what I'm hoping?"  In response, Mr. Benjamin simply "confirmed, in part, 'Oh yes it does.  We passed the resolution yesterday!  $50k. [. . .]  I will call to discuss!"  (Ind. ¶ 17).

Instead, the Indictment alleges that some two weeks later, on July 9, 2019, Migdol met Mr. Benjamin at his senate district office in Harlem and provided Mr. Benjamin with three checks totaling $25,000 for his Senate campaign – that is, not the small-dollar contributions that purportedly had been the subject of their March meeting.  (Ind. ¶ 18).  During that meeting, the Indictment alleges that Mr. Benjamin "reminded" Migdol about the state grant and that he "still expected" Migdol "to procure numerous small contributions for his Comptroller Campaign." (Ind. ¶ 18).  But the Indictment does not allege that Mr. Benjamin explicitly connected the two, or threatened to now withhold or cancel the grant if Migdol did not secure the desired contributions.

Similarly, there is no allegation that, on September 12, 2019, when Mr. Benjamin presented Migdol and the nonprofit organization with "an oversized novelty check in the amount of $50,000" either man said anything about campaign contributions.  (Ind. ¶ 20).  And while the

Indictment alleges that, from October 2019 to January 2021, Migdol made "numerous contributions to the Comptroller Campaign, many of which were fraudulent," insofar as they were made in the names of persons who had not authorized or personally funded the contributions, or had been reimbursed, it does not allege that Migdol and Mr. Benjamin discussed the $50,000 grant in October or ever again.  (Ind. ¶ 22).  Nor does the Indictment charge Mr. Benjamin with this straw-donor scheme alleged against Migdol.

Despite the lack of any allegation of an explicit *quid pro quo* – or perhaps to obscure this failing – the Indictment goes on to charge two additional counts related to the purportedly corrupt exchange.  Count Four of the Indictment charges Mr. Benjamin, pursuant to 18 U.S.C. § 1519, with falsifying the donation forms accompanying the Senate campaign contribution forms that Migdol provided at a July 8, 2019 meeting, intending to impede or obstruct a hypothetical investigation by the Department of Justice.  According to the Indictment, Mr. Benjamin "direct[ed]" Migdol to provide information indicating the contributions were made by others, when in fact Mr. Benjamin "knew" those contributions were made and funded by Migdol, and that he did so with the intent to obstruct any future investigation of the alleged bribery scheme.  (Ind. ¶ 42).

Count Five likewise charges Mr. Benjamin pursuant to § 1519 with falsification of records, this time predicated on his submission of an executive appointment questionnaire in August 2021, when he was under consideration for appointment as Lieutenant Governor.  The Indictment alleges that in his response to that questionnaire Mr. Benjamin indicated he had never "directly exercised" his governmental authority "concerning a matter of a donor" he had directly solicited, when in fact he had "procured" the $50,000 grant for the nonprofit organization supported by Migdol, "whom he had repeatedly solicited."  (Ind. ¶¶ 30, 44).  As with Count

9

Four, Count Five alleges that Mr. Benjamin made this purportedly false statement in his questionnaire in an effort to hamper any potential future investigation of his allegedly corrupt exchange with Migdol.  (Ind. ¶ 44).

All of the charges in the Indictment thus rest on the claim there was a corrupt exchange of campaign contributions for a state grant.  And that claim rests not on any alleged explicit agreement between Migdol and Mr. Benjamin to trade this for that, but on a chronology that can be summed up as follows:

| Date | Allegation | Indictment ¶ |
|---|---|---|
| June 2017 | Mr. Benjamin took office as a New York senator representing District 30. | 3 |
| March 8, 2019 | Mr. Benjamin and Migdol had a meeting at Migdol's home. Mr. Benjamin asked Migdol to procure numerous small contributions for his planned Comptroller campaign. Migdol stated that he had no experience doing so; that his fundraising efforts were focused on his nonprofit; and that his ability to procure contributions was limited because potential donors were the same as those who donated to his nonprofit. Mr. Benjamin responded, "Let me see what I can do." | 9 |
| May 30, 2019 | Mr. Benjamin learned that he had additional discretionary funding available to direct to organizations in his district, including $50,000 for schools, libraries, or nonprofits focused on education (as was Migdol's nonprofit). | 13 |
| May 31, 2019 | Mr. Benjamin told Migdol that Mr. Benjamin intended to procure a $50,000 grant for Migdol's nonprofit. | 14 |
| June 3, 2019 | One of Mr. Benjamin's senate staffers submitted a request form from Mr. Benjamin to allocate $50,000 in discretionary funding to Migdol's nonprofit. | 15 |
| June 19, 2019 | The New York Senate approved a $50,000 allocation to Migdol's nonprofit. | 16 |
| June 20, 2019 | Mr. Benjamin texted Migdol to tell him the Senate approved the allocation to Migdol's nonprofit. | 17 |
| July 8, 2019 | At a meeting at Mr. Benjamin's office, Migdol gave Mr. Benjamin three check donations totaling $25,000 for Mr. Benjamin's Senate (i.e. not his Comptroller) campaign, made in the name of two of Migdol's family members and an LLC Migdol controlled.  Migdol filled out three campaign contribution forms at Mr. Benjamin's request.  Mr. Benjamin | 18 |

| Date | Allegation | Indictment ¶ |
|------|-----------|--------------|
| | "reminded" Migdol of the $50,000 grant, and that he still "expected" Migdol to procure numerous small contributions for his Comptroller campaign. | |
| September 12, 2019 | At a fundraiser for Migdol's nonprofit, Mr. Benjamin presented Migdol with an oversized novelty check for $50,000 for Migdol's nonprofit. | 20 |
| September 19, 2019 | Mr. Benjamin filed with the Campaign Finance Board to announce his potential candidacy for City Comptroller and indicated that he would participate in the city's matching funds program. | 6, 21 |
| October 2019 | Mr. Benjamin called Migdol and "specified the types of contributions that [he] expected [Migdol] to procure," including that they should be no more than $250 each, and paid by check or money order. | 21 |
| October 2019 to January 2021 | Migdol provided numerous contributions, including some fraudulent ones, to Mr. Benjamin's Comptroller campaign. Mr. Benjamin periodically communicated with Migdol about his fundraising efforts. | 22 |

**II.** ████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████







## <u>ARGUMENT</u>

**I.      Counts One, Two, And Three Should Be Dismissed Because The Indictment Fails To Allege An Explicit *Quid Pro Quo***

      This is the most aggressive purported political bribery case ever attempted.  It flies in the face of well-established Supreme Court precedent, and the government's own recognition of the extremely high bar it must clear to allege bribery and honest services fraud, based on nothing more than campaign contributions and routine government services.  Given the prosecutions that courts have dismissed based on far more egregious facts, it is hard to understand why the government has overreached so dramatically here, bringing a case against a sitting Lieutenant Governor where the alleged official action indisputably benefited a community nonprofit.  Most significantly, as the Supreme Court made clear in the seminal case *McCormick*, 500 U.S. at 272, this prosecution poses a direct threat to the most fundamental principles underlying our democratic system – that our elected officials can and should be responsive to the interests and needs of their constituents, who in turn can and should show their support for actions they approve of, including by providing campaign contributions.

      In *McCormick*, the Court could not have provided clearer guidance about the line that should never be crossed in prosecutions of our elected representatives:

> Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." ***To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation***.

*Id.* at 272 (emphasis added).  As if speaking about this very case, the Court went on to state:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator.  It is also true that campaigns must be run and financed.  Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done.

*Id*.  To protect legitimate fundraising from prosecutorial overreach, the Court required that the government show an *explicit quid quo pro* between politician and constituent – mere inference is not enough.  *See id.* at 273 (receipt of payments unlawful only when "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act").  The Court dealt in *McCormick* with the extortion statute, but the principles underlying its holding apply equally to bribery cases, including to the very statutes at issue here, as decisions since *McCormick* have held and the government itself has conceded.

This core principle protecting lawful fundraising from government overreach has been repeatedly and recently reaffirmed by the Supreme Court, which has described the "influence and access" that come with campaign contributions as a "central feature of [our] democracy," and said that the First Amendment "has its fullest and most urgent application

precisely to the conduct of campaigns for political office." *Ted Cruz for Senate*, 142 S. Ct. at 1649-50 (quoting *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971)).

In this case, the government is attempting to do exactly what the First Amendment so clearly forbids. The government is pursuing bribery charges based on facts that do not come close to meeting what the law requires, in circumstances that are without precedent. As alleged in the Indictment, the scheme turns on a March 8, 2019 meeting between Mr. Benjamin and Migdol, during which the two discussed potential fundraising for Mr. Benjamin's City Comptroller campaign. The government does not allege that Migdol promised or agreed to raise funds for Mr. Benjamin, or that Mr. Benjamin promised or agreed to do anything for Migdol. Instead, the government's case is constructed entirely on a series of inferences that the prosecution hopes will be drawn from the chronology of events following the meeting, and the vague statement purportedly made by Mr. Benjamin, "Let me see what I can do."

The allegations in the Indictment come nowhere close to satisfying the explicit *quid pro quo* requirement established by *McCormick* and its progeny to safeguard core democratic principles and First Amendment values. The Second Circuit has made clear that an "explicit" *quid pro quo* means what it says: an "express" quid pro quo. *United States v. Ganim*, 510 F.3d 134, 142-43 (2d Cir. 2007). Other courts have similarly described it as "clear and unambiguous," and have, in two recent cases, dismissed indictments where the government's case was similarly premised on an improper theory that did not allege an explicit *quid pro quo*. *See United States v. Donagher*, 520 F. Supp. 3d 1034, 1045 (N.D. Ill. 2021); *United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D.N.J. 2015). The allegations here are far weaker than in those cases, utterly fail to allege an explicit *quid pro quo*, and leave no doubt that dismissal of Counts One, Two, and Three is required.

16

A.      An Indictment Must Be Dismissed When The Facts Alleged Do Not
        Constitute a Crime

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by

pretrial motion any defense, objection, or request that the court can determine without a trial of

the issue."  Fed. R. Crim. P. 12(b); *see also United States v. Covington*, 395 U.S. 57, 60–61

(1969) (holding that where determinative questions of law were decided in his favor, defendant

was entitled to dismissal of indictment); *United States v. Bodmer*, 342 F. Supp. 2d 176, 189

(S.D.N.Y. 2004) (dismissing indictment on the ground that statute contravened the constitutional

fair notice requirement).  Because federal crimes are "solely creatures of statute," *Dowling v.*

*United States*, 473 U.S. 207, 213 (1985) (internal quotation marks omitted), "a federal indictment

can be challenged on the ground that it fails to allege a crime within the terms of the applicable

statute," *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012).  "[A] claim that an

indictment does not charge an offense may be raised at any time, and may be considered by a

court *sua sponte*."  *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000).

In considering the Indictment, the Court accepts all pertinent allegations as true.

*United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  Where, as here, the government

has set out detailed allegations in the indictment, the Court must dismiss the Indictment if those

allegations, even if true, do not establish criminal liability.  *See, e.g., United States v. Pirro*, 212

F.3d 86, 92 (2d Cir. 2000) (dismissing tax fraud and perjury counts because conduct alleged in

indictment did not violate applicable statute); *Aleynikov*, 676 F.3d at 76-79 (dismissing

indictment because transferring proprietary computer source code, as alleged in indictment, did

not constitute offense under National Stolen Property Act); *United States v. Heicklen*, 858 F.

Supp. 2d 256, 275-76 (S.D.N.Y. 2012) (dismissing indictment where facts alleged did not

constitute the crime of attempting to influence the actions of a juror); *United States v. Kerik*, 615

17

F. Supp. 2d 256, 271-74 (S.D.N.Y. 2009) (dismissing false statement charge based on allegations in the indictment because defendant's alleged failure to disclose information in response to a question that the court determined was "fundamentally ambiguous" was not a crime as a matter of law. As Judge Wood wrote in dismissing an indictment where it was clear that the factual allegations did not suffice to constitute a violation of the charged statute, "Indeed, it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what the facts it was able to establish at trial." *Heicklen*, 858 F. Supp. 2d at 262 n.5.

Here, the government has conceded that the Indictment sets forth the detailed basis for the crimes alleged. In a May 20, 2022 letter responding to our request for further particulars, the government relied on the fact that the Indictment "contains detailed allegations specifying the crimes charged," and confirmed that the Indictment "lays out clearly the prosecution's theory," and that, with the search warrant affidavits turned over in discovery "make clear exactly what is said in the indictment is the prosecution's theory." (Letter from U.S. Attorney's Office to Barry Berke (May 20, 2022) ("May 20 Gov't Response") (Berke Decl. Ex. E)). For all the reasons set forth below, those "detailed allegations" in the Indictment that "lay[]" out clearly the prosecution's theory" do not come close to alleging the "explicit" *quid pro quo* required by *McCormick* to avoid trampling the core democratic and First Amendment principles central to our system of representative government.

> B.   Bribery Charges Based On Campaign Contributions Must Allege An Explicit *Quid Pro Quo* To Constitute A Crime And Avoid Violating Bedrock Democratic And First Amendment Principles

> 1.   *The Democratic and First Amendment Principles at Stake*

This is a rare case where the government has chosen to prosecute campaign contributions as bribes. There is a reason campaign contribution cases are so rarely, if ever,

brought:  Doing so absent an explicit corrupt scheme risks upending the fundraising system that

underlies our representative democracy.  This case therefore implicates democratic and First

Amendment values that lie at the heart of our political process.  The Supreme Court has made

clear that political contributions are protected speech, and that there is a difference between

lawful "influence or access" by donors, on the one hand, and corrupt *quid pro quo* arrangements,

on the other.  Last month, in reiterating the importance of this distinction, the Court reaffirmed a

principle that it has stated time and again:

> As we have explained, influence and access "embody a central
> feature of democracy—that constituents support candidates who
> share their beliefs and interests, and candidates who are elected can
> be expected to be responsive to those concerns."  ***To be sure, the
> "line between* quid pro quo *corruption and general influence may
> seem vague at times, but the distinction must be respected in order
> to safeguard basic First Amendment rights."  And in drawing that
> line, "the First Amendment requires us to err on the side of
> protecting political speech rather than suppressing it."***

*Ted Cruz for Senate*, 142 S. Ct. at 1653 (emphasis added) (quoting *McCutcheon v. Fed. Election

Comm'n*, 572 U.S. 185, 192, 209 (2014)).  In *Citizens United v. Fed. Election Comm'n*, the

Court similarly observed that "[t]he fact that [donors] may have influence over or access to

elected officials does not mean that these officials are corrupt."  558 U.S. 310, 359 (2010).  In

*McCutcheon v. Fed. Election Comm'n*, it explained that ingratiation and access "embody a

central feature of democracy—that constituents support candidates who share their beliefs and

interests, and candidates who are elected can be expected to be responsive to those concerns."

572 U.S. 185, 192 (2014).

   In *McDonnell v. United States*, the Court overturned the bribery convictions of the

former governor of Virginia and his wife, despite their acceptance of loans and gifts from a

businessman seeking business with the state, finding that "[t]he basic compact underlying

representative government assumes that public officials will hear from their constituents and act appropriately on their concerns."  579 U.S. 550, 575 (2016).  While that case turned on what constitutes an "official act" under the bribery statute, the Court spoke directly to what the government is trying to do in this prosecution:

> In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*.
>
> But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time.  The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ballgame.  Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.
>
> This concern is substantial.  White House counsel who worked in every administration from that of President Reagan to President Obama warn that the Government's "breathtaking expansion of public-corruption law would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties."  Six former Virginia attorneys general—four Democrats and two Republicans—also filed an *amicus* brief in this Court echoing those concerns, as did 77 former state attorneys general from States other than Virginia—41 Democrats, 35 Republicans, and 1 independent.

*Id.* at 575 (internal citations omitted); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in part and dissenting in part) ("Favoritism and influence are not . . . avoidable in representative politics.").

As all of these decisions explicitly or implicitly recognize, prosecution of political figures based on campaign contributions poses great risks to our democracy. Constituents give money to their representatives in the hopes that they will take particular actions and pursue an agenda that aligns with their interests. It is not a crime when elected officials take actions that are supported by those who have contributed to their campaigns and advocated for those actions. Bribery prosecutions in this context threaten to elide the distinction between legitimate political activity and truly corrupt bargains – and without a clear line between the two, candidates and constituents alike will hesitate in engaging in the former for fear of criminal prosecution.

This is a fact that the very office pursuing this case has previously acknowledged. Five years ago, in the face of similar legal and factual challenges, the Acting United States Attorney for the Southern District of New York publicly explained the reasons the Office was declining to prosecute the then mayor of New York after an extended investigation of the mayor's fundraising activities, issuing the following statement:

> In considering whether to charge individuals with serious public corruption crimes, we take into account, among other things, the high burden of proof, the clarity of existing law, any recent changes in the law, and ***the particular difficulty in proving criminal intent in corruption schemes where there is no evidence of personal profit.***

(Press Release, Acting U.S. Attorney Joon H. Kim, Statement on the Investigation into City Hall Fundraising (Mar. 16, 2017), https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-statement-investigation-city-hall-fundraising). Inexplicably, the Office has ignored these concerns by indicting a sitting Lieutenant Governor shortly before an election where there is also "no evidence of personal profit," and there was every reason to proceed with the greatest of caution.

2.      *The Requirements of* United States v. McCormick *and its Progeny*

These core democratic and First Amendment principles are at the heart of the

Supreme Court's decision in *United States v. McCormick*.  There, the government charged the

defendant, a West Virginia legislator, with Hobbs Act extortion[3] in connection with payments he

received during his campaign from a lobbyist.  As a legislator who represented a district with a

shortage of medical doctors, the defendant supported a state program allowing foreign medical

school graduates to obtain temporary practice permits.  When certain members of the legislature

sought to end the program, a lobbyist, on behalf of foreign doctors, worked to extend it.  The

defendant sponsored legislation extending the program, which ultimately passed, and then, after

discussions with the lobbyist, agreed to sponsor future legislation granting permanent medical

licenses.

During his subsequent reelection campaign, the defendant told the lobbyist that

his campaign was "expensive," that he had spent substantial money "[from] his own pocket," and

that he "had not heard anything from the foreign doctors."  500 U.S. at 260.  The lobbyist

responded that he would reach out to the foreign doctors and "see what he could do."  After he

did so, the foreign doctors sent multiple cash payments to the defendant, and the lobbyist

delivered to him an envelope containing nine $100 bills.  *Id.*  The defendant did not list any of

the payments as campaign contributions or report them on his personal tax returns.[4]  He then

sponsored and advocated for the permanent licensing bill, which was passed and signed into law.

---

[3]      *See* 18 U.S.C. § 1951.  The statute defines "extortion" as, among other things, "the
obtaining of property from another, with his consent, . . . under color of official right."

[4]      The cash payments were not listed in the campaign's ledger as contributions; they were
instead "accompanied only by initials or other codes signifying that the money was for" the
defendant.  *Id.* at 260.

Two weeks later, the defendant received another cash payment from the foreign doctors. *Id.* The defendant was charged with extortion and convicted at trial.

The Supreme Court ultimately reversed. Below, the Court of Appeals had adopted a multifactor test to determine whether campaign contributions were "illegitimate, extortionate payments" that looked to factors including "whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor; whether the official had supported legislation before the time of the payment; and whether the official had directly or indirectly solicited the payor individually for the payment." *Id.* at 271-72. The Supreme Court concluded that, even if each of those inquiries went against McCormick "as they very likely [did] in the Court of Appeals' view," he still would not have violated the Hobbs Act. *Id.* at 272. Instead, the Supreme Court held that the receipt of campaign contributions is criminal under the statute "only if the payments are made in return for an ***explicit promise or undertaking*** by the official to perform or not to perform an official act." *Id.* at 273 (emphasis added). The Court further explained, "[i]n such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *Id.* Importantly, the Court set forth the concerns animating its decision, which bear repeating:

> Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." ***To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation***.

*McCormick*, 500 U.S. at 272 (emphasis added).

The rule that *McCormick* established, requiring an explicit *quid pro quo*, has since served to draw a clear line between a corrupt bargain and legitimate campaign fundraising to prevent prosecutors from chilling democratic participation and punishing conduct that is necessary and central to our system of elective government.

Following *McCormick*, the Second Circuit has recognized that when the alleged bribe consists of campaign contributions, the *quid pro quo* must be explicit – which means it has to be "express." *See Ganim*, 510 F.3d at 142-43 (Sotomayor, J.). In *Ganim*, the court made clear that, under *McCormick*, "proof of an *express* promise is necessary when the [allegedly corrupt] payments are made in the form of campaign contributions." *Id*. at 142 (emphasis added). Citing its prior decision in *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993), the court distinguished such cases from those that do not involve campaign contributions. With regard to the latter involving personal benefits, the *quid pro quo* may be "implicit" – that is, it may be "implied from [the official's] words and actions." *Id*. at 414 (citing *Evans v. United States*, 504 U.S. 255, 272–73 (1992) (Kennedy, J., concurring in part and concurring in judgment)).[5] But with regard to campaign-contribution cases, as here, the explicit (or "express," as *Ganim* requires) standard governs.

C.   The Rule In *McCormick* Applies Here

*McCormick* was a Hobbs Act extortion case, but its rule requiring an explicit *quid pro quo* has been recognized to apply equally to federal bribery and honest services fraud cases involving campaign contributions. *McCormick* "placed little reliance upon the text and structure

---

[5]   On this basis, the Second Circuit distinguished *Evans v. United States*, a Supreme Court case which followed M*cCormick* and involved an allegation of bribes that were not campaign contributions, from *McCormick* itself.

of the Hobbs Act itself." *Donagher*, 520 F. Supp. 3d at 1043; *see also McCormick*, 500 U.S. at

277 (Scalia, J., concurring) (explaining that the majority's reasoning is not grounded in the text

of the Hobbs Act).  Instead, "what animated the Court's analysis was concern about

criminalizing everyday interactions between politicians and their constituents." *Donagher*, 520

F. Supp. 3d at 1043.

   Accordingly, courts across the country have applied *McCormick*'s explicit *quid

pro quo* requirement, including at the motion to dismiss stage, to all manner of alleged political

bribery cases involving campaign contributions, regardless of what statute they are charged

under – including the statutes charged in this case, 18 U.S.C. §§ 666 and 1343/1346.  *See

Donagher*, 520 F. Supp. 3d at 1044-45 (granting motion to dismiss bribery charges under 18

U.S.C. § 666 in light of *McCormick*; "the Court concludes that the government must allege an

explicit *quid pro quo*, as an implied element of the offense, where the 'thing of value' under §

666(a)(2) consists of a campaign contribution."); *United States v. Pawlowski*, 351 F. Supp. 3d

840, 849–50 (E.D. Pa. 2018) ("Although *McCormick* involved a prosecution for Hobbs Act

extortion under color of official right, courts have applied its explicit quid pro quo requirement to

prosecutions for honest services fraud and bribery when the thing of value offered in exchange

for an official act is a campaign contribution."); *Menendez*, 132 F. Supp. 3d at 644 (granting

motion to dismiss bribery counts under 18 U.S.C. § 201 for failure to meet *McCormick*'s

"heightened pleading standard" requiring an explicit *quid pro quo*).[6]

---

[6]  *See also United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal
difference between extortion under color of official right and bribery, it would seem that courts
should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in
interpreting the Hobbs Act: absent some fairly explicit language otherwise, accepting a campaign
contribution does not equal taking a bribe unless the payment is made in exchange for an explicit
promise to perform or not perform an official act.").

Indeed, the government has conceded in other cases that *McCormick* applies to prosecutions under 18 U.S.C. §§ 666 and 1343/1346 where the alleged bribe is a campaign contribution.  *See, e.g.*, *Pawlowski*, 351 F. Supp. 3d at 849 ("[T]he parties agree [in a bribery prosecution under § 666] that where the '*quid*' or thing of value offered, is a campaign contribution, the Government must prove a *quid pro quo* that is explicit – i.e., an explicit *quid pro quo*."); *Menendez*, 132 F. Supp. 3d at 641-43 ("The government has not disputed the application of the *McCormick* requirement to the bribery and honest services fraud charges . . . ." (citation omitted)).

D.      The Indictment Does Not Allege the Requisite Explicit *Quid Pro Quo*

The allegations in the Indictment – which, again, the government acknowledges "contains detailed allegations specifying the crimes charged" and "lays out clearly the prosecution's theory" – do not come close to meeting the *McCormick* standard.  The Indictment does not allege that any promises or agreements – explicit, express, or otherwise – were made at the March 8, 2019 meeting between Mr. Benjamin and Migdol (the purported genesis of the bribery scheme), or at any point thereafter.  Indeed, the allegations in this case are far weaker than those in other cases where courts have dismissed the bribery charges at the indictment stage under *McCormick*.

As alleged, the bribery scheme began at a meeting between Mr. Benjamin and Migdol on March 8, 2019.  During that meeting, they allegedly discussed Mr. Benjamin's fundraising efforts for his upcoming race for New York City Comptroller.  According to the Indictment, Migdol told Mr. Benjamin he lacked experience bundling small contributions, his fundraising efforts were focused on his nonprofit, and he thought the potential donors for the Comptroller campaign were likely to be the same donors to the nonprofit.  In response, Mr. Benjamin allegedly said: "Let me see what I can do."  (Ind. ¶ 9).

Accepting the allegations as true, this was far from an explicit agreement to take official action in return for a bribe. In fact, it was no agreement at all. Mr. Benjamin did not agree to obtain a grant for Migdol's nonprofit in return for contributions to his Comptroller campaign, and Migdol did not agree to procure contributions if Mr. Benjamin did so. The two could not have made any such agreement, because, as stated in the Indictment, Mr. Benjamin did not even learn that funding for such a grant would be available until nearly three months after the March 8 meeting, on May 30, 2019. (Ind. ¶ 13). "Let me see what I can do," stated months before the official action in question could even be contemplated, is precisely the kind of ambiguous language at issue in *McCormick* itself. There, after the defendant legislator told the lobbyist that his "campaign was expensive," that he had spent his own funds, and that "he had not heard anything from the foreign doctors," the lobbyist told the defendant (in strikingly similar words to those allegedly used by Mr. Benjamin) that he would contact the doctors and "see what he could do." *McCormick*, 500 U.S. at 260. Indeed, in *McCormick*, there was far more evidence to suggest a corrupt *quid pro quo* than is alleged here. Following the conversation between the lobbyist and the defendant, the defendant received cash contributions from the foreign doctors, which he recorded under codes signifying that the payments were for him personally, rather than contributions for his campaign. *Id.* at 261. The defendant then sponsored and advocated for the desired legislation, and after it passed, received another cash payment. *Id.* at 260.

This kind of vague allusion to future action was also rejected as a basis for bribery charges in *Menendez*, 132 F. Supp. 3d at 644, where the court dismissed multiple counts of the indictment under *McCormick*. There, the 68-page speaking indictment alleged, among other things, that the alleged briber, Melgen, had made substantial political donations to benefit

27

Senator Menendez, "in return for Menendez being influenced in the performance of official acts, as opportunities arose."  Indictment, *United States v. Menendez*, 2:15-Cr-00155 (WHW) (D.N.J. Apr. 1, 2015), ECF No. 457 at ¶¶ 242-49.  The Court held that these allegations did not constitute an explicit *quid pro quo*, but rather amounted to simply a "generalized expectation of some future favorable action barred by *McCormick*," and dismissed them on that basis.  132 F. Supp. 3d at 644 (internal quotation marks and citation omitted); *see also Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (discussing *McCormick* and finding that where campaign contributions are involved, "[v]ague expectations of some future benefit should not be sufficient to make a payment a bribe.").

Here, there is no allegation that Mr. Benjamin and Migdol ever explicitly agreed to exchange contributions for the grant to the nonprofit, during or following the March 8 meeting.  Nearly three months later, Mr. Benjamin allegedly called Migdol to advise that he intended to seek the grant, but there is not even an allegation that Mr. Benjamin sought assurances that he would receive campaign contributions in return, or that Migdol agreed to provide them.  (Ind. ¶ 14).  Subsequently, when the grant was announced, Migdol expressed surprise that his nonprofit had received it.  (Ind. ¶ 17 ("does it mean what I'm hoping?")).  On July 8, Migdol allegedly provided Mr. Benjamin with contributions to his campaign for *senate*, rather than his campaign for Comptroller – the latter being the campaign involving small-dollar contributions that the two men had allegedly discussed at the March 8 meeting, and (under the government's theory) the reason Mr. Benjamin sought to obtain the grant to the nonprofit in the first place.  (*See* Ind. ¶¶ 18-19).  Even still, Migdol did not say that he was making the contributions in return for the grant.  These detailed allegations thus further undercut, rather than

substantiate, any argument that the Indictment alleges an explicit *quid pro quo* agreement on March 8 or any time thereafter.

The sole remaining allegations relating to this issue are two purported statements by Mr. Benjamin, long after the March 8 meeting, and after the grant was announced. At the July 8 meeting where Migdol provided support for his senate campaign, Mr. Benjamin allegedly stated that he "still expected" Migdol to obtain contributions for his Comptroller campaign. (Ind. ¶ 18). And, in October 2019, Mr. Benjamin allegedly called Migdol and "specified the types of contributions that [he] expected [Migdol] to procure." (Ind. ¶ 21). These, too, fall far short of an explicit *quid pro quo*. First, they were made after the grant was announced, and Mr. Benjamin and Migdol are not alleged to have said, during these conversations or any others, that the contributions were to be made in exchange for the grant. Further, while the Indictment alleges that Mr. Benjamin "retained the ability to alter or withdraw" the grant, it does not allege that Mr. Benjamin ever told Migdol that he would do so should Migdol fail to provide campaign contributions. (Ind. ¶ 23).

These kinds of allegations – which depend on speculation and inference – are wholly deficient under *McCormick* and cannot support a bribery indictment. To state the obvious, mere temporal proximity between soliciting a campaign donation, receiving it, and taking official action furthering the interests of the donor cannot establish an explicit *quid pro quo*. *See McCormick*, 500 U.S. at 271-72 (rejecting argument that those factors taken together made a campaign contribution illegal and instead concluding that an explicit *quid pro quo* was required). In the *Menendez* case, where, as cited above, the court dismissed counts from the indictment for failing to comply with *McCormick*, the court dismissed additional bribery counts following presentation of the evidence at trial. *See United States v. Menendez*, 291 F. Supp. 3d

606, 623 (D.N.J. 2018).  As to those counts, the court found as a matter of law that, under

*McCormick*, the government could not ask the jury to simply infer from timing of certain

political contributions to Menendez that they were made in exchange for Menendez's

intervention with executive agencies on the alleged briber Melgen's behalf.  *Id*. at 623–35.  The

court rejected the government's invitation to "infer an explicit *quid pro quo* from 'context'" –

namely that Melgen did not agree to donate until Menendez had set up a meeting for him and

Menendez's support supposedly "escalated" following the donation, *id*. at 627 – holding that "[a]

close temporal relationship between political contributions and favorable official action, without

more, is not sufficient to prove the existence of an explicit *quid pro quo*."  *Id*. at 624 (citing

*United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("The official must agree to

take or forego some specific action in order for the doing of it to be criminal under § 666.  In the

absence of such an agreement on a specific action, even a close-in-time relationship between the

donation and the act will not suffice.")).

      The Seventh Circuit reached the same conclusion in *Empress Casino Joliet Corp.*

*v. Johnston*, 763 F.3d 723, 731 (7th Cir. 2014), a racketeering case relating to bribery allegations

against the former governor of Illinois, Rod Blagojevich.  The Seventh Circuit, citing

*McCormick*, affirmed summary judgment dismissing certain of plaintiffs' claims, because the

predicate bribery allegations rested on inferences to be drawn from the timing of the governor's

support for a bill that benefitted a campaign donor.  Legislative action on the bill had stalled, but

after a meeting between the governor's fundraising aide and the campaign donor, the governor

"began to take an interest in the matter," threw his support behind the bill and signed it into law.

*Id.* at 725, 730.  The donor subsequently sent a "thank you" note and separately made a $125,000

donation to the governor's campaign through various subsidiaries.  *Id.* at 730.  The court found,

as a matter of law, that this was insufficient evidence of a *quid pro quo*, concluding that a suspicious sequence of events alone — inaction, meeting, support, donation — "cannot, without more, support liability for acts of political corruption." *Id.* at 731.  Citing *McCormick*, the court refused to "hold illegal an official's support of legislation furthering the interests of some constituents shortly before or after campaign contributions are solicited and received." *Id.* at 731.

   The allegations in this case no more make out an explicit *quid pro quo* than did the government's allegations in *Menendez* and *Empress Casino*, as they similarly rely on strained inferences the government seeks to draw from Mr. Benjamin's vague statement, "Let me see what I can do," and the chronology of events that followed — rather than an explicit agreement between Mr. Benjamin and Migdol that the contributions were in exchange for and necessary to Mr. Benjamin procuring the $50,000 grant.

   For all of these reasons, the court should dismiss the Indictment and not permit this prosecution to proceed any further.  There is no question that this Court has the authority to dismiss on this basis at the indictment stage.  *See Dongaher*, 520 F. Supp. 3d at 1034 (dismissing counts from indictment under *McCormick*); *Menendez*, 132 F. Supp. at 644 (same).  In *Donagher*, the court dismissed counts charging bribery under § 666 as insufficiently explicit under *McCormick*.  The government alleged that the defendants had bribed county clerks so that they would be hired to collect fines, fees, and other court-related debts owed to the court.  The indictment described a series of interactions between the defendants and clerk reflecting that the defendants had increased their contributions above those of competing debt-collectors in order to obtain additional business from the county.  In one instance, the indictment alleged that one of the defendants had made additional payments because a clerk had "busted [his] stones and said

[another debt-collection company] ponied up another 10K." *Dongaher*, 520 F. Supp. 3d at 1041. In another instance, after a clerk told the defendant that a competing debt-collector had contributed a certain amount to her campaign, the defendant directed his employees to give that same amount "plus a dollar," and subsequently hosted a birthday party in her honor. *Id.* According to the indictment, the defendant even told his political lobbyist that "we made a shitload of [election] calls for [the Clerk]. Have you all received the numbers we requested to make sure everything is equal?" *Id.* The court dismissed the indictment under *McCormick*. In its view, a reader of the indictment could "plausibly infer that Defendants gave their contributions with the mere hope that the Clerk would confer favorable treatment upon [the defendants' company] in return, without any understanding or agreement as to how their efforts would be received." *Id.* at 1046. Having reviewed and considered the facts alleged in the indictment, the court held that the government had failed to allege an explicit *quid pro quo*, which, under *McCormick*, must be "clear and unambiguous, leaving no uncertainty about the terms of the bargain." *Id.* at 1045.

Even though the allegations in *Donagher* suggested a much closer link than here between contributions and official action – including conduct and statements creating a strong inference that the bribers were increasing their contributions in order to win business with the county – those allegations fell short under *McCormick*. The allegations in this case depend on inferences that are far more attenuated and a statement that is far more ambiguous than those at issue in *Donagher*. Accordingly, the Indictment must be dismissed for failure to allege an explicit *quid pro quo*. As in *Donagher*, "doing so is necessary to shield ordinary, constitutionally protected campaign financing activities from criminal prosecution." *Id.* at 1046 (citing *McCormick*, 500 U.S. at 271-73).

32

* * *

In the three decades since *McCormick*, the Supreme Court has carefully policed the line between corrupt *quid pro quo* arrangements and legitimate fundraising.  By failing to allege any agreement between Mr. Benjamin and Migdol to exchange campaign contributions for official action – much less an explicit agreement – the government's Indictment in this case utterly disregards that line, at the expense of core democratic principles and the First Amendment.  Dismissal is not only clearly warranted under *McCormick,* it is also necessary to remedy the chilling effect – what the Supreme Court has called the "pall of potential prosecution," *McDonnell*, 579 U.S. at 575 – that the government's decision to proceed with this case will otherwise have on lawful interactions between representatives and their constituents.  Indeed, dismissal is required to comply with the Supreme Court's admonition, disregarded by the government, that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office."  *Cruz*, 142 S. Ct. at 1649.

Counts One, Two, and Three should be dismissed.

## II.  Counts Four And Five Fail To Allege A Violation Of § 1519 And Should Therefore Be Dismissed

Counts Four and Five – which charge Mr. Benjamin, pursuant to 18 U.S.C § 1519, with knowingly making a false entry in a record with the intent to impede an investigation – should also be dismissed.  As set forth in the Indictment, the government alleges that Mr. Benjamin aided and abetted falsification of campaign donor forms (Count Four) and provided false information on a state government vetting form (Count Five) in order to conceal the alleged bribery scheme charged in Counts One through Three.  The government's charges here are similarly aggressive and unprecedented – no contemporaneous or actual investigation into the scheme is alleged, and the government's theory is entirely inferential and speculative that Mr.

Benjamin contemplated and intended to impede a potential and hypothetical future bribery investigation within Department of Justice jurisdiction.

Accepting the factual allegations in the Indictment as true, the government has failed to allege a violation of § 1519; or if deemed to have done so, the government has charged § 1519 in a manner that is so attenuated that it is unconstitutionally vague and improper.  As set forth in Point One, the Indictment fails to allege a bribery scheme and Mr. Benjamin's alleged conduct constitutes lawful interactions between a representative and a constituent, protected under the First Amendment.  As the Indictment fails to allege that Mr. Benjamin committed bribery in the first place, it alleges no basis for the claim that Mr. Benjamin believed he was committing bribery, much less that he contemplated or knowingly intended to obstruct a potential future investigation into a non-existent bribery scheme under § 1519.  For this reason, Counts Four and Five should be dismissed.

A.      Background To Counts Four and Five

After describing the alleged bribery scheme, the Indictment alleges that Mr. Benjamin "engaged in a series of lies and deceptions to cover up [the bribery scheme], including by falsifying campaign donor forms . . . and providing false information in vetting forms [Mr. Benjamin] submitted while under consideration to be appointed the next Lieutenant Governor of New York State."  (Ind. ¶ 2).  More specifically, Counts Four and Five charge Mr. Benjamin under § 1519 based on two discrete events in July 2019 and August 2021, neither of which, accepting the allegations as true, had any demonstrable connection to a federal bribery investigation – existing or future.

The allegations underlying Count Four, set forth in paragraphs 18-19 and 42 of the Indictment, describe a July 8, 2019 meeting at which Migdol provided campaign contribution

checks to Mr. Benjamin in the names of two relatives ███████████████████[7] and a

company he owned and controlled.  The Indictment alleges that Migdol in fact funded the

contributions, but made them in the names of ████████████████ in an effort "to conceal

any connection between [Migdol] and the contributions."  (Ind. ¶ 19).  The inference the

government apparently seeks from this allegation is that Migdol sought to hide from future

investigators his connection to the contributions in order to conceal his involvement in the

bribery scheme alleged in Counts One through Three.  This inference is already highly

attenuated given that the checks were in the names of close relatives, and easily traced to Migdol.

It is even more attenuated as to Mr. Benjamin, who is alleged to have aided and abetted Migdol's

obstruction by simply accepting the checks, giving Migdol forms to fill out in connection with

the contributions, and instructing Migdol "to provide additional information on the forms

regarding" his family members.  (Ind. ¶ 19).  The basis for the allegation that Mr. Benjamin

knew that Migdol was seeking to conceal his connection to the contributions in order to distance

himself from a potential bribery investigation is that Migdol provided Mr. Benjamin with

"information concerning [██████████████] that made clear to Benjamin that the

contributions were funded not by [████████████████], but by [Migdol]."[8]  (Id.).

---

7 ████████████████████████████████████████
███████████████████████████████████████████
███████████████████████

8 ████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

The allegations relating to Count Five, set forth in paragraphs 30-31 and 44, relate to an "executive appointment questionnaire" that Mr. Benjamin is alleged to have submitted on August 17, 2021 to the New York State Office of General Services when he was under consideration for appointment as Lieutenant Governor.  Among other things, Mr. Benjamin is alleged to have indicated on the questionnaire that he had never "directly exercised [his] governmental authority (either as a Legislator or Executive official) concerning a matter of a donor [he] directly solicited."  (Ind. ¶ 30).  The Indictment alleges that this was false because of Mr. Benjamin's "direct solicitation of political contributions from [Migdol] and his exercise of official authority to allocate the State Grant to [Migdol's nonprofit]."  (*Id.*).  Again, the form itself has no alleged connection to a federal bribery investigation (or to the federal government at all), and the attenuated inference the government apparently seeks is that Mr. Benjamin knowingly did not mention Migdol because he believed the two men had been involved in a bribery scheme that he hoped to conceal from a potential future federal investigation.

B.    Argument

Based on the allegations in the Indictment – which, again, the government has said "contains detailed allegations specifying the crimes charged" and "lays out clearly the prosecution's theory," (May 20 Gov't Response (Berke Decl. Ex. E)) – Counts Four and Five charge Mr. Benjamin with violating 18 U.S.C. § 1519.  The statute provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any

such matter or case, shall be fined under this title, imprisoned not
more than 20 years, or both.

While the language of the statute, read literally, is expansive – potentially applying to obstructive

conduct "in relation to" a matter within the jurisdiction of the federal government – courts have

made clear that it must be applied more narrowly, or else it would be unconstitutionally vague.

A statute is unconstitutionally vague if it does not "define the criminal offense with sufficient

definiteness that ordinary people can understand what conduct is prohibited and in a manner that

does not encourage arbitrary and discriminatory enforcement." *United States v. Scott*, 979 F.3d

986, 993 (2d Cir. 2020) (internal quotation marks and citation omitted). The Second Circuit has

held that, to be constitutional, the statute must be interpreted to require that a defendant

"knowingly act with the intent to impede an investigation." *See id.* While an investigation does

not have to be pending at the time of the conduct at issue, it has to be actually "contemplated" by

the defendant, and the defendant has to intend to impede it. *See also United States v. Kernell*,

667 F.3d 746, 753 (6th Cir. 2012); *United States v. Fattah*, 223 F. Supp. 3d 336, 371-72

(E.D. Pa. 2016).

Thus, for example, in *United States v. Scott*, the court upheld the application of §

1519 in a prison assault case, where the defendant supervisory prison guard directed the guards

she supervised to falsify and fabricate evidence to make it appear as if the victim of the assault

was in fact the aggressor. 979 F.3d at 993. While there was no evidence of an existing federal

investigation, it was clear in the context of that case – where the defendant falsified evidence that

would be used in an investigation into a prison assault – that the defendants contemplated and

intended to impede a future investigation. The Court concluded "that the statute was not vague

as applied to Scott's conduct, which involved the filing of a false injury report and the

orchestration of false use-of-force reports and photographs designed to mislead prison

administrators and others into believing that Moore was the aggressor, as opposed to the victim, of a brutal assault." *Id.* at 993.  In reaching its decision, the court explained that "any person of ordinary intelligence – let alone a [law enforcement officer] – would comprehend that this statute prohibits . . . officer[s] from knowingly writing a false report with the intent to impede an ongoing, or future, investigation." *Id.* (alterations in original).  The court has upheld the application of the statute in similar cases, where it was clear from the defendant's conduct that he contemplated and intended to impede an investigation of a matter within the jurisdiction of the federal government.  *See United States v. Gray*, 642 F.3d 371, 378-79 (2d Cir. 2011) (affirming conviction under § 1519 where defendant prison guards assaulted inmate then falsified reports and lied to investigators; "There was an ample basis to conclude that the defendants, as officers at a facility that housed federal prisoners, were aware of DOJ's policy of investigating allegations of excessive force at [the facility].").

        While the Second Circuit has found that § 1519 does not require a "nexus" – what the Supreme Court has called a "relationship in time, causation, or logic," *United States v. Aguilar*, 515 U.S. 593, 599 (1995) – between a defendant's conduct and an "official proceeding," *see Gray*, 642 F.3d at 375, this does not mean that the statute's potential application is unbounded.  Section 1519 speaks of an "investigation" rather than an "official proceeding," and there must be a demonstrable connection between the defendant's conduct and an investigation, whether past, present, or future; indeed, the government must prove that the defendant contemplated and intended to impede it.  The conduct the government has alleged in this case is so far removed from any applicable investigation that the government has failed to allege a violation of the statute.  The fundamental premise underlying Counts Four and Five is that Mr. Benjamin was actually involved in a bribery scheme, knew he was involved in that scheme, and

was concerned that at some point in the future the scheme would be investigated by federal law enforcement.  As demonstrated in Point One, this is a faulty premise – as alleged, Mr. Benjamin's conduct did not constitute bribery.  Rather, the "bribery" allegations in the Indictment describe lawful interactions between a representative and a constituent, protected by the First Amendment.  Mr. Benjamin thus had no reason to believe that he had committed bribery, and no reason to conceal his conduct from future investigators.

Moreover, nothing about Mr. Benjamin's alleged conduct in accepting campaign contribution checks from Migdol on July 8, 2019, or responding to the executive appointment questionnaire on August 17, 2021, remotely suggests that he intended to obstruct a federal bribery investigation.  Indeed, we have found no case where the government has charged and the court has upheld a § 1519 charge on allegations as thin and attenuated as those here.  *Cf.*, *e.g.*, *Kernell*, 667 F.3d at 755 (upholding § 1519 where there was "no doubt" that the defendant "contemplated that an investigation would occur when he took his action, since he specifically referenced the possibility of an FBI investigation in his [internet] post."); *United States v. Miah*, 546 F. Supp. 3d 407 (W.D. Pa. 2021) (defendant deleted threatening tweets after FBI had attempted to interview him about online threats); *United States v. Krug*, 198 F. Supp. 3d 235 (W.D.N.Y. 2016) (same); *United States v. Fumo*, 628 F. Supp. 2d 573, 598-99 (E.D. Pa. 2007) (senator destroyed electronic evidence after learning of FBI investigation from public reporting).

Allowing the government to proceed on these allegations under § 1519 even where they have failed to allege bribery would permit an unprecedented application of the statute beyond the limits of due process.  In defining the limits of another obstruction of justice statute, 18 U.S.C. § 1512, the Supreme Court has said:  "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogative of

Congress, and out of a concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Anderson LLP v. United States*, 544 U.S. 696, 703 (2005) (internal quotation marks and citations omitted).

If indeed § 1519 does somehow extend to the allegations in this case, Mr. Benjamin – who did not commit bribery and had no reason to suspect there would be a bribery investigation – could never have known as much, and the statute as applied to Mr. Benjamin would be unconstitutionally vague. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

Accordingly, Counts Four and Five should be dismissed.

**III.   The Government Must Provide Further Discovery Regarding** ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

A.       Background

        1.       *Timeline of Events*

                    ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ [9]

                    ███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

_____

[9] ████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████ .





████████████████████████████████████████████

███████████████████████████ 12

        █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ :



████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ :









---

14 

15      The charges against Mr. Benjamin were unsealed on April 12, 2022, just 67 days before
early voting began in the New York primary in which Mr. Benjamin was a candidate on the
ballot to continue serving as New York's Lieutenant Governor.  The 67 days is significant
because the Department of Justice has long recognized that prosecutors should avoid public
disclosure of investigative steps or the return of an indictment against a candidate within at least
60 days of a primary or general election to avoid impacting the election.  (*See* Eric Holder,
*James Comey Is A Good Man, But He Made A Serious Mistake*, Wash. Post (Oct. 30, 2016),

2.      *Discovery Requests and Response*

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    Accordingly, by letter dated June 1, 2022, the defense sought additional

---

https://www.washingtonpost.com/opinions/eric-holder-james-comey-is-a-good-man-but-he-made-a-serious-mistake/2016/10/30/08e7208e-9f07-11e6-8832-23a007c77bb4_story.html; Jamie Gorelick and Larry Thompson, *James Comey is Damaging Our Democracy,* Wash. Post (Oct. 29, 2016), https://www.washingtonpost.com/opinions/james-comey-is-damaging-our-democracy/2016/10/29/894d0f5e-9e49-11e6-a0ed-ab0774c1eaa5_story.html; Jane Chong, *Pre-Election Disclosures: How Does, and Should, DOJ Analyze Edge Cases*, Lawfare Blog (Nov. 8, 2016), https://www.lawfareblog.com/pre-election-disclosures-how-does-and-should-doj-analyze-edge-cases).  Indeed, as described by former Deputy Attorney General Sally Yates, the practice of refraining from actions that could impact an election stretches well beyond the 60-day period.  In testimony to the Office of the Inspector General of the Department of Justice, she explained, "I look at it sort of differently than 60 days.  To me if it were 90 days off, and you think it has a significant chance of impacting an election, unless there's a reason you need to take that action now you don't do it."  (Office of the Inspector General, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election at 18 (June 2018), https://www.justice.gov/file/1071991/download).

Here it seems the timing of Mr. Benjamin's Indictment was hastily orchestrated to comply with this longstanding principle, but in doing so, the prosecution has undermined the very safeguard the rule is intended to serve.  Mr. Benjamin was forced to resign as Lieutenant Governor, and do so after already being designated the Democratic Party's nominee for that office in the upcoming election.  The state legislature had to pass special legislation to enable Mr. Benjamin to remove his name from the ballot.  And the shadow of what we submit is a baseless prosecution that never should have been brought, and should be dismissed for the reasons set forth above, hangs over the sitting Governor as she pursues election for that office. (*See, e.g.*, Luis Ferre-Sadurni & Grace Ashford, *N.Y. Governor Candidates Flood the Airwaves With $20 Million in Ads*, N.Y. Times (May 23, 2022), https://www.nytimes.com/2022/05/23/ny region/governor-race-ny.html (Zeldin has a television ad "focused exclusively on the arrest in May of Ms. Hochul's former lieutenant governor, Brian Benjamin, on federal bribery charges."); Grace Ashford, *Brian Benjamin Won't Be on the New York Ballot After All*, N.Y. Times (May 2, 2022), https://www.nytimes.com/2022/05/02/nyregion/brian-benjamin-ballot-removal.html; William K. Rashbaum, Nicholas Fandos & Jeffery C. Mays, *Lt. Gov. Benjamin Resigns Following Campaign Finance Indictment*, N.Y. Times (Apr. 12, 2022), https://www.nytimes.com/2022/04/12/nyregion/brian-benjamin-resigns-indicted.html).

information █████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

B.   <u>Argument</u>

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ The prosecution must

produce all the materials and information relating to these critical issues pursuant to its

obligations under *Brady.*

The government has a constitutional duty to disclose favorable evidence to the

accused where such evidence is material to guilt.  *Brady v. Maryland*, 373 U.S. 83 (1963).

Evidence is "favorable to the accused, either because it is exculpatory, or because it is

impeaching."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████



















███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

The prosecution will no doubt respond, ██████████████████████████████ ████████ that they understand their obligations under *Brady* and its progeny and are complying with those obligations, ███████████████████████████ ██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

The page is almost entirely redacted (black bars). Only header and footer visible.





The Court may "order *Brady/Giglio* disclosure at any time as a matter of 'sound case management.'"  *United States v. Taylor*, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014) (quoting *United States v. Nogbou*, No. 07-CR-814 (JFK), 2007 WL 4165683, at *3–4 (S.D.N.Y. Nov. 19, 2007)).  And we respectfully request the Court do so here.

Lastly, we respectfully request that the Court direct the prosecution to produce responsive materials and information, and confirmation that they have done so, within four weeks of the Court's issuance of its order.  We submit that mandating this review and disclosure now is necessary to avoid the harm that can otherwise result from the slow trickle of disclosures – in some cases the result of egregious mismanagement – that have plagued recent prosecutions in this District.  *See Ahuja and Shor*, No. 18 Cr. 328 (KPF) (S.D.N.Y. Dec. 20, 2021), ECF No. 457; Transcript, *United States v. Pizarro*, No. 17-Cr-151 (AJN) (S.D.N.Y. May 17, 2018), Dkt No. 135 at Tr. 5:11-16 ("[W]e were scheduled to pick our jury today and proceed to trial on Monday after that and, quite surprisingly, the government has continued to produce new information.  And I don't mean surprisingly because they ought not to have done that, surprisingly because we continue to learn of new information."); *United States v. Jain*, No. 19-CR-59 (PKC), 2020 WL 6047812, at *1 (S.D.N.Y. Oct. 13, 2020) ("Based upon the entirety of

the record, the Court concludes that the failure to timely produce this data was the result of a pattern of inattentiveness, carelessness, failure of recollection, failure of the original case agent to speak up at critical junctures, failure of the original case agent to communicate critical information to his successor, failure of the successor case agent to review the entirety of the case file and failure of a prosecutor to make prudent and timely inquiries of the original and successor case agents."); *United States v. Nejad*, 487 F. Supp. 3d 206, 225 (S.D.N.Y. 2020) (dismissing indictment, with prejudice, as a result of disclosure violations and government misrepresentations, and ordering that all Southern District prosecutors be required to read the court's opinion, noting that "[w]ith each document wrongfully withheld, an innocent person faces the chance of wrongful conviction").

\* \* \*



The government must disclose materials and information that address all of the open questions that relate to these crucial case-determinative issues.

We respectfully submit that the Court should direct the prosecution to produce all materials and information in its possession relating to these questions

*See United States v. Nejad*, 521 F. Supp. 3d 438, 450 (S.D.N.Y. 2021) ("Prosecutors have an obligation to ensure that their disclosures to the defense are complete," an obligation that "require[s] affirmative diligence, not only the absence of abject bad faith.").

### IV.     The Government Must Identify Co-Conspirators And Provide Particulars Concerning Count One

Should this case proceed, the government must also identify all alleged co-conspirators and provide a bill of particulars regarding the conspiracy allegations contained in Count One.   While the government has said that the Indictment clearly lays out their bribery theory, they have drafted Count One in such a way so as to allow them to change or expand that theory prior to trial.   The prosecution has refused to answer simple questions that would confirm Count One's scope, prevent surprise, and ensure that Mr. Benjamin can adequately prepare a defense.   The nearly eight-hundred thousand documents and 2.6 terabytes of data that the government has produced in discovery, as well as the dozens of potential witnesses they have identified to the defense, do not help to define the limits of Count One.   Accordingly, Mr.

Benjamin respectfully moves under Federal Rule of Criminal Procedure 7(f) for an order requiring the government to provide a bill of particulars as to Count One that identifies: (i) all known co-conspirators and (ii) any other "bribes" allegedly involved in the conspiracy (including all things of value Mr. Benjamin is alleged to have solicited, demanded, or accepted as part of the conspiracy; all of the "business, transactions, and series of transactions" as to which Mr. Benjamin is alleged to have been intended to be influenced; and all official actions he is alleged to have undertaken as part of the conspiracy).

        A.     <u>Background To Count One</u>

Count One describes a dual-object conspiracy, running from "at least in or about 2019, up to and including at least in or about 2021," to commit (i) bribery, in violation of 18 U.S.C. § 666, and (ii) honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. (Ind. ¶ 33). Unlike Counts Two and Three (charging, respectively, substantive counts of § 666 bribery and honest-services wire fraud), Count One is not, by its terms, tied to any particular allegations. For example, both Counts Two and Three contain a "to wit" clause, referencing campaign contributions from Migdol and Mr. Benjamin's "use of, his official authority and influence to obtain the State Grant for [Migdol's nonprofit]." (Ind. ¶ 38, 40). Count One does not. In describing the § 666 object, Count One simply alleges that Mr. Benjamin solicited, demanded, and accepted "something of value," while "intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of New York involving something of value of $5,000 or more," without indicating whether the "something of value" is limited to the same campaign contributions referenced in Count Two, or whether the "business, transaction, and series of transactions" are limited to the $50,000 grant to the nonprofit. (Ind. ¶ 34). Similarly, the paragraph describing the honest-services wire fraud object

in Count One does not indicate whether it is based solely on campaign contributions and the State Grant, as in Count Three.  (Ind. ¶ 35)

The speaking portion of the Indictment confuses matters further.  While most of the Indictment is focused on the chronology of events concerning campaign contributions and the $50,000 grant, paragraph 25 contains a seemingly unrelated allegation.  It alleges that on October 21, 2020, Mr. Benjamin offered to help Migdol secure a zoning variance from a local community zoning board, where Mr. Benjamin had previously served as Chair, to permit construction on property Migdol owned, in return for a contribution from Migdol to a "particular political campaign committee."  (Ind. ¶ 25).  It is further alleged that although Migdol eventually gave a $15,000 contribution, the "matter of the zoning variance sought by [Migdol] has not come before the Community Board."  (Ind. ¶ 25).

While it seems unlikely that the government is alleging that this conduct is part of the bribery conspiracy charged in Count One, the defense is entitled to know for sure one way or another.  If the government is making this allegation, we will file a motion to dismiss the count to the extent it relies on this alleged conduct.  The motion will be based on the government's obvious failure to allege that Mr. Benjamin was acting as an agent of New York State, *see* 18 U.S.C. § 666(a)(1)(B) (requiring that the defendant be an agent of an organization or state or local government receiving federal funds and that he intend be influenced in connection with the business of that organization or state or local government), or that he undertook an "official act," *see United States v. Silver*, 864 F.3d 102, 111 (2d Cir. 2017) (requiring that the defendant undertake an official act in honest-services fraud prosecution), as is clearly required under controlling law.

The discovery is of no help on these issues.  To date, the government has produced approximately eight-hundred thousand documents, as well as a hard drive with approximately 2.6 terabytes of data consisting of several large data sets, including two cell phone images, iCloud account data, and search warrant returns for two email accounts.  While only one co-conspirator – Migdol – is specifically referenced in the Indictment, Count One refers to "others known and unknown," and the discovery contains references to and communications involving dozens of others, including 160 individuals and entities that were subpoenaed in the course of the investigation.  The government has also advised the defense that 27 other individuals were involved in the matters alleged and interviewed by the government; but they have refused to advise which of these individuals, if any, the prosecution considers to be co-conspirators.

B.   Argument

A defendant may move for a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).  The motion has multiple purposes, each critical to the defendant's trial rights: "enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Id.* (citing *Wong Tai v. United States*, 273 U.S. 77, 82 (1927)).  A bill of particulars is required when "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (citations omitted).  Thus, a defendant is entitled to a bill of particulars when the indictment fails "to provide the defendant with sufficient detail to defend adequately the charges against him." *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).  The fact that providing a bill of particulars would "require[] the disclosure of evidence or the theory of the prosecution" does not

undermine the necessity of "giv[ing] the defendant enough information about the charge to prepare his defense." *Id.* (citing 1 Charles Alan Wright, *Federal Practice and Procedure* § 129 (1982)). "Whether to grant a bill of particulars rests within the sound discretion of the district court." *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) (citation omitted).

### 1. *The Government Must Identify All Known Co-Conspirators*

The government should be compelled to identify any other persons that the prosecution alleges are co-conspirators, other than Migdol – the sole co-conspirator referenced in the Indictment. The conspiracy alleged in this case spans at least three years, and possibly longer. The discovery indicates that there are literally dozens of other individuals that the government has interviewed and subpoenaed, yet the government has refused to say which of these they consider to be co-conspirators. ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ Yet the government has refused to provide the defense with guidance as to how far reaching they allege the conspiracy was, and thus where we should focus our time and resources as we prepare for trial. Notably, there are no witness-security concerns that might otherwise counsel in favor of delayed disclosure.

Even without court intervention, it is common in this District for co-conspirators to be identified by the government prior to trial. *See, e.g.*, Government's Brief, *United States v. Lavidas*, No. 19-cr-716 (DLC) (S.D.N.Y. Dec. 4, 2019), ECF No. 43 at 16 ("The Government today has provided defense counsel with a letter identifying individuals who are co-conspirators of the defendant with respect to the charged conspiracies."); Defendant's Brief, *United States v. Martoma*, No. 12-Cr-973 (PGG) (S.D.N.Y. May 20, 2013), ECF No. 27 at 7–8 (government agreed to identify all known co-conspirators); *United States v. Gupta*, No. 11-Cr-907 (JSR)

(S.D.N.Y. Apr. 9, 2012), ECF No. 47 at 1, 2 (government provided bill of particulars detailing "the identity of additional known co-conspirators in the charged conspiracy"); *United States v. Rajaratnam*, No. 09-cr-1184 (RJH), 2010 WL 2788168, at *1 n.1 (S.D.N.Y. July 13, 2010) (government identified co-conspirators for each count on defendant's request).  We are surprised that the prosecution has declined to do so here.

When the government chooses not to disclose co-conspirators' names on its own volition, there is ample precedent for courts ordering disclosure to ensure the defendant is not surprised at trial.  *See, e.g. United States v. Akhavan*, No. S3 20-cr-188(JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (granting two co-defendants' request for a bill of particulars identifying their co-conspirators in alleged bank fraud conspiracy occurring over three years); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302-03 (S.D.N.Y. 2018) (granting request for a bill of particulars to identify co-conspirators in a scheme that did not involve "complexities" or a "long-running conspiracy" but only insider trading "of one specific stock based on material nonpublic information exchanged during a specific period of time"); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2017 WL 11490480, at *5 (E.D.N.Y. May 24, 2017) (granting request for a bill of particulars to identify unindicted co-conspirators in a wire fraud conspiracy prosecution despite the fact that the government "convincingly argue[d] that the narrow scope of the alleged conspiracy, limited as it is to three months and centered on a single transaction, ha[d] been further trimmed" by the government's disclosures in discovery); *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *13 (S.D.N.Y. Jan. 2, 2001) (ordering identification of co-conspirators in conspiracy with a "voluminous amount of discovery" made "well in advance of trial" in order to allow defendants "to narrow, or at least to prioritize, their review of the [evidence]"); *United States v. Feola*, 651 F. Supp. 1068, 1131–34 (S.D.N.Y. 1987)

70

(granting demand for bill of particulars specifying "the names of all persons whom the government will claim at trial were co-conspirators"), aff'd 875 F.2d 857 (2d Cir. 1989); *United States v. McGuinness*, 764 F. Supp. 888, 894 (S.D.N.Y. 1991) (ordering disclosure of names of co-conspirators with the bill of particulars because "the government has offered no good reason for withholding the list of co-conspirators until two weeks before trial" as requested and "earlier disclosure of these names would better ensure that the trial will proceed smoothly and efficiently").

Given the alleged conspiracy here spans at least three years, and possibly more, Mr. Benjamin is entitled to know which, if any, of the ███████████████████ ███████████████████████████████ the government is claiming participated in the alleged conspiracy. *See, e.g., United States v. Oruche*, No. 07-Cr-0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (requiring in narcotics conspiracy spanning "a number of years" the identification of "any known unindicted co-conspirator with respect to each paragraph of the Indictment in which the word 'others' appears"); *United States v. Savin*, No. 00-Cr-45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (requiring disclosure of co-conspirators involving 100,000 pages of discovery, a mail and wire fraud conspiracy over a six-year period, and "numerous transactions").

The enormous number of documents the government has produced to the defense to review – nearly eight-hundred thousand documents plus an additional 2.6 terabytes of data – likewise cuts in favor of disclosure. Courts have ordered identification of co-conspirators "if the discovery has been voluminous [and] identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial." *United States v. Nachamie*, 91 F. Supp. 2d 565, 572–73 (S.D.N.Y. 2000); *see also Lino*, 2001 WL 8356, at *2, 13 (ordering

disclosure of co-conspirators' names to "facilitate defendants' trial preparation and allow them to narrow, or at least to prioritize, their review" in light of the "voluminous amount of discovery" including "60 boxes of records containing about 570,000 pages of documents"); *Oruche*, 2008 WL 612694, at *4 (ordering disclosure of names of unindicted co-conspirators given the "volume of discovery" in the case, which included "compact discs containing 7326 audio files, and over 2300 pages of documents").

    Finally, there is no danger to witnesses here that might otherwise counsel against disclosure.  *See Nachamie*, 91 F. Supp. 2d at 572 (considering "the potential danger to co-conspirators and the nature of the alleged criminal conduct" in deciding whether to grant a bill of particulars for the names of unindicted co-conspirators).  In cases that do not involve allegations of violent or threatening conduct, the government's basis for resisting disclosure is far weaker and courts more readily order identification of co-conspirators.  *See, e.g. Lino*, 2001 WL 8356, at *12–13 (ordering disclosure of co-conspirators' names despite government's "legitimate security concerns" in part because defendants seeking bill of particulars had not been charged with violent acts and the government had not argued they pose a threat to witnesses); *United States v. Barrett*, 153 F. Supp. 3d 552, 572–73 (E.D.N.Y. 2015) (ordering disclosure of names of unindicted co-conspirators because "the government has not articulated any potential danger to co-conspirators"); *cf. United States v. Bin Laden*, 92 F. Supp. 2d 225, 241 (S.D.N.Y. 2000) (recognizing government's "legitimate concerns" that revealing the names of unindicted co-conspirators would endanger them given the defendant al Qaeda associates were "accused of using the most severe types of violence"); *United States v. Kaplan*, No. 02-Cr-883 (DAB), 2003 WL 22880914, at *18 (S.D.N.Y. Dec. 5, 2003) (refusing request for a bill of particulars in part because "there is probable cause of danger to witnesses or co-conspirators").

Mr. Benjamin cannot fairly prepare for trial if he is forced to guess which, if any, of the dozens of individuals potentially involved in the events underlying this years-long conspiracy the government considers to be co-conspirators.  The government will suffer no undue prejudice by disclosing this information.  Accordingly, the government should be compelled to provide it.

2.    *The Government Must Identify All Other Alleged Bribes and Official Acts*

As noted, unlike the substantive charges in Counts Two and Three, Count One leaves uncertain whether the government will try to argue at trial that there are "bribes" encompassed by the scheme other than Migdol's contributions to Mr. Benjamin's City Comptroller campaign, or official acts other than the $50,000 state grant to the nonprofit.  The government must advise the defense now of any other things of value allegedly provided to Mr. Benjamin, the state business as to which he was allegedly influenced in, and any other official action that he allegedly undertook in connection with the scheme.

Where an indictment leaves open the possibility that the government will be able to later choose from among different underlying payments to prove a bribery scheme, courts have required a bill of particulars to "specify[] the date and amount of unlawful payments, as well as the identity of the maker of such payments."  *United States v. Siddiqi*, No. 06 CR. 377 SWK, 2007 WL 549420, at *2 (S.D.N.Y. Feb. 21, 2007) (collecting cases).  In *Siddiqi*, the court granted the defendant's motion for a bill of particulars on his bribery indictment despite the fact that a previously filed criminal complaint specified that the defendant had received approximately $16,000 in cash bribes in 2002.  *Id.* at *1, *3.  The court found this insufficient and held that the defendant was "entitled to notice of the approximate date and amount of illegal payments that he received, as well as the identity of the [person] who made such payments."  *Id.*

at *2; *see also United States v. Ganim*, 225 F. Supp. 2d 145, 155 (D. Conn. 2002) (granting

request for bill of particulars setting forth the benefits the defendant was alleged to have

received, where indictment specified some benefits, "among others"); *Lino*, 2001 WL 8356, at

*4 (granting bill of particulars to defendant accused of participating in pension fund fraud and

kickback conspiracy to inform him of "whom he agreed to bribe, the pension fund with which

the bribe recipient was affiliated, and the amount of the bribe"); *McGuinness*, 764 F. Supp. at

893–94 (granting bill of particulars to defendant accused of conspiring to violate the Taft-Hartley

Act to inform him of the "approximate amount and date of each payment referred to in overt acts

[specified in the indictment], as well as the name of the person making the payment"); *United

States v. McCarthy*, 292 F. Supp. 937, 941 (S.D.N.Y. 1968) ("Defendants are entitled, however,

to the names of persons who paid money to the defendants at the times and places alleged in the

overt acts.").

      Similarly, courts have required the government to particularize the acts that a

defendant is alleged to have undertaken in return for bribes.  In *Siddiqi*, for example, in addition

to ordering the government to specify the dates and amounts of bribes received, the court

required the government to provide particulars concerning what the defendant allegedly provided

in return for the bribes.  *Siddiqi*, 2007 WL 549420, at *3; *United States v. Catapano*, No.

05-Cr-229 (SJ), 2008 WL 2222013, at *30 (E.D.N.Y. May 22, 2008) (granting request by

defendants, who allegedly bribed union officials into not enforcing collective bargaining

agreements, for government to particularize "each provision of the [agreements] it intends to

prove were not enforced"), report and recommendation adopted, No. 05-Cr-229 (SJ) (SMG),

2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008).

Mr. Benjamin was a state senator for more than four years, and then, until recently, New York's Lieutenant Governor. During his time in government, he has undertaken numerous official acts, received thousands of campaign contributions, and had hundreds, if not thousands, of interactions with constituents. Yet, unlike Counts Two and Three, Count One contains no clarifying "to wit" clause limiting the Indictment's reach and constraining the government from later claiming that the conspiracy is broader than what is alleged as part of Counts Two and Three. *Cf. United States v. Ferrara*, 990 F. Supp. 146, 153 (E.D.N.Y. 1998) (particularization of count of indictment alleging defendant offered town official a bribe was unnecessary because "that count, unlike the other two, allege[d] the date of the charged crime with particularly, to wit, as having occurred in or about May 1996"). While the government has indicated that the allegations in the Indictment clearly lay out the prosecution's bribery theory, they have refused to provide any assurance that they will not later argue that Count One reaches beyond those allegations and should not be permitted to spring a new theory on the defense at trial.

Importantly, requiring the government to identify all bribes and official actions alleged to be part of Count One will also compel the prosecution to clarify whether the zoning variance allegation described in paragraph 25 of the Indictment is part of this charge. If the zoning variance allegation is in fact part of the purported conspiracy, the defense will move to dismiss this prior to trial as a basis for the conspiracy. The zoning variance allegation cannot be the basis of a conspiracy to violate either of the two statutes cited in Count One, §§ 666 or 1343/1346. Section 666(a)(1)(B) requires the government to prove that a defendant is an agent of "an organization, or of a State, local, or Indian tribal government, or any agency thereof" that receives federal funds of a certain amount and that the defendant "corruptly solicit[ed] or

demand[ed] for the benefit of any person, or accept[ed] or agree[d] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions *of such organization, government, or agency* involving any thing of value of $5,000 or more." *Id.* § 666(a)(1)(B) (emphasis added). Count One alleges that Mr. Benjamin is an agent of New York State for the purposes of the statute. But the zoning variance allegation in paragraph 25 is not alleged to involve the business of New York, as it must under the statute. Instead the Indictment alleges that obtaining the variance involved "seeking approval from the local community board." (Ind. ¶ 25). For this reason, the zoning variance allegation, on its face, is not sufficient to support charge of conspiracy to commit bribery under § 666, to the extent it is alleged as part of Count One.

The zoning variance allegation also cannot be the basis for the other alleged object of the conspiracy charged in Count One, honest services fraud pursuant to 18 U.S.C. §§ 1343 and 1346. To commit the crime of honest services fraud the defendant has to give or receive something of value "in exchange for an official act." *Silver*, 864 F.3d at 111. "[A]n official action must be a decision or action on a matter involving the formal exercise of government power akin to a lawsuit, hearing, or agency determination." *Id.* at 118. But not everything a public official does, even in his official capacity, is an official act. Even concrete acts a public official carries out in his official capacity – such as hosting an event, meeting with other officials, speaking with interested parties, making introductions or expressing support – will not by themselves constitute an official act. *See McDonnell*, 579 U.S. at 557, 571-72. The Indictment here alleges no official act by Mr. Benjamin with regard to the zoning variance. It alleges simply that Mr. Benjamin, formerly the chair of the local community board, stated that he "would help" Migdol obtain the community board's approval, (Ind. ¶ 25), but contains no hint of

how Mr. Benjamin would purportedly do this.  Nor is Mr. Benjamin alleged to have had any role, official or otherwise, with the community board at the time of his conversation with Migdol.

Given that the Indictment leaves open the possibility that the government considers the zoning variance to be part of Count One – and the fact, as explained above, that this is a legally untenable position – the government should be required to clarify whether they are claiming that this allegation, or any other alleged conduct, provides a basis for the charged bribery conspiracy.

*   *   *

For the reasons set forth above, we respectfully request that the Court grant Mr. Benjamin's motion for a bill of particulars and direct the Government to identify (i) all known co-conspirators and (ii) any other "bribes" allegedly involved in the conspiracy (including all things of value Mr. Benjamin is alleged to have solicited, demanded, or accepted as part of the conspiracy;  all of the "business, transactions, and series of transactions" as to which Mr. Benjamin is alleged to have been intended to be influenced; and all official actions he is alleged to have undertaken as part of the conspiracy).

## **CONCLUSION**

For the foregoing reasons, Mr. Benjamin respectfully requests that all counts of

the Indictment be dismissed, the government produce discovery ████████████████

████████████████████████████, and the government be required to identify

co-conspirators and particularize the charges in Count One.


Dated:   New York, New York          Respectfully submitted,
         June 24, 2022

                                     KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                     By:  /s/ Barry H. Berke
                                          Barry H. Berke
                                          Dani R. James
                                          Darren A. LaVerne
                                          1177 Avenue of the Americas
                                          New York, NY 10036
                                          Telephone: 212.715.9100

                                     *Attorneys for Defendant Brian Benjamin*