UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

BRIAN BENJAMIN,

*Defendant*.

S2 21 Cr. 706 (JPO)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT BRIAN BENJAMIN'S
PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

Celia V. Cohen
Andrea M. Griswold
Jarrod L. Schaeffer
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I. The Court Should Deny Benjamin's Motion to Dismiss the Superseding Indictment........... 2

        A. Legal Standard .................................................................................................... 2

        B. The Allegations Concerning Conspiracy, Bribery, and Honest Services Wire Fraud Track the Relevant Statutes and Provide Sufficient Factual Detail .................................. 4

        C. Benjamin's Arguments Regarding the Sufficiency of Counts One Through Three Are Meritless .................................................................................................................. 6

        D. Counts Four and Five Sufficiently Allege Violations of 18 U.S.C. § 1519..................... 20

    II. The Court Should Deny Benjamin's Motion for Further Discovery Regarding Migdol's Plea Allocution ................................................................................................ 24

        A. The Government's Broad Disclosures Regarding the Plea Allocution........................... 26

        B. Argument ............................................................................................................ 31

    III. The Court Should Deny Benjamin's Motion for a Bill of Particulars ............................... 41

        A. Legal Standard .................................................................................................... 41

        B. Argument ............................................................................................................ 43

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

### *Cases*

*Alston v. United States*, No. 15 Cr. 435 (CM), 2021 WL 2380064 (S.D.N.Y. 2021).................. 42

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ passim

*Brown v. Davenport*, 142 S. Ct. 1510 (2022) ............................................................ 13

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)............................................ 16

*Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014) .................................... 19

*Evans v. United States*, 504 U.S. 255 (1992)........................................................ passim

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................ 27, 31, 33

*Kyles v. Whitley*, 514 U.S. 419 (1995)..................................................................... 39

*McCormick v. United States*, 500 U.S. 257 (1991)..................................................... passim

*Moore v. Illinois*, 408 U.S. 786 (1972).................................................................... 39

*Skilling v. United States*, 561 U.S. 358 (2010) .......................................................... 16

*United States v. Abrams*, 539 F. Supp. 378 (S.D.N.Y. 1982)................................................ 33

*United States v. Agurs*, 427 U.S. 97 (1976) .............................................................. 39

*United States v. Ahuja, et al.*, No. 18 Cr. 28 (KPF), Dkt. 457 (S.D.N.Y. Dec. 17, 2021)..... passim

*United States v. Akhavan*, No. 20 Cr. 188 (JSR), 2020 WL 2555333 (S.D.N.Y. 2020)............... 48

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ..................................................... 4

*United States v. Bagley*, 473 U.S. 667 (1985) ...................................................... 38, 39

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ..................................................... 13

*United States v. Baldeo*, No. S1 13 Cr. 125 (PAC),
2014 WL 6807833 (S.D.N.Y. Dec. 3, 2014) ........................................................ 22

*United States v. Becker*, 502 F.3d 122 (2d Cir. 2007) ................................................... 35

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ................................... 9, 14

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994)................................... 9, 10, 15

*United States v. Block*, No. 16 Cr. 595 (JPO),
  2017 WL 1608905 (S.D.N.Y. 2017).................................................. 42, 45, 48, 50

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ................................ 41, 42, 47

*United States v. Brewster*, 408 U.S. 501 (1972) ........................................... 16

*United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992)........................... 9, 14

*United States v. Carr*, 582 F.2d 242 (2d Cir. 1978) .................................... 3

*United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020)........................ 44

*United States v. Chambers*, No. 17 Cr. 396 (WHP), 2018 WL 1726239 (S.D.N.Y. 2018).......... 44

*United States v. Coppa*, 267 F. 3d 132 (2d Cir. 2001)............................... 33, 38

*United States v. Cossette*, 593 F. App'x 28 (2d Cir. 2014)........................ 23

*United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993) .................................. 12

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ........................... 42

*United States v. Davis*, 841 F. App'x 375 (3d Cir. 2021) ........................... 9, 15

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ............................ 3, 4, 5, 20

*United States v. Delacruz*, No. 14 Cr. 815 (KBF),
  2015 WL 2211943 (S.D.N.Y. May 12, 2015) ...................................... 34, 37

*United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021)............... 18

*United States v. Dozier*, 672 F.2d 531 (5th Cir. 1982) ............................. 9

*United States v. Espinal*, 96 F. Supp. 3d 53 (S.D.N.Y. 2015) ..................... 31

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ....................... 48

*United States v. Gangi*, 1 F. Supp. 2d 256 (S.D.N.Y. 1998) ....................... 38

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ........................... 11, 12, 18

*United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993)............................. 11

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985).......................... 2, 17, 21

*United States v. Gottlieb*, 493 F.2d 987 (2d Cir. 1974) ........................... 42

*United States v. Gray*, 642 F.3d 371 (2d Cir. 2011) ............................... 23

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992) .......................................................... 2, 5

*United States v. Horge*, No. 19 Cr. 96 (LTS), 2020 WL 6273932 (S.D.N.Y. 2020) ................... 42

*United States v. Jamie*, No. 92 Cr. 194 (CSH), 1992 WL 188360 (S.D.N.Y. 1992) ................... 44

*United States v. Johnson*, No. 16 Cr. 457 (NGG), 2017 WL 11490480 (E.D.N.Y. 2017) .......... 49

*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. 2000) ....... 45, 46, 47, 49

*United States v. Lupoi*, No. 14 Cr. 42 (SJ), 2014 WL 12681632 (E.D.N.Y. 2014) ..................... 50

*United States v. Mangano*, 2018 WL 851860 (E.D.N.Y. 2018) ................................................... 44

*United States v. Mangini*, No. 20 Cr. 162 (JPO), 2021 WL 1268507 (S.D.N.Y. 2021) .............. 43

*United States v. McCarthy*, 292 F. Supp. 937 (S.D.N.Y. 1968)) .................................................. 46

*United States v. McGregor*, 879 F. Supp. 2d 1308 (M.D. Ala. 2012) .................................. 11, 13

*United States v. McGuinness*, 764 F. Supp. 888 (S.D.N.Y. 1991) ........................................ 46, 49

*United States v. Menendez*, 132 F. Supp. 3d 635 (D.N.J. 2015) ................................................. 18

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018) ................................................. 14

*United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3443117 (S.D.N.Y. 2018) .......... 44

*United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. 2018) .......... 45

*United States v. Moyer*, 674 F.3d 192 (3d Cir. 2012) ................................................................. 23

*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) ........................................................ 38

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) .................................................................. 16

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000)) .............................................. 47

*United States v. Nobles*, 422 U.S. 225 (1975) ............................................................................. 38

*United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694 (S.D.N.Y. 2008) ............. 48

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) ............................................................... 43

*United States v. Pawlowski*, 351 F. Supp. 3d 840 (E.D. Pa. 2018) ............................................. 14

*United States v. Pawlowski*, No. 17-390-3, 2017 WL 11350965 (E.D. Pa. Dec. 5, 2017) .......... 20

*United States v. Payden*, 613 F. Supp. 800 (S.D.N.Y. 1985) ..................................................... 42

*United States v. Percoco*, No. 16. Cr. 776 (VEC),
2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) .............................................. 3, 5, 20

*United States v. Pinto-Thomas*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018)........................ 49

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ...................................... 13

*United States v. Rose*, 19 Cr. 789 (PGG), 2021 WL 2117119 (S.D.N.Y. 2021) ......................... 42

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)........................................ 11, 12, 15

*United States v. Rowland*, No. 14 Cr. 79 (JBA), 2015 WL 800083 (D. Conn. Feb. 25,
2015), *aff'd*, 826 F.3d 100 (2d Cir. 2016)................................................. 41

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018)....................................... 4, 24

*United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. 2001) .............. 49, 50

*United States v. Scott*, 979 F.3d 986 (2d Cir. 2020) ........................................ 23

*United States v. Siddiqui*, No. 06 Cr. 377 (SWK), 2007 WL 549420 (S.D.N.Y. 2007)......... 45, 47

*United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011)....................................9, 10, 14, 15

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021) .... 12, 13

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020), *cert. denied sub nom. Matsura v. United
States*, ___ U.S. ___ (May 24, 2021)...................................................... 22, 24

*United States v. Skelos*, 2015 WL 6159326 (S.D.N.Y. 2015) ................................ 42

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014), *aff'd sub nom. United States v.
Halloran*, 664 F. App'x 23 (2d Cir. 2016).................................................. 16

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003)..................................... 9

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) ...................................... 9, 14

*United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995)..................................... 9

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990), *overruled on other grounds as recognized
by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) .................................. 41, 50

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)............................. 42

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ....................................... 43

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ...................................... 3, 4, 19

*United States v. Yielding*, 657 F.3d 688 (8th Cir. 2011) ............................................................. 23

*United States v. Zahavi*, No. 12 Cr. 288 (JPO), 2012 WL 5288743 (S.D.N.Y. 2012) ................ 44

### *Rules*

Fed. R. Crim. P. 7 ........................................................................................................... 2, 5, 46

Fed. R. Crim. P. 12 .................................................................................................................. 3

Fed. R. Crim. P. 16 .................................................................................................................. 38

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by the defendant, Brian Benjamin, seeking: (*i*) dismissal of the Indictment; (*ii*) further "discovery" regarding the plea allocution of cooperating witness Gerald Migdol; and (*iii*) a bill of particulars.  (Dkt. No. 48, hereinafter "Mot.")  For the reasons set forth below, Benjamin's motions should be denied.

## BACKGROUND

Benjamin is charged with (*i*) conspiracy to commit bribery and honest services wire fraud, in violation of 18 U.S.C. § 371 ("Count One"); (*ii*) bribery, in violation of 18 U.S.C. § 666 ("Count Two"); (*iii*) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 ("Count Three"); and (*iv*) two counts of destroying, altering, or falsifying records in a federal investigation, in violation of 18 U.S.C. § 1519 ("Counts Four and Five").[1]  (Dkt. No. 18 (the "S-2").)  These charges arise out of a scheme whereby Benjamin obtained campaign contributions from Gerald Migdol, a real estate developer identified as "CC-1" in the S-2, in exchange for Benjamin's agreement to use, and actual use of, his official authority and influence as a senator for the State of New York to obtain a $50,000 grant of state funds (the "State Grant") for a non-profit organization controlled by Migdol ("Organization-1").  (S-2 ¶ 1.)  In so doing, Benjamin abused his authority as a state senator, engaging in a bribery scheme that used public funds for his own corrupt purposes.  (*Id.*)  And during the course of that scheme, Benjamin and others acting on his behalf engaged in a series of lies and deceptions to cover up the scheme, including by falsifying

---

[1] With respect to Counts Two through Five, Benjamin was also charged with aiding and abetting the alleged offenses, in violation of 18 U.S.C. § 2.  (*See* S-2 ¶¶ 37–44.)

campaign donor forms, misleading municipal regulators, and providing false information in vetting forms that Benjamin submitted while under consideration to be appointed Lieutenant Governor of New York. (*Id.* ¶ 2.) Based on this conduct, Benjamin was indicted and later arrested on April 11, 2022.

## ARGUMENT

### I. The Court Should Deny Benjamin's Motion to Dismiss the Superseding Indictment

In his motion, Benjamin argues that Counts One through Three should be dismissed because, in Benjamin's view, they fail to allege a corrupt exchange. (*See* Mot. 1–5, 14–33.) That argument is meritless, both because the S-2 sufficiently alleges an explicit *quid pro quo* under governing law and because Benjamin significantly mischaracterizes the allegations in the S-2. Benjamin also seeks dismissal of Counts Four and Five on grounds largely derivative of his arguments with respect to the earlier counts. (*See id.* at 1–5, 33–40.) For similar reasons, those arguments likewise should be rejected.

### A. Legal Standard

Federal Rule of Criminal Procedure 7 requires, in relevant part, that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). "The purpose of this requirement is to give a defendant adequate notice of the charges to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense." *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).[2] On a motion to dismiss, the Court evaluates the indictment in its entirety, *id.*, and all allegations in the indictment are assumed to be true, *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

---

[2] Unless otherwise noted, case text quotations contained herein omit all internal alterations, quotation marks, and citations.

"A defendant challenging the sufficiency of an indictment on a motion to dismiss faces a high hurdle," *United States v. Percoco*, No. 16. Cr. 776 (VEC), 2017 WL 6314146, at *2 (S.D.N.Y. Dec. 11, 2017), particularly where, as here, the defendant is charged in an indictment "that provide[s] significant detail about the factual nature of the charges," *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021).   "An indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* (quoting *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021)).   "To satisfy these requirements, 'an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Id.*; *see also United States v. Carr*, 582 F.2d 242, 244 (2d Cir. 1978) (collecting cases) ("Where . . . an indictment tracks the statutory language and specifies the nature of the criminal activity . . . it is sufficiently specific to withstand a motion to dismiss.").

Although Federal Rule of Criminal Procedure 12 permits "any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), because there is no summary judgment in criminal cases, *Wedd*, 993 F.3d at 121, courts do not "weigh[] whether certain factual allegations . . . [a]re consistent with the charged violations," *Dawkins*, 999 F.3d at 780.   "[A]uthorizing district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions risks invading 'the inviolable function of the jury' in our criminal justice system,"  and further risks "upset[ting] the policy choices reflected in the criminal discovery rules" by forcing the Government "to reveal its complete case before trial" in

order to "overcome such motions."[3]  *United States v. Sampson*, 898 F.3d 270, 280–81 (2d Cir.

2018).  Thus, "a judge cannot resolve . . . on a Rule 12(b) motion" any "factual dispute that is

inextricably intertwined with a defendant's potential culpability," *id.* at 281, as courts "do not

evaluate the adequacy of the facts to satisfy the elements of the charged offense" until "after trial,"

*Wedd*, 993 F.3d at 121.

### B.  The Allegations Concerning Conspiracy, Bribery, and Honest Services Wire Fraud Track the Relevant Statutes and Provide Sufficient Factual Detail

Benjamin first argues that the S-2 fails to allege the offenses charged in Counts One

through Three.  (*See* Mot. 1–5, 14–33.)  As noted above, "[a]n indictment is sufficient as long as

it (1) contains the elements of the offense charged and fairly informs a defendant of the charge

against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in

bar of future prosecutions for the same offense."  *Dawkins*, 999 F.3d at 779 (quoting *Wedd*, 993

F.3d at 120).  That standard is plainly satisfied with respect to Counts One through Three.

Count Two, which charges Benjamin with bribery in violation of 18 U.S.C. § 666, tracks

the language of that statute, states that the offense occurred between in or about 2019 and in or

about 2021, and specifies further that Benjamin "solicited and received campaign contributions

from [Migdol] intending to be influenced in connection with [Benjamin]'s use of official authority

and influence to obtain the State Grant for Organization-1."  (S-2 ¶ 38.)  Likewise, Count Three,

which charges Benjamin with honest services wire fraud in violation of 18 U.S.C. §§ 1343 and

1346, tracks the language of those statutes, states that the offense occurred during the same time

---

[3] The S-2 does not set forth all of evidence the Government would offer at trial, and so the "extraordinarily narrow" exception to this rule, *Sampson*, 898 F.3d at 282, which may apply where "the [G]overnment has made what can fairly be described as a full proffer of the evidence it intends to present at trial," *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998), is not relevant.

period as charged in Count Two, and specifies further that Benjamin "solicited and received campaign contributions from [Migdol] in exchange for [Benjamin]'s agreement to use, and actual use of, his official authority and influence to obtain the State Grant for Organization-1." (*Id.* ¶ 40.) Count One, which charges Benjamin with conspiracy to commit the crimes charged in Counts Two and Three,[4] in violation of 18 U.S.C. § 371, tracks the language of the pertinent statutes, states that the offense occurred during the same time period as charged in Counts Two and Three, describes the two objects of the conspiracy, and details four specific overt acts. (*Id.* ¶¶ 33–36.) And all of these counts also incorporate by reference (*id.* ¶¶ 32, 37, 39), more than fourteen pages of speaking allegations that precede them, which provide additional detail regarding the charged crimes (*id.* ¶¶ 1–31). These allegations clearly exceed the requirements of Rule 7 and provide Benjamin with the requisite notice of the charges to enable him to prepare a defense. *See* Fed. R. Crim. P. 7(c)(1); *Hernandez*, 980 F.2d at 871; *Dawkins*, 999 F.3d at 779. As such, Benjamin has not cleared the "high hurdle" confronting his motion to dismiss. *Percoco*, 2017 WL 6314146 at *2.

Benjamin nonetheless asserts that the S-2 "does not allege that any promises or agreements – explicit, express, or otherwise – were made" at any point. (Mot. 26.) But it does exactly that, alleging that Benjamin "solicited and received campaign contributions from [Migdol] *in exchange for* [Benjamin's] *agreement to use, and actual use of, his official authority and influence* to obtain the State Grant for Organization-1." (S-2 ¶ 40 (emphasis added); *accord id.* ¶ 38.) The S-2 thus alleges that Benjamin engaged and conspired to engage in a specific exchange: Benjamin's use of

---

[4] Benjamin asserts that he is unable to discern the relevant conduct underlying Count One. (*See* Mot. 65–68; *but see* Mot. 10 ("All of the charges . . . rest on the claim there was a corrupt exchange of campaign contributions for a state grant.").) However, the S-2 is clear that the conspiracy charged in Count One relates to the same conduct underlying the substantive offenses charged in Counts Two and Three.

his official authority as a state senator to allocate $50,000 in state funding to Migdol's organization in return for Migdol's efforts to obtain campaign contributions for Benjamin.  Moreover, for the reasons explained *infra* Section I.C.2, the allegations pertaining to Counts One through Three are sufficient to satisfy the explicit *quid pro quo* standard set forth in *McCormick v. United States*, 500 U.S. 257 (1991), and *Evans v. United States*, 504 U.S. 255 (1992).[5]

### C.   Benjamin's Arguments Regarding the Sufficiency of Counts One Through Three Are Meritless

Benjamin also argues that the allegations underlying Counts One through Three fail to meet the explicit *quid pro quo* standard in *McCormick* and *Evans*.  (*See* Mot. 1–5, 14–33.)  Those arguments fail for two primary reasons: (*i*) they misinterpret what is required by *McCormick* and its progeny; and (*ii*) they misconstrue, ignore, or mischaracterize the S-2's allegations in an effort to show they do not meet Benjamin's erroneous standard.

#### 1.   Benjamin Misinterprets the Governing Standard Under *McCormick* and *Evans*

Benjamin misstates the standard established by *McCormick*, urging this Court to adopt an exceedingly narrow interpretation at odds with that decision and subsequent cases.  In *McCormick*, the Supreme Court considered whether an elected official's receipt of political contributions in return for supporting certain legislation could be prosecuted as extortion under the Hobbs Act.  *See* 500 U.S. at 259–61.  The lower court had affirmed the conviction, concluding that elected officials "may be convicted under the Hobbs Act without proof that they have granted or agreed to grant some benefit or advantage in exchange for money" where they "receive[d] money other than

---

[5] While *McCormick* concerned extortion under the Hobbs Act, Benjamin is correct that other courts have applied the same standard in cases involving bribery. (*See* Mot. 24–26.)  For purposes of this motion, the Government assumes that *McCormick* applies to Benjamin's bribery and honest services wire fraud offenses.

'legitimate' campaign contributions," and that in such circumstance the Hobbs Act did not require proof of a *quid pro quo*. *Id.* at 265–66. The Supreme Court reversed, "disagree[ing] . . . that a *quid pro quo* is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution." *Id.* at 274. Noting that "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done," the Court explained that "[w]hatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries" would stretch beyond what Congress intended when it enacted the Hobbs Act. *Id.* at 272. Thus, the Court held that the Hobbs Act prohibited campaign contributions "as having been taken under color of official right . . . only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 272–73.

One year later, in *Evans*, the Court applied the *McCormick* standard in another extortion case involving campaign contributions. *See* 504 U.S. at 268. In *Evans*, as relevant here, the Court considered a jury instruction that had been given by the district court:

> The defendant contends that the $8,000 he received . . . was a campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.

> However, if a public official *demands or accepts money in exchange for a specific requested exercise of his or her official power*, such a demand or acceptance does constitute a violation of the Hobbs Act *regardless of whether the payment is made in the form of a campaign contribution*.

*Id.* at 257–58 (emphasis added).  The Court approved that instruction, finding that it "satisfie[d] the *quid pro quo* requirement of *McCormick*," *id.* at 268, by requiring proof that campaign contributions were provided "in exchange for a specific requested exercise of . . . official power," *id.* at 258.  Moreover, Justice Kennedy emphasized in a concurring opinion that *McCormick* did not require "[t]he official and the payor [to] . . . state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods," affirming that "a *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct." *Id.* at 274 (Kennedy, J.) (concurring in part and concurring in the judgment).  Thus, Justice Kennedy explained, an official's conduct "is criminal if it is express or if it is implied from his words and actions, so long as he intends it be so and the payor so interprets it," consistent with the longstanding principle that the "[t]he criminal law in the usual course concerns itself with motives and consequences, not formalities." *Id.*

At times, Benjamin seems to agree that *McCormick* merely describes the specificity of the requisite promise or agreement in cases involving campaign contributions.  (*See, e.g.*, Mot. 16, 32 (citing cases stating that agreement must be "clear and unambiguous")).  Elsewhere, however, Benjamin appears to make the remarkable claim that he cannot be found guilty of bribery unless his corrupt bargain with Migdol was actually stated out loud or written down.  (*See, e.g.*, Mot. 28 ("Migdol *did not say* that he was making the contributions in return for the grant." (emphasis added)), 29 ("Benjamin and Migdol *are not alleged to have said*, during these conversations or any others, that the contributions were to be made in exchange for the grant." (emphasis added)).)  And he argues that, in the absence of some spoken or written exchange, an "explicit" *quid pro quo* cannot be inferred from a course of conduct or the surrounding circumstances.  (*See* Mot. 26–31.)  Those assertions are baseless, and have been rejected by every Circuit to consider substantially

8

similar arguments.[6]  *See, e.g.*, *United States v. Davis*, 841 F. App'x 375, 379 (3d Cir. 2021); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015); *United States v. Terry*, 707 F.3d 607, 612–13 (6th Cir. 2013); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011); *United States v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995); *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992).

"Explicit, as explained in *Evans*, speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated."  *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994).  Although Benjamin equates "explicit" with "express" and appears to assume that means any promise or agreement must be stated or transcribed (*see* Mot. 24, 28–29), *McCormick* itself cited with approval *United States v. Dozier*, 672 F.2d 531 (5th Cir. 1982), a decision that acknowledged the law does not "punish every elected official who solicits a monetary contribution that represents the donor's vague expectation of future benefits," but emphasized the law does "discover and penalize those who, under the guise of requesting 'donations,' demand money in return for some act of official grace."  672 F.2d at 537.  Mirroring the jury instruction later approved in *Evans*, the *Dozier* court explained that "[t]he demanding of *specific contributions in return for specific actions* . . . well exemplifies this type of political misconduct," and the court affirmed the underlying convictions because the defendant's "implication was clear" from the circumstances surrounding his solicitation of bribes, even though at the time the defendant had "denied . . . that he was 'putting a fee' on his help."  *Id.* at 538 (emphasis added).  So although

---

[6] It is also inconsistent with the commonsense recognition that criminal agreements are often tacit. *See, e.g.*, *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) ("Conspiracies are secretive by their very nature, and it is thus well-settled that the elements of a conspiracy may be proved by circumstantial evidence.").

*McCormick* required "an explicit promise or undertaking by [an] official to perform or not to perform an official act," it simultaneously endorsed a case where the *quid pro quo* was not stated or transcribed—and even affirmatively denied by the defendant official.  *See* 500 U.S. at 272–73.

*Evans* likewise confirmed that "explicit" does not mean what Benjamin suggests by approving a jury instruction that did not require a *quid pro quo* to be stated or transcribed.  There, the Court described an official's acceptance of a bribe as "an *implicit promise* to use his official position to serve the interests of the bribegiver," before holding that the jury instructions, which said the crime was completed "if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power," had "satisfie[d] the *quid pro quo* requirement of *McCormick*."  *Evans*, 504 U.S. at 257–58, 268 (emphasis added).  Justice Kennedy's concurrence further dispels any potential ambiguity, making clear that a corrupt promise or agreement "can be inferred from an ongoing course of conduct" and may be "implied from . . . words and actions."  *Id.* at 274 (Kennedy, J.) (concurring in part and concurring in the judgment); *accord Siegelman*, 640 F.3d at 1171 (reading *Evans* to confirm "there is no requirement that this agreement be memorialized in writing"); *Blandford*, 33 F.3d at 696 (same).

Benjamin argues that "the Second Circuit [has] distinguished *Evans* . . . from *McCormick*" as a case that "involved an allegation of bribes that were not campaign contributions," and that *Evans* is therefore inapplicable to cases involving such contributions.  (Mot. 24 & n.5.)  But *Evans* did involve campaign contributions—a fact underscored by the Supreme Court's invocation of *McCormick* in the first place.  *See Evans*, 504 U.S. at 268 (applying *McCormick* standard).  The *Evans* opinion made clear that the defendant was prosecuted both for $7,000 in cash that he received, as well as a $1,000 check made payable to his campaign.  *See Id.* at 257.  The trial court in *Evans* had instructed the jury that the defendant believed that the "$8,000 he received from [the

FBI agent] *was a campaign contribution*." *Id.* (emphasis added).   And Justice Kennedy's concurrence described the case as one "in which it is alleged that money was given to the public official in the form of a campaign contribution," stating that the requirement of proving a *quid pro quo* in such a case "was established" in *McCormick*.   *Id.* at 277–78 (Kennedy, J.) (concurring in part and concurring in the judgment).[7]

While the Second Circuit has not had occasion to apply *McCormick* and *Evans* in a case involving campaign contributions, its reasoning in prior cases supports the Government's position here.   In particular, when the Second Circuit has discussed the concept of an "explicit" or "express" *quid pro quo*, it has done so in the context of differentiating between (*i*) promises or agreements where "particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts," and (*ii*) broader arrangements—often called "as opportunities arise" schemes—where "a particular payment is made in exchange for a commitment to perform official acts to benefit the payor in the future."   *Ganim*, 510 F.3d at 147; *accord United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) (explaining that "[o]utside the unique context of campaign contributions . . . we have not, in the context of bribery cases, required proof of an express promise regarding the specific official acts to be undertaken as part of the exchange," and contrasting that requirement with prior holdings establishing that "a promise to perform such acts as the

---

[7] In *United States v. Garcia*, the Second Circuit stated that *Evans* "modified" the *McCormick* standard "in non-campaign contribution cases."   992 F.2d 409, 414 (2d Cir. 1993).   That statement has been repeated elsewhere.   *See, e.g.*, *United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007). To the extent it suggested *Evans* did not involve campaign contributions, that statement was clearly incorrect for the reasons described above.   *Cf. United States v. McGregor*, 879 F. Supp. 2d 1308, 1318 (M.D. Ala. 2012) (citing *Ganim*, 510 F.3d at 143) (observing that "[t]he Second and Sixth Circuits misread the factual background in *Evans* when they cabined that decision to non-campaign contribution bribes").   Notably, that aspect of *Evans* did not bear on the decision in *Ganim* or *Garcia*, because neither case involved campaign contributions.   *See Ganim*, 510 F.3d at 136, 138–39 (describing benefits received by the defendant); *Garcia*, 992 F.2d at 410–12 (same).

opportunities arise is sufficient"); *United States v. Coyne*, 4 F.3d 100, 111 (2d Cir. 1993) ("Proof of an explicit promise at the time of payment to perform certain acts is not necessary, and the jury was free to infer that Coyne accepted the $30,000 knowing that it was payment related to his using his influence as County Executive on Crozier's behalf as specific opportunities arose."); *see also United States v. Silver*, 948 F.3d 538, 568 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021) (explaining that, in cases not involving campaign contributions, a "particular question or matter [must] be identified at the time the official enters into a *quid pro quo* arrangement," but the official "need not promise to perform any precise act upon the relevant question or matter"). The former meets the *McCormick* standard, because the *quid pro quo* has the requisite degree of specificity; the latter is viable only in non-campaign contribution cases. In this case, the S-2 properly alleges "particular bribes . . . linked at the time of the corrupt agreement to [a] particular official act[]." *Ganim*, 510 F.3d at 147; *compare Silver*, 948 F.3d at 566 & n.15 (citing *Coyne*, 4 F.3d at 113–14) (explaining that "the *quid pro quo* requirement" does not mandate an "explicit promise" where an offense is predicated on an "as the opportunities arise" theory, and so "which specific actions [an official] would take" can "remain[] unspecified").

Benjamin's contrary arguments turn largely on the statement in *Ganim* that "proof of an express promise is necessary when the payments are made in the form of campaign contributions." (Mot. 24 (quoting *Ganim*, 510 F.3d at 142).) As discussed above, however, the Second Circuit's references to "explicit" or "express" promises or agreements in prior decisions have consistently referred not to *how* an agreement was struck (*i.e.*, whether it was stated or implied), but to whether there is a sufficiently specific link between an official action and a particular payment or benefit. *See Silver*, 948 F.3d at 568; *Rosen*, 716 F.3d at 701; *Ganim*, 510 F.3d at 147; *Coyne*, 4 F.3d at 111. Since *Ganim* did not involve campaign contributions, any discussion of the standard applicable in

such cases was dicta.  But even if it were not, nothing in *Ganim* can be read to supplant a standard articulated by the Supreme Court in a case that *did* involve campaign contributions.  *See Evans*, 504 U.S. at 257–58, 268.  *Ganim* merely discussed what the Government "need *not* show" in non-campaign contribution cases—*i.e.*, whether "the defendant intended for his payments to be tied to specific official acts (or omissions)"—and recognizes that in non-campaign contribution cases "bribery can be accomplished through an ongoing course of conduct, so long as evidence shows that the 'favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor." *United States v. Bahel*, 662 F.3d 610, 635 (2d Cir. 2011) (quoting *Ganim*, 510 F.3d at 148–49).

Ultimately, Benjamin's argument attempts to imbue the terms "explicit" and "express" with special meanings that ignore the content and context of decisions interpreting them.[8]  Similar attempts have been overwhelmingly rejected by other courts.  *See supra* at pp. 8–9 (collecting cases).  For example, the Sixth Circuit has noted that while "some cases debate how 'specific,' 'express' or 'explicit' a *quid pro quo* must be to violate the bribery, extortion and kickback laws," what the law requires is "an agreement . . . which can be formal or informal, written or oral," and "[a]s most bribery agreements will be oral and informal, the question is one of inferences taken

---

[8] That attempt is made possible by the fact that, as other courts have observed, opinions do not always use particular terms with precision.  *See, e.g.*, *Silver*, 948 F.3d at 549 (noting that the court has at times used terms like "agreement" and "promise" interchangeably in this context); *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (observing that "[t]he *McCormick* Court failed to clarify what it meant by 'explicit,' and subsequent courts have struggled to pin down the definition of an explicit *quid pro quo* in various contexts"); *McGregor*, 879 F. Supp. 2d at 1319 ("In the public-corruption context, courts have been particularly lax in the use of certain words—explicit, express, agreement, promise, and *quid pro quo*—that should have clear legal meanings."). In any event, this Court need not parse words in judicial opinions as it would statutory language. *See Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) ("This Court has long stressed that the language of an opinion is not always to be parsed as though we were dealing with the language of a statute.").

from what the participants say, mean and do, all matters that juries are fully equipped to assess." *Terry*, 707 F.3d at 612–13. Similarly, the Seventh Circuit correctly observed, while applying *McCormick*, that "[f]ew politicians say, on or off the record, 'I will exchange official act X for payment Y,'" just as "persons who conspire to rob banks or distribute drugs do not propose or sign contracts in the statutory language." *Blagojevich*, 794 F.3d at 738. And the Ninth Circuit previously rejected an argument that "the explicitness requirement [in *McCormick*] cannot be met unless an official has specifically stated that he will exchange official action for a contribution," because it would "allow officials to escape liability . . . with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money." *Carpenter*, 961 F.2d at 827. Indeed, even the cases on which Benjamin relies reject his position. *See, e.g.*, *Siegelman*, 640 F.3d at 1171 ("Defendants assert that the instruction failed to tell the jury that not only must they find that Siegelman and Scrushy agreed to a *quid pro quo*, . . . but that this agreement had to be express. We disagree that *McCormick* requires such an instruction."); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 850 (E.D. Pa. 2018) (explaining that "[w]hile the *quid pro quo* must be explicit, it need not be express; thus, political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken out loud" and "the jury may consider both direct and circumstantial evidence, including the context of the arrangement"); *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) ("While the *quid pro quo* must be explicit, it need not be express; political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken out loud.").

As these cases make clear, whether or not bribes take the form of campaign contributions, "a *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct" and "is criminal if it is express or if it is implied from . . . words and actions, so long as

[an elected official] intends it be so and the [bribe] payor so interprets it." *Evans*, 504 U.S. at 274 (Kennedy, J.) (concurring in part and concurring in the judgment); *see also, e.g.*, *Davis*, 841 F. App'x at 379 (endorsing Justice Kennedy's concurrence in case involving campaign contributions); *Siegelman*, 640 F.3d at 1171 (same); *Blandford*, 33 F.3d at 696 (same).  As the Second Circuit observed in *Silver*, the defendant official in *Evans* "had never expressly promised to take official action, . . . [b]ut he had . . . 'implicitly promised' to do so when, after several meetings and phone calls, he accepted $8,000 from an undercover FBI agent posing as a real estate developer interested in rezoning a specific plot of land," and the Supreme Court "treated this 'implicit promise' as sufficient" to satisfy "the *quid pro quo* requirement of *McCormick* . . . ."  948 F.3d at 548 (quoting *Evans*, 504 U.S. at 267–68).  The *quid pro quo* alleged in this case likewise satisfies that standard.

Benjamin's generic quotations and lofty rhetoric about protecting legitimate political activity add nothing of substance to his arguments.[9]  (*See* Mot. 15–16, 18–20.)  As Benjamin concedes (*see id.* at 22–24), the Supreme Court carefully weighed such interests in *McCormick*, and it concluded that legitimate political activity is adequately protected by the requirement that the Government prove a direct link between a specific act and an official's receipt of campaign contributions.  *See* 500 U.S. at 272–73; *Evans*, 5004 U.S. at 257–58.  Moreover, *McCormick* was clear that there remains a "forbidden zone of conduct" properly subject to prosecution.  500 U.S. at 273.  Benjamin's conduct falls squarely within that zone.  "'[I]t has always been as plain as a pikestaff that bribes and kickbacks' are prohibited," *Rosen*, 716 F.3d at 700 (quoting *Skilling v.*

---

[9] Benjamin's motion also references a matter involving a different public official in which the Government did not pursue charges five years ago.  (*See* Mot. 21.)  That discussion is irrelevant and, at best, serves merely to demonstrate that the Government carefully considers the particular facts in each case.

*United States*, 561 U.S. 358, 411 (2010)), and thus the First Amendment does not shield Benjamin's conduct.  *See, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 605 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (explaining that "[j]ust because th[e] alleged *quid pro quo* arrangement involved political-party officials, they are not entitled to immunity for their actions under the guise of protected speech"); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 581 (S.D.N.Y. 2014) (rejecting argument that a defendant's conduct was petitioning activity protected under the First Amendment "because bribes (in any context) . . . are not normal and legitimate exercises of the right to petition").  That conduct does not fall within "legitimate constituent services" or "lawful interactions between a representative and a constituent" (Mot. 2, 34), because "[t]aking a bribe . . . is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator," *United States v. Brewster*, 408 U.S. 501, 526 (1972).  Nor is such conduct immunized by claims that a corrupt act might have some positive effects.  *See United States v. Myers*, 692 F.2d 823, 845 (2d Cir. 1982) ("[I]t is *taking* the bribe . . . , not performance of the illicit compact, that is the criminal act." (quoting *Brewster*, 408 U.S. at 526)).

In sum, there is no authority for Benjamin's claim that bribery reaches only elected officials careless enough to state or transcribe the contours of their crime.  In a case involving campaign contributions, *McCormick* and *Evans* require that the Government prove such contributions were provided "in exchange for a specific requested exercise of . . . official power."  *Evans*, 504 U.S. at 258; *accord McCormick*, 500 U.S. at 273 (requiring that campaign contributions be "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act").  The allegations in Counts One through Three satisfy that requirement.

### 2.   Benjamin Misstates and Mischaracterizes the Allegations in the S-2

Apart from misinterpreting the law, Benjamin's motion strains to characterize the S-2's allegations in a manner that supports his other arguments.  In service of that goal, Benjamin misconstrues, ignores, or outright rejects the facts actually alleged in the S-2.  *Contra Goldberg*, 756 F.2d at 950 ("[W]e accept as true all of the allegations of the indictment . . . .  Contrary assertions of fact by the defendants will not be considered.").  Most egregiously, he asserts that the S-2 "does not allege that any promises or agreements – explicit, express, or otherwise – were made . . . at any point" (Mot. 26), when in fact the S-2 alleges a very specific promise and agreement.  (*See, e.g.*, S-2 ¶ 38 ("[Benjamin] . . . corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded"); 40 (alleging Benjamin "solicited and received campaign contributions from [Migdol] in exchange for [Benjamin's] agreement to use, and actual use of, his official authority and influence to obtain the State Grant for Organization-1").)  Benjamin also selectively parses the allegations in the S-2, focusing myopically on the March 2019 meeting between Benjamin and Migdol and arguing that no *quid pro quo* could have been reached then as Benjamin had not yet learned of funding available for the State Grant.  (*See, e.g.*, Mot. 27.)  As the S-2 alleges, after Benjamin learned of available funds, he promptly called Migdol to say he intended to procure a grant for his organization (*see* S-2 ¶¶ 13–14); later allocated that funding (*id.* ¶ 15); and then, in a meeting where Benjamin received fraudulent campaign contributions from Migdol, reminded Migdol of the grant —which was allocated, but not yet paid—and made clear that he still expected Migdol to procure further contributions (*Id.* ¶ 18).  Thus, the S-2 plainly alleges an explicit exchange in which Benjamin took a particular official action (allocating $50,000 in state funding to Organization-1) in return for specific benefits (campaign contributions procured by Migdol).  That is "a specific requested exercise of [Benjamin's] official power" provided "in

17

exchange for" payments "made in the form of [] campaign contribution[s]," *Evans*, 504 U.S. at 258, which identif[ies] "particular bribes . . . linked at the time of the corrupt agreement to [a] particular official act[]," *Ganim*, 510 F.3d at 147.

Given the detailed allegations in the S-2, the cases on which Benjamin relies are readily distinguishable.  In *United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021), for instance, elected court clerks from several counties hired a company and its chief executive officer to collect fines, fees, and other court-related debts.  *Id.* at 1039.  During that same period, the defendants provided thousands of dollars in campaign contributions and gifts to the clerks, and "[b]ased on that conduct," the defendants were charged with bribery and bribery conspiracy.  *Id.*  In *Donagher*, however, "[i]t [wa]s undisputed that the indictment nowhere mention[ed] a '*quid pro quo*' or use[d] any 'words of similar import,' . . . such as 'in exchange for.'"  *Id*. at 1045.  That is not the case here.

In *United States v. Menendez*, 132 F. Supp. 3d 635 (D.N.J. 2015), the court found that certain counts "fail[ed] to satisfy the heightened pleading standard" because they "allege[d] that [the alleged bribe payor] made contributions . . . 'in order to influence [the defendant]'s official acts, *as opportunities arose*," which was little more than "an allegation of a 'generalized expectation of some future favorable action' barred by *McCormick*."  *Id.* at 644 (emphasis added). *Menendez* is consistent with the Second Circuit cases discussed above, *see supra* at pp. 11–12, and is readily distinguishable given the S-2's identification of a specific corrupt exchange rather than an agreement to obtain benefits as opportunities arise.  Notably, *Menendez* declined to dismiss other counts that, like the S-2, identified "specific *quid pro quo* agreements," emphasizing "[t]hat the alleged agreement was not express is irrelevant," and "the trier of fact is quite capable of

deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor." *Id.* at 643.[10]

Benjamin also cites *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014), a civil case in which the Seventh Circuit affirmed a grant of summary judgment dismissing certain bribery-based claims brought under the civil Racketeer Influenced and Corrupt Organizations Act. *See id.* at 725.  Setting aside the lack of summary judgment in criminal cases, *Wedd*, 993 F.3d at 121, the court in *Johnston* found that the plaintiffs had "provide[d] no evidence that [the defendant] offered . . . a bribe in exchange for Governor Blagojevich's signature," and a letter offered as evidence "merely thanked [Blagojevich] for his support" and "did not suggest that Blagojevich had agreed to sign the bill in exchange for a bribe," 763 F.3d at 731.  The court also noted that the plaintiffs "ma[d]e no allegation and ha[d] no evidence that the [r]acetracks ever bribed or attempted to bribe state legislators," nor did they "point to evidence that [Blagojevich] agreed to exert improper influence over state legislators . . . in exchange for a bribe." *Id.* at 729.  Left solely with campaign contributions made at a later date, the Seventh Circuit affirmed the lower court's grant of summary judgment. *Id.* at 731.  As detailed above, however, the allegations in Counts One through Three do not rest solely on temporal proximity.  And unlike summary judgment in a civil case, this Court has not yet seen and heard the evidence in this case—including testimony, communications, and documents—supporting the allegations in the S-2.

_____

[10] Benjamin also cites a later decision in *Menendez*, which dismissed certain counts after trial.  (*See* Mot. 29–30 (citing *Menendez*, 291 F. Supp. 3d at 623–27).)  The crucial difference, of course, is that the decision turned on evidence presented at trial and did not consider only allegations in the indictment.  *See Wedd*, 993 F.3d at 121 (noting that before trial courts "do not evaluate the adequacy of the facts to satisfy the elements of the charged offense").  Moreover, though the court ultimately concluded the evidence was insufficient as to those counts, it again "emphasize[d] that the agreement need not be express, and that a jury may infer a *quid pro quo* from circumstantial evidence." *Menendez*, 291 F. Supp. 3d at 629.

At this stage, the Court does not "evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Dawkins*, 999 F.3d at 780.   Benjamin may not agree with the S-2's allegations, but it is for the jury to determine whether they have been proven.  *See United States v. Pawlowski*, No. 17-390-3, 2017 WL 11350965, at *1 (E.D. Pa. Dec. 5, 2017) ("Whether the acts alleged in the S-2 in fact satisfy the meaning of an explicit *quid pro quo* under *McCormick* . . . are factual determinations to be resolved after the Government has presented evidence at trial."); *see also McCormick*, 500 U.S. at 270 ("It goes without saying that matters of intent are for the jury to consider."); *Percoco*, 2017 WL 6314146 at *7 ("The sufficiency of the Government's evidence of intent cannot be considered on a motion to dismiss the indictment, and the indictment need only track the language of the statute.").  Because the S-2 sufficiently alleges the offenses charged in Counts One through Three, Benjamin's motion should be denied as to those counts.

### D.   Counts Four and Five Sufficiently Allege Violations of 18 U.S.C. § 1519

Benjamin also seeks dismissal of Counts Four and Five, each of which charges Benjamin with destroying, altering, or falsifying records in a federal investigation, in violation of 18 U.S.C. § 1519.  (S-2 ¶¶ 41–44.)  Benjamin's arguments regarding these counts are largely derivative of his arguments with respect to Counts One through Three; in particular, he urges that because the S-2 purportedly "fails to allege that [] Benjamin committed bribery in the first place, it alleges no basis for the claim that [] Benjamin believed he was committing bribery, much less that he contemplated or knowingly intended to obstruct a potential future investigation into a non-existent bribery scheme under § 1519."  (Mot. 34.)  Like Benjamin's arguments with respect to Counts One through Three, his arguments seeking dismissal of Counts Four and Five are meritless.

As with Counts One through Three, the S-2's allegations regarding Counts Four and Five are plainly sufficient, because they "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime[s].'"  *Dawkins*, 999 F.3d at 779.  Count Four

mirrors Section 1519 and specifies that, in or about July 2019, Benjamin "falsified contribution forms for contributions to his Senate Campaign by directing [Migdol] to provide information indicating such contributions were made by others, when in fact, as [Benjamin] knew, those contributions were made and funded by [Migdol], with the intent to impede, obstruct, and influence the investigation and proper administration of a contemplated matter, which matter was within the jurisdiction of the United States Department of Justice." (S-2 ¶ 42.) Count Five similarly tracks the statute and specifies that, in or about August 2021, Benjamin "falsely indicated on an executive appointment questionnaire while under consideration to be appointed Lieutenant Governor of New York that he had never 'directly exercised [his] governmental authority (either as a Legislator or Executive official) concerning a matter of a donor [he] directly solicited,' when in fact [he] had procured the State Grant for Organization-1, which [he] knew was controlled by [Migdol], whom he had repeatedly solicited, with the intent to impede, obstruct, and influence the investigation and proper administration of a contemplated matter, which matter was within the jurisdiction of the United States Department of Justice." (*Id.* ¶ 44.) And once again, each count realleges facts set forth in prior allegations that provide even greater detail. (*See id.* ¶¶ 18–19, 30.)

Benjamin claims "the fundamental premise" of Counts Four and Five is that he "was actually involved in a bribery scheme" that he sought to conceal from investigators, and that this premise is faulty because, Benjamin insists, his "conduct did not constitute bribery." (Mot. 38–39.) His argument rests on an assertion that the allegations in the S-2 are false, *contra Goldberg*, 756 F.2d at 950, and ignores the fact that—whether or not Benjamin concedes he engaged in bribery—the crux of Counts Four and Five is that Benjamin sought to obstruct a matter within the jurisdiction of the Department of Justice. (*See* S-2 ¶¶ 42, 44.) For the reasons discussed above,

Benjamin is wrong that the conduct alleged in the S-2 does not constitute bribery.[11]  And even if Benjamin were not actually convicted of bribery at trial, he may still be found guilty of the obstructive conduct charged in Counts Four and Five.  *See, e.g.*, *United States v. Baldeo*, No. S1 13 Cr. 125 (PAC), 2014 WL 6807833, at *2 (S.D.N.Y. Dec. 3, 2014) ("A conviction of obstructing justice by impeding an investigation does not require that the investigation itself lead to a conviction; rather, an obstruction charge has its own elements, elements which the jury found to exist based on the evidence presented.").

Benjamin's suggestion that the allegations in this case are "unprecedented" is also incorrect.  (Mot. 33.)  The S-2 alleges that Benjamin falsified or aided and abetted the falsification of the documents identified in Counts Four and Five because he was engaged in a bribery scheme with Migdol and sought to conceal their corrupt arrangement like he sought to conceal Migdol's procurement of contributions to his comptroller campaign.  (*See* S-2 ¶¶ 26–29.)  The falsification of those documents related to a matter within the jurisdiction of the Department of Justice, including because concealing Benjamin's corrupt relationship with Migdol furthered a bribery scheme that violated federal law.  There is nothing unusual about those charges or vague about the application of the statute to such conduct.  *Compare, e.g.*, *United States v. Singh*, 979 F.3d 697, 719–20 (9th Cir. 2020), *cert. denied sub nom. Matsura v. United States*, ___ U.S. ___ (May 24, 2021) (rejecting an argument that the defendant's "conduct [wa]s not within the jurisdiction of the United States, because it involved a local campaign, and the falsified campaign disclosure forms violated state and local laws, not federal law," because, while "violations of state campaign

---

[11] Thus, the Court need not decide whether it would violate due process to "[a]llow[] the [G]overnment to proceed on these allegations under § 1519 even where they have failed to allege bribery."  (Mot. 39.)

disclosure laws do not fall within the jurisdiction of the United States," federal law enforcement has jurisdiction to investigate other violations in "state and local elections insofar as the FBI investigates donations" that violate federal law); *United States v. Cossette*, 593 F. App'x 28, 31 (2d Cir. 2014) (upholding conviction of local police officer for making false reports outside of any federal investigation, without any finding that the officer was performing federal duties or employed by offices obliged to report to a federal agency).

Equally meritless is Benjamin's claim that "[t]he conduct . . . alleged in this case is so far removed from any applicable investigation that the [G]overnment has failed to allege a violation of the statute." (Mot. 38.)  The Government need not prove that charges had been filed, *see United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012), or that an investigation had been commenced at the time the offense occurred, *see United States v. Yielding*, 657 F.3d 688, 711 (8th Cir. 2011) ("The statute . . . does not allow a defendant to escape liability for shredding documents with intent to obstruct a foreseeable investigation of a matter . . . just because the investigation has not yet commenced.").  Nor is the Government required to prove that Benjamin "knew his . . . conduct would obstruct a federal investigation, or that a federal investigation would take place," *United States v. Scott*, 979 F.3d 986, 991 (2d Cir. 2020), because Section 1519 does not contain "any requirement that the [G]overnment prove a link between a defendant's conduct and an imminent or pending official proceeding," *United States v. Gray*, 642 F.3d 371, 377 (2d Cir. 2011).  Rather, it is sufficient that a reasonable fact-finder could infer the defendant's conduct was in anticipation of an investigation or future review.  *Id.* at 378 (affirming a § 1519 conviction for correction officers, finding there was sufficient evidence that their actions were in "contemplation" of a matter since the defendant had been trained to report any improper use of force and omitted the beating in an official report).

23

The S-2 alleges that Benjamin falsified documents with the intent to obstruct a contemplated investigation. (S-2 ¶¶ 42, 44.) It further alleges that Benjamin, who had prior electoral experience, was involved in a bribery scheme and did not seek to conceal Migdol's connection to prior contributions unrelated to that scheme. (*Id.* ¶¶ 2, 3, 5.) *See also Singh*, 979 F.3d at 719 (finding sufficient that the defendant "contemplated an investigation due to unlawful activity" where, *inter alia*, he "had a long history of involvement in campaigns and elections, and that he was warned about the reporting requirements"). Benjamin may claim that those allegations are "thin and attenuated" and that "nothing about [his] alleged conduct . . . suggests that he intended to obstruct a federal bribery investigation" (Mot. 39), but "matters of intent are for the jury to consider." *McCormick*, 500 U.S. at 270. On a motion to dismiss, courts do not resolve "factual dispute[s]" like those raised by Benjamin, which are "inextricably intertwined with [his] potential culpability." *Sampson*, 898 F.3d at 281. As such, Benjamin's motion should be denied as to Counts Four and Five.

## II. The Court Should Deny Benjamin's Motion for Further Discovery Regarding Migdol's Plea Allocution

Benjamin next seeks further "discovery" regarding Gerald Migdol's plea allocution. (*See* Mot. 40–65.) Though heavy on rhetoric and insinuation, Benjamin's arguments fail to provide any facts or law that support his request and, accordingly, the Court should deny his motion.

Benjamin broadly seeks additional information regarding the Government's involvement in shaping Migdol's allocution, which he claims may constitute material required to be produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), or as impeachment material. Despite his colorful assertions, there was nothing nefarious about the Government's interactions with Migdol or his lawyers in connection with that allocution. Indeed, "there is nothing *per se* improper in the involvement of prosecutors in drafting, editing, or shaping the plea allocutions of its cooperating

witnesses." *United States v. Ahuja, et al.*, No. 18 Cr. 28 (KPF), Dkt. 457 at 27 (S.D.N.Y. Dec. 17, 2021).  Moreover, as part of its fulsome discovery productions in this case, which also included early productions of material not required to be disclosed until closer to trial, the Government has already disclosed to the defense all discoverable information on this subject.  Both on its own initiative and further upon its receipt of additional requests from Benjamin, the Government affirmatively conducted a search of its files and disclosed relevant information concerning its discussions with Migdol and his counsel regarding Migdol's allocution, as further detailed below. And the Government also disclosed, prior to any request by Benjamin and more than seven months before trial, a full set of reports and notes reflecting statements that Migdol made to the Government with only limited redactions (that related to matters beyond the scope of the S-2). Particularly in light of these broad disclosures, there is no basis for Benjamin's request to conduct a fishing expedition through the Government's internal files.

In an effort to fabricate some exceptional need for that fishing expedition, Benjamin's arguments create the false impression that Migdol's plea allocution was inconsistent with facts developed during the Government's investigation by distorting the record of what Migdol actually told the Government.  He does so by cherry-picking excerpts from reports and notes of Migdol's statements, repeatedly quoting short selections while omitting crucial portions central to the allegations in this case—including statements that directly follow those Benjamin extracts.  Most notably, throughout his motion Benjamin repeats certain statements from the report of an interview of Migdol on December 10, 2022, arguing that those statements show there was no "explicit" corrupt agreement in this case.  (*See* Mot. 40, 54.)  But each time, Benjamin ignores that those same notes—indeed, sometimes the very next sentence—actually reflect that Migdol told the Government, months before any discussions about a plea allocution in April 2022, that Migdol

had a "*quid pro quo*" agreement with Benjamin involving an exchange of the State Grant for

campaign contributions.  (Decl. of Barry H. Berke, Esq. ("Berke Decl."), Ex. B at 2–3 (noting █████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ ).)  Benjamin's remaining arguments

are unfounded and misleading.   For the reasons set forth below, his demands for additional

information should be denied.

### A.   The Government's Broad Disclosures Regarding the Plea Allocution

Gerald Migdol pleaded guilty before a Magistrate Judge on April 11, 2022, under seal.

This Court accepted Migdol's guilty plea on April 13, 2022.  On May 9, 2022, the Government

moved to unseal and docket Migdol's guilty plea, the superseding information to which he pleaded

guilty (the "S-1"), and the transcript of his plea proceeding (the "Plea Transcript").  (Dkt. 35.)

That same day, the Court granted the Government's request for unsealing.  (*Id.*)  On May 27, 2022,

less than two months after Benjamin's indictment, the Government produced to him, among other

things, the S-1 and the Plea Transcript.   As relevant here, the Plea Transcript contained the

following allocution that Migdol provided to the Court with respect to the bribery-related offenses

charged in Counts One through Three of the Indictment:

> For counts One through Three, in 2019, I entered into a quid pro quo agreement
> with Brian Benjamin, who was then a state Senator.  Specifically, he offered to
> obtain a $50,000 state grant for my charitable organization in exchange for
> campaign contributions that I agreed to give him and procure for him.   In
> furtherance of the agreement, calls were made, and texts and emails were sent to
> and from Manhattan.

(Dkt. 40 at 23:11–18.)  Additionally, beyond providing Benjamin with the core plea documents

identified above, the Government conducted a prompt and thorough review of its files to gather

and produce any further information concerning discussions between the Government and Migdol

or his counsel related to Migdol's allocution, including any drafts of that allocution exchanged

with Migdol's counsel.  The Government also decided to produce a full set of reports and notes of statements Migdol had made to the Government during his prior interviews.  Although the Government is under no obligation to produce material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), or 18 U.S.C. § 3500 at this stage of the proceedings, the Government elected to produce these materials early, recognizing that Benjamin may wish to make certain arguments or seek permission to pursue certain lines of cross-examination based on these materials.[12]

In particular, in advance of these productions, each of the Assistant United States Attorneys and their two unit supervisors who participated, directly or indirectly, in discussions with Migdol or his counsel concerning Migdol's allocution, reviewed their files.  Cognizant of its disclosure obligations under *Brady*, *Giglio*, and their progeny, the Government reviewed:  (*a*) its written communications with counsel for Migdol regarding the substance of his allocution; (*b*) internal notes memorializing communications with Migdol's counsel regarding the substance of the allocution; and (*c*) internal communications concerning the allocution.  As part of this process, the Government also searched for all draft versions of the allocution in the Government's possession, and conducted a review of internal work product, deliberative process communications concerning the substance of the allocution, and grand jury materials.  The Government also considered whether there were any unmemorialized oral conversations with Migdol's counsel relating to Migdol's allocution that may contain disclosable information.  Based on those reviews, the

---

[12] To be clear, the Government does not concede that such arguments or potential lines of cross-examination would be permissible in this case.  *See, e.g.*, *Ahuja*, No. 18 Cr. 328 (KPF), Dkt. 457 at 27:8–28:6 (explaining any use of such information must be balanced against countervailing concerns under Federal Rule of Evidence 403 and "in many cases, the probative value of the [G]overnment's involvement in the allocution won't overcome those concerns").

Government made disclosures on this topic on May 27, 2022; June 16, 2022; and June 23, 2022. Those disclosures are described in more detail below.

*May 27, 2022*

The Government's May 27, 2022 production, which was made prior to any requests from Benjamin on this topic, included disclosures related to the Government's communications with Migdol's counsel regarding Migdol's allocution, as well as significant material related to Migdol's cooperation in general that well exceeds the Government's obligations under Federal Rule of Criminal Procedure 16. Among other things, the Government affirmatively produced the following:

- Draft Allocutions: Documents reflecting all draft versions of Migdol's allocution exchanged between the Government and Migdol's counsel, including (a) a proposed draft allocution sent from counsel for Gerald Migdol to the Government on April 10, 2022 (Berke Decl., Ex. A), and (b) a proposed draft allocution sent by the Government to counsel for Migdol, also on April 10, 2022, first in an email (*id.*, Ex. D) and then—at the request of Migdol's counsel—re-attached to an email as a word document.[13]

- Written Communications with Counsel for Migdol: Email communications with counsel for Migdol regarding the substance of Migdol's plea allocution. (*See* Berke Decl., Exs. A, D.)

- Notes of a Call with Counsel for Migdol: Notes memorializing a call on April 10, 2022, between the Government and counsel for Migdol regarding the substance of the allocution. (Berke Decl., Ex. C.)

- S-1 and Plea Transcript: The S-1 and the Plea Transcript, which reflects the allocution Migdol provided under seal in court.[14]

- Notes of Interviews with Gerald Migdol and Others: A complete set of notes and reports of interviews reflecting information provided to the Government

---

[13] This separate email and attachment, which was not appended to the Berke Declaration, was produced as SDNY_BB_00130210–130212, and the substance of that draft allocution is identical to the prior emailed version.

[14] These documents were produced as SDNY_BB_00130242–250, and SDNY_BB_00130213–241, respectively.

28

> by Gerald Migdol, which contained limited redactions of information unrelated
> to the subject matter of this case, as well as notes and reports of interviews
> reflecting information provided to the Government by certain other individuals
> with similarly limited redactions.

(*See* Ex. 1 (Discovery Ltr. dated May 27, 2022) at 2.)

*June 16, 2022*

On June 1, 2022, in response to the Government's May 27 production, the Government received a letter from Benjamin containing 36 requests for "documents and external and internal communications" across expansive categories of information purportedly related to Gerald Migdol's plea hearing and allocution.  (Berke Decl., Ex. L (the "June 1 Letter") at 2.)  Most discoverable information requested in the June 1 Letter had already been produced by the Government in its May 27, 2022 production.  The Government nonetheless carefully considered each of the requests to determine whether any additional responsive information existed that also should be disclosed.  As described above, that consideration included a full review of the Government's files, including the files, emails, communications, and notes maintained by the AUSAs who worked on the investigation of this matter, as well as their supervisors.

On June 16, 2022, the Government produced additional information, including Gerald Migdol's final signed plea agreement (Berke Decl., Ex. H),[15] and further pointed Benjamin to portions of previously-produced Grand Jury minutes (*id.*, Ex. K).  The cover letter to the June 16, 2022 production (*id.*, Ex. M (the "June 16 Letter")), also provided certain additional disclosures reflecting the substance of a brief oral conversation between the Government and Migdol's counsel prior to the plea proceeding on April 11.  Specifically, that disclosure provided:

> Gerald Migdol was not present for this conversation, which took place in a separate
> room outside the courtroom.  During the conversation, counsel for Migdol stated,

---

[15] This document contained limited redactions of material that goes beyond the scope of the S-2.

> in substance and in part, that the Government's proposed allocution was accurate and acceptable to him and Migdol, so Migdol would be allocuting consistent with it.  Counsel for Migdol also made a comment to the effect of, "I thought my version was fine, too."  Counsel for Migdol proposed one change to the second sentence of the Government's proposed allocution (changing "he agreed to obtain" to "he offered to obtain," and then adding "that I agreed to give" later in the sentence).  The Government agreed that the allocution remained accurate and acceptable with that change.

(Berke Decl., Ex. M at 3.)  Where possible, the Government also provided clarifying information in response to particular questions posed by Benjamin in the June 1 Letter.

For example, Benjamin's Request No. 14 had sought "external and internal communications concerning the [G]overnment's April 10, 2022 meeting with Gerald Migdol and his counsel when Mr. Migdol previewed his proposed allocution with the government, including, but not limited to, what Mr. Migdol and his counsel disclosed regarding the allocution and what the government said about the allocution."  (*Id.* at 4.)  The June 16 Letter noted that Benjamin's request appeared to assume that Migdol was present for an April 10 conversation between the Government and Migdol's counsel during which counsel "previewed [Migdol's] proposed allocution," and the Government informed Benjamin that his assumption was incorrect.  (*Id.* at 3.) The Government also directed Benjamin to redacted notes it had produced on May 27 regarding an April 10 meeting between the Government, Migdol, and his counsel, which reflected the Government's memorialization of certain statements by Migdol.  (*Id.* at 3–4.)   In light of Benjamin's further inquiries, the Government produced those notes in unredacted form (*see* Berke Decl., Ex. J) along with the June 16 Letter, specifically setting out the previously redacted text from those notes:

> [The Government] [e]xplained that [I]nformation contains additional counts because all cooperators are required to plead guilty to all crimes.  Explained that 5K will contain all facts – good and bad – and that it is not his job to help us win cases or convict people.  Just to tell the truth.  GM responded that he already knew that.

(Berke Decl., Ex. M at 3–4.)  The June 16 Letter also clarified for Benjamin where the Government

had not identified responsive, disclosable information, such as for his Request No. 8, which sought

documents and internal and external communications concerning whether to disclose to the court

certain details surrounding Migdol's plea allocution.  (*See id.* at 5–6.)

*June 23, 2022*

The Government made an additional disclosure on June 23, 2022 (*see* Berke Decl., Ex. I),

in which it provided information concerning the substance of a brief oral conversation between the

Government and Migdol's counsel on April 8, 2022.  That disclosure stated:

> During that conversation, counsel for Migdol expressed his view that Migdol's
> allocution would be an opportunity for him to "tell his story."  The Government
> responded, in substance and in part, that while Migdol would have the opportunity
> to do so at sentencing, Migdol's plea allocution should focus only on addressing
> the elements of the offenses to which Migdol would be pleading guilty, which were
> reflected in the "to wit" clauses of the Superseding Information provided to
> Migdol's counsel.

(*Id.* at 1–2.)

## B.  Argument

Not content with the Government's prompt and fulsome efforts to review its files and

provide Benjamin—more than seven months before trial—with the material described above,

Benjamin has moved to compel the Government to provide further information, much of which

does not exist, is not discoverable, or is irrelevant to any material issue.  In an effort to bolster his

wide-ranging requests for further information, Benjamin implies—without basis or justification—

that the Government's conduct with respect to Migdol's allocution was improper.  And despite the

significant material produced to Benjamin regarding this subject, much of which was provided

long before disclosure was required, *see, e.g.*, *United States v. Espinal*, 96 F. Supp. 3d 53, 66

(S.D.N.Y. 2015) (noting that "the practice in the Southern District of New York is for the

[G]overnment to produce 3500 (and *Giglio*) material a week or two before the start of trial,

depending on the complexity of the case"), he suggests the Government somehow has sought to avoid its discovery obligations.  Benjamin's accusations are unfounded, his expansive requests have no basis in fact or law, and his motion should be denied.

As an initial matter, the Government's communications with Migdol's counsel regarding Migdol's plea allocution were in no way improper.  As noted above, "there is nothing *per se* improper in the involvement of prosecutors in drafting, editing, shaping the plea allocutions of its cooperating witnesses."  *Ahuja*, No. 18 Cr. 328 (KPF), Dkt. 457 at 27.  Particularly in the context of a guilty plea pursuant to a plea agreement, there is nothing wrong with the Government insisting that a defendant's allocution be fully accurate.  Indeed, prosecutors have an "obligation" to ensure that guilty pleas comply with the requirements of Federal Rule of Criminal Procedure 11.  *United States v. Pattee*, 820 F.3d 496, 504 (2d Cir. 2016).  Thus, while Benjamin claims it is "truly stunning" that the Government might recommend that the court reject Migdol's plea unless changes were made to the draft allocution (Mot. 64), there is nothing remarkable about the fact that the Government was not prepared to endorse an allocution that "d[id] not hit the elements for each of the offenses" and "[p]rovid[ed] a narrative of some, but not all, of the factual events," thus "r[unning] a serious risk that the truncated version [would] appear[] incomplete or inaccurate." (Berke Decl., Ex. D at 1.)

Regardless, recognizing that Benjamin may nonetheless wish to make arguments or seek permission to pursue certain lines of cross-examination based on the Government's involvement in drafting a cooperator's allocution, the Government affirmatively made considerable disclosures concerning this topic prior to any requests by Benjamin.[16]  As set forth in detail above, the

---

[16] *See supra* p. 27 n.12.

Government has now produced:  (*a*) all draft versions of Migdol's plea allocution exchanged with his counsel; (*b*) all written communications with Migdol's counsel regarding the substance of Migdol's allocution; (*c*) a detailed summary of a call with Migdol's counsel regarding the substance of the allocution; (*d*) disclosures regarding two brief oral conversations between the Government and Migdol's counsel concerning the allocution; and (*e*) all reports and notes reflecting statements by Migdol to the Government concerning matters within the scope of the S-2. Through these productions, the Government has provided all relevant, discoverable material to which Benjamin is entitled on the subject of Migdol's allocution and has fully complied with its disclosure obligations.[17]

Despite those efforts, Benjamin accuses the Government of only "produc[ing] a handful of materials [] relating to these issues" (Mot. 55) and otherwise "refus[ing] to produce materials in response to [Benjamin's] requests" (*id.* at 5).  This is wrong and misleading.  As detailed above, the Government's disclosures regarding Migdol's plea allocution have been substantial, and include, among other things, material not required to be produced until much closer to trial. Benjamin fails to cite any authority that requires more.  In *Ahuja*, on which Benjamin primarily relies, the court faulted the Government for failing to produce until a year after trial a comparison document showing the Government had edited a cooperator allocution, and for not memorializing certain communications with the cooperator's counsel concerning that involvement.  *See* No. 18

---

[17] At various points, Benjamin incorrectly claims that Government's disclosures were untimely. (Mot. 59.)  That simply is not true given the prompt disclosures that were made.  In any event, the Government is required to "disclose *Brady* and *Giglio* material in time for its effective use at trial or at a plea proceeding."  *United States v. Coppa*, 267 F. 3d 132, 146 (2d Cir. 2001); *see also United States v. Abrams*, 539 F. Supp. 378, 390 (S.D.N.Y. 1982) ("*Brady* . . . does not require the [G]overnment to disclose information pertaining to the credibility of witnesses before that witness testifies.").  To the extent *Brady* or *Giglio* applies here, the Government has met this standard.

Cr. 328 (KPF), Dkt. 457 at 32.  In contrast, here the Government promptly identified, reviewed, and produced *precisely this information* as part of its initial discovery productions, within months of Benjamin's indictment and far in advance of trial.  Thus, Benjamin has been provided with the information necessary to pursue any investigative leads or make any motions *in limine* he wishes regarding proposed cross-examination or jury arguments.  *See id.* at 28 (observing courts may consider Government involvement in shaping cooperator allocutions when determining the proper scope of the cooperator's cross-examination).

Nonetheless, Benjamin makes expansive and general demands for "all communications, notes or other materials regarding the allocution and surrounding circumstances." (Mot. 5.)  This is nothing more than an attempt to conduct "a broad and blind fishing expedition among items possessed by the Government on the chance that something impeaching might turn up." *United States v. Delacruz*, No. 14 Cr. 815 (KBF), 2015 WL 2211943, at *1 (S.D.N.Y. May 12, 2015). Benjamin attempts to justify that foray by insinuating the Government acted improperly with respect to its involvement in Migdol's allocution, which is not true.  *See* No. 18 Cr. 328 (KPF), Dkt. 457 at 27.  And he does so by distorting the factual record of what Migdol told the Government, apparently attempting to make the allocution later revised by the Government seem inconsistent with Migdol's prior statements.  (*See, e.g.*, Mot. 54–55.)  Those efforts are misleading and unavailing.

For instance, Benjamin brazenly asserts that Migdol's original proposed allocution "made no mention of a purported *quid pro quo* agreement with [] Benjamin or otherwise indicated that [] Benjamin acted with a corrupt state of mind." (Mot. 53; *see also* Mot. 40–41 (suggesting the draft allocution provided by Migdol's counsel "omitted any mention of a *quid pro quo*, explicit or otherwise").)  But that is simply false.  While problematic in some ways given the omission of

34

certain elements and its attempt to distill several hours-long interviews into a few sentences, the original allocution proposed by Migdol's counsel clearly stated that Migdol had provided campaign contributions to Benjamin "in corrupt exchange for his having arranged the grant." (Berke Decl., Ex. A at 2).[18]

Similarly, citing snippets from interviews with Migdol, Benjamin insists throughout his motion that Migdol never definitively described a corrupt agreement between them. But in recounting the content of Migdol's statements, Benjamin selectively quotes portions of those statements while omitting key information. For example, no less than three times (*see* Mot. 12, 40, 54), Benjamin misleadingly quotes from a report of Migdol's December 10, 2021 interview in which Migdol discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮, citing the following:



(Berke Decl., Ex. B at 2–3.) Claiming that "after four months of meeting with the prosecution . . . , Migdol's attorney sent the prosecution a draft allocution that omitted any mention of a *quid pro quo*, explicit or otherwise," Benjamin then accuses the Government of improperly "insert[ing] the three magic words – *quid pro quo* – into [Migdol's] allocution . . . in an apparent effort to buttress their theory of the case and impede Mr. Benjamin's defense." (Mot. 40–41, 55.) That is a

---

[18] Benjamin suggests that the Government's revisions to Migdol's proposed allocution "reflect[s] the prosecution's attempt to fill the gaping hole in their case against . . . Benjamin" (Mot. 51), but that claim makes no sense. It is not clear that Migdol's allocution would be admissible evidence at trial, *see, e.g., United States v. Becker*, 502 F.3d 122, 126 (2d Cir. 2007) (reversing conviction where Government relied on, *inter alia*, plea allocutions of co-conspirators entered into evidence); *Ahuja*, No. 18 Cr. 328 (KPF), Dkt. 457 at 28:15–17 (noting "there is a difference between a plea allocution that isn't read into the record at trial, and the actual trial testimony of a cooperator"), and the Government currently has no intent to offer it. Moreover, as discussed *infra*, the allocution merely reflected what Migdol had already told the Government in prior interviews.

remarkable accusation, since the *very next line* in the same report Benjamin cites, which he is careful to omit each time, reflects that Migdol confirmed to the Government that:



(Berke Decl., Ex. B at 2–3.)  The allocution drafted by the Government regarding the bribery scheme, which states that Migdol "entered into a quid pro quo agreement with Brian Benjamin" (Berke Decl., Ex. D), is entirely consistent with this statement.  Benjamin likewise omits that it was Migdol who

.  (*See* Berke Decl., Ex. B at 2–3

); *see also* Ex. 2 (Report of Interview of Gerald Migdol on Dec. 6, 2021) at 3–4

); Ex. 3. (Report of Interview of Gerald Migdol on Mar. 15, 2022) at 2) (

).  Benjamin also misleadingly quotes a report of a March 28, 2022 interview of Migdol, describing that report as

(Mot. 54 (quoting Berke Decl., Ex. O at 2) (emphasis in original).)  Again, however, the *very next sentence* conspicuously omitted by Benjamin says that,

(Berke Decl., Ex. O at 2 (emphasis added).)  Considering rather than ignoring those statements, it is clear that Migdol's ultimate allocution was consistent with the facts developed

over the course of this investigation, including information Migdol had provided during interviews with the Government.

Benjamin argues further information is crucial to the defense because it may show there was no explicit *quid pro quo* in this case.  (*See, e.g.*, Mot. 40 (claiming that "[b]ased on what the prosecution has turned over thus far in discovery, . . . Gerald Migdol specifically told the prosecution ███████████████████████████████████"); Mot. 53 (stating that "[i]n his initial draft" Migdol did not state "there was any explicit discussion of an agreement".)  He reaches that conclusion only by ignoring key portions of Migdol's statements to the Government, as discussed above, and by attempting to reframe statements that Benjamin ███ ███████████████████████████████ as suggesting there was no explicit *quid pro quo*, even though Migdol further explained that ███████████████████████████████████ (Berke Decl., Ex. B at 2–3 (emphasis added)), and consistently made clear that ███████████ ███████████████████████ (*see* Ex. 2 at 3–4; Ex. 3 at 2; Berke Decl., Ex. B at 2–3).  Even if that reframing were accurate, however, Benjamin's argument again depends on his incorrect belief that any corrupt bargain must be stated out loud or written down.  As discussed in Section I.B.1 *supra*, that argument is wrong.  So while Benjamin claims "the question of whether there was an explicit *quid pro quo* . . . will be absolutely critical at trial" (Mot. 40), much of what he argues—and much of the additional information he demands—is in service of a legal theory squarely foreclosed by *McCormick*, *Evans*, and their progeny.  An incorrect and unsupported defense cannot justify the "broad and blind fishing expedition" Benjamin seeks.  *Delacruz*, 2015 WL 2211943 at *1.

Benjamin also claims the Government must specify any "inaccuracies" it identified in the draft allocution provided by Migdol's counsel.  (Mot. 57–58.)  As a threshold matter, his demands

for an explanation of the Government's mental processes—expressly seeking to require the Government to detail its thinking and analysis of the record (Mot. 60 (complaining that the defense may have to "figure out for ourselves what the prosecution deemed to be inaccurate" based on the evidence produced))—improperly try to force the Government to catalogue evidence, explain its legal significance, and divulge Government work product and deliberative processes. *See United States v. Bagley*, 473 U.S. 667, 675 (1985) ("The prosecutor is not required to deliver his entire file to defense counsel."); *United States v. Nobles*, 422 U.S. 225, 238 (1975) (recognizing that work-product doctrine may be applied to the files of the prosecution); *United States v. Gangi*, 1 F. Supp. 2d 256, 263 (S.D.N.Y. 1998) (observing that "the Government's legal theories, mental impressions, and thought processes" are privileged as attorney work product and generally shielded from inquiry); *cf. United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996) (noting the Government is "not required to particularize all of its evidence before trial" or "disclose the manner in which it will prove the charges or preview its evidence or legal theory"); *accord* Fed. R. Crim. P. 16(a)(2). Of course, where the Government is in possession of information favorable to the defense and material to guilt or punishment, it must disclose those *facts*, even if the information is found in internal communications, work product, or deliberative process materials. *See Coppa*, 267 F. 3d at 139 ("The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt or punishment."). [19] But Benjamin is not entitled to demand disclosure of "the Government's legal theories, mental impressions, and thought processes," *Gangi*, 1 F. Supp. 2d at 263, merely because

---

[19] Although Benjamin claims generally that the wide-ranging categories of information he seeks may be *Brady* material, the legal criteria for such material is more searching. *See Bagley*, 473 U.S. at 675; *Coppa*, 267 F. 3d at 139. Other than suggesting that it may be helpful or important to the defense, Benjamin makes little effort to explain how the information he demands is material.

38

he believes it might be useful to his defense.  *See Coppa*, 267 F.3d at 139; *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976) (noting that such a standard would "necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense").  Contrary to Benjamin's tacit assumption, *Brady* does not require the Government to adopt an open file disclosure policy.  *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Bagley*, 473 U.S. at 675; *cf. Moore v. Illinois*, 408 U.S. 786, 797 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.").

In any event, the Government has not withheld any discoverable information regarding Migdol's allocution.  While Benjamin finds it "hard to understand the basis" for certain statements the Government made to Migdol's counsel and demands that the Government be ordered to "disclose [additional] materials and information that address all of the open questions" he conjures (Mot. 56, 65), Benjamin already has the information he seeks.  The Government's draft allocution, which has been produced to the defense, reflects the Government's changes to better capture the information Migdol provided during his interviews and ensure that the allocution met the elements of all seven offenses charged in the S-1.  The notes and interview reports concerning those interviews have also been produced.  And Benjamin is wrong to assume there are undisclosed materials reflecting how Migdol and his counsel "repeatedly resisted" the Government's entreaties about changes to the allocution.  (Mot. 58–59.)  As the Government disclosed in its June 23, 2022 letter, in a separate phone call with counsel for Migdol on April 8, 2022, the Government had asked that any allocution track the elements of the offenses in the S-1.  And the notes of the April 10 call reflect that the same matter arose again during that discussion.  The Government has not identified any other material concerning this issue, and Benjamin's speculation it might exist is

just that.  In other words, the Government meant what it conveyed to Migdol's counsel, both orally and in writing:  the draft allocution that counsel had proposed was "not legally sufficient because it d[id] not hit the elements for each of the offenses"; in some aspects appeared "inconsistent with statements [Migdol] ha[d] made" during interviews; and, by "[p]roviding a narrative of some, but not all, of the factual events r[an] a serious risk that the truncated version [would] appear[] incomplete or inaccurate."[20]  (Berke Decl., Ex. D at 1; *accord* Berke Decl., Ex. C (conveying the Government's view that the draft allocution was "inconsistent with certain information [Migdol] provided" and should not include "extraneous narrative" because "it is difficult if not impossible to condense so many proffer sessions into a short allocution")).

The balance of Benjamin's arguments fail to specify any additional materials to which he is entitled, instead engaging in a fit of speculation (*see* Mot. 59–60) and requesting a Court-ordered fishing expedition through the Government's files.  (*Id.* at 62 (asking that the Court "direct the prosecution to review their internal and external communications, notes, and other documents for any further materials and details bearing on any of these events or issues, including the veracity of Migdol's interview statements and proposed allocution, the prosecution's role in pressuring Migdol to provide the version they drafted, and his repeated resistance to that demand."); *id.* at 65 ("We respectfully submit that the Court should direct the prosecution to produce all materials and information in its possession relating to these questions.")).  He also claims, without justification, that there must exist some trove of discoverable material on this issue that the Government is

---

[20] As reflected in material produced to Benjamin, the Government even identified an example of a factual inaccuracy during its oral conversation with counsel on April 10, which pertained to $25,000 in contributions that had been directed to Benjamin's senate campaign.  (*See* Berke Decl., Ex. C ("I noted that in the reference to a $25,000 contribution 'to his campaign,' it appears that 'campaign' refers to the Comptroller campaign, because that is the campaign previously mentioned [in the draft].").)  This document was part of the Government's May 27, 2022 production.

simply refusing to disclose.  (*See, e.g.*, Mot. 55 (speculating that the Government has failed "to produce the full set of materials and information that bear on these issues")).  This is simply not the case.  As detailed above, the Government has reviewed its files and produced the relevant, discoverable materials in its possession.  This material discloses the fact and scope of the Government's involvement in Migdol's allocution and provides Benjamin with all information on that subject to which he is entitled.  To the extent the defense believes such material casts doubt on Migdol's testimony or undermines the Government's investigation, Benjamin is free to try and pursue those arguments at trial, subject to *in limine* rulings by this Court.  But Benjamin has not provided any basis for additional discovery, and his exceedingly broad demands for further material should be denied.  *Cf. United States v. Rowland*, No. 14 Cr. 79 (JBA), 2015 WL 800083, at *5 (D. Conn. Feb. 25, 2015), *aff'd*, 826 F.3d 100 (2d Cir. 2016) (rejecting post-trial request for discovery under *Brady* based on, *inter alia,* an "undisclosed . . . draft plea allocution" the court assumed to be exculpatory based on its "somewhat tepid acknowledgement of guilt").

## III.   The Court Should Deny Benjamin's Motion for a Bill of Particulars

Benjamin's request for a bill of particulars further specifying the bribes at issue in Count One and providing the names of all co-conspirators should be denied.

### A.   Legal Standard

A bill of particulars is only appropriate to furnish facts that are necessary to apprise a defendant of the charges against him with sufficient precision to (*i*) enable him to prepare his defense, (*ii*) avoid unfair surprise at trial, and (*iii*) preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  In other words, a "bill of particulars is required only where the charges of the indictment are so general that they do not advise the

defendant of the specific acts of which he is accused." *United States v. Block*, No. 16 Cr. 595 (JPO), 2017 WL 1608905, at \*5 (S.D.N.Y. 2017); *accord Torres*, 901 F.3d at 234.

"Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.3d at 234. Thus, "a defendant is not entitled to disclosure of the manner in which the [G]overnment will attempt to prove the charge, the precise manner in which the [G]overnment will allege the defendant committed the crimes charged, or a preview of the [G]overnment's evidence or legal theories." *United States v. Skelos*, 2015 WL 6159326, at \*13 (S.D.N.Y. 2015); *accord United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974) ("The prosecution need not particularize all of its evidence.")).

Moreover, "the standard for granting a bill of particulars is not whether it would be helpful to [the] defense but, rather, whether it is necessary . . . ." *Block*, 2017 WL 1608905, at \*6; *accord United States v. Rose*, 19 Cr. 789 (PGG), 2021 WL 2117119, at \*14 (S.D.N.Y. 2021); *United States v. Horge*, No. 19 Cr. 96 (LTS), 2020 WL 6273932, at \*3 (S.D.N.Y. 2020); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985). Indeed, bills of particulars are generally disfavored because they risk "confin[ing] the [G]overnment's evidence at trial to the particulars furnished." *Payden*, 613 F. Supp. at 816; *accord Alston v. United States*, No. 15 Cr. 435 (CM), 2021 WL 2380064, at \*7 (S.D.N.Y. 2021) ("A bill of particulars is generally disfavored in federal practice; it is ordered only where the indictment (as supplemented by discovery and other disclosures) is not sufficient to provide adequate notice to a defendant.").

Finally, in assessing the need for a bill of particulars, courts consider whether the information sought by defendant, even if not in the indictment, has been provided in some acceptable alternate form, including discovery. *Bortnovsky*, 820 F.2d at 574; *United States v.*

*Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (finding defendant adequately informed of nature of charges through discovery); *United States v. Mangini*, No. 20 Cr. 162 (JPO), 2021 WL 1268507, at *2 (S.D.N.Y. 2021) ("A bill of particulars is not necessary where the Government makes sufficient disclosures concerning its evidence and witnesses by other means, such as through a detailed indictment and discovery."). The decision to grant or deny a bill of particulars is within the sound discretion of the district court. *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984).

## B.  Argument

Benjamin's request for a bill of particulars identifying the bribes at issue in Count One and the names of all co-conspirators should be denied.

### 1.  The S-2 Describes the Bribes at Issue in Count One with Sufficient Particularity

The bribes at issue in Count One are identified in the very first sentence of the S-2: "From at least in or about 2019, up to and including at least in or about 2021, [Benjamin] . . . participated in a scheme to obtain campaign contributions from . . . [Migdol] . . . in exchange for [Benjamin]'s agreement to use, and actual use of, his official authority and influence as a New York State Senator to obtain a $50,000 grant of state funds (the "State Grant") for a non-profit organization controlled by [Migdol] ("Organization-1")."  (S-2 ¶ 1.)  This is neither a complicated nor a sprawling conspiracy; Benjamin took campaign contributions procured by Migdol in exchange for the State Grant for Organization-1.  No additional "particulars" about these bribes are required.[21]

---

[21] To the extent Benjamin demands to know whether the Government alleges his offer of assistance to Migdol regarding a zoning variance is one of the official acts at issue in Count One, the S-2 already makes clear it is not.  Although not pertinent to the Court's resolution of the instant motions, however, the Government notes that Benjamin's offer with respect to the variance is nonetheless relevant and admissible as, among other thing, evidence of the corrupt relationship between Migdol and Benjamin.

Indeed, courts in this District routinely deny requests for bills of particulars in comparable, and even in more complex, cases.  For example, in *United States v. Chambers*, an attorney was charged with giving a police officer both cash and gifts in return for favorable treatment of the defendant's clients' firearms licensing matters.  800 F. App'x 43, 45 (2d Cir. 2020).  The district court denied the defendant's request for particulars regarding the alleged bribes.  *United States v. Chambers*, No. 17 Cr. 396 (WHP), 2018 WL 1726239, at *2 (S.D.N.Y. 2018) (citing *United States v. Mangano*, 2018 WL 851860, at *17 (E.D.N.Y. 2018) (denying request for bill of particulars identifying, *inter alia*, all of the bribes, kickbacks, and official acts on the basis that such information could be obtained from discovery and other pre-trial disclosures by the Government)).  Likewise, in *United States v. Jamie*, where the defendant was charged as part of a bribery scheme involving DMV employees, the district court denied a motion for a bill of particulars itemizing the bribes at issue.  No. 92 Cr. 194 (CSH), 1992 WL 188360, at *1 (S.D.N.Y. 1992).

Indeed, this Court has properly denied requests for bills of particulars even in cases involving multi-year, multi-party frauds.  For example, in *United States v. Zahavi*—a bank fraud case—this Court denied a motion for a bill of particulars identifying the specific false statements and corresponding bank actions allegedly influenced by those false statements, concluding that the defendants were entitled only to know the general contours of the scheme, which was sufficiently described in the indictment.  No. 12 Cr. 288 (JPO), 2012 WL 5288743, at **6–7 (S.D.N.Y. 2012).  Likewise, in *United States v. Middendorf*, which involved a two-year scheme to pass a range of confidential information from various people at the Public Company Accounting Oversight Board to various employees at KPMG, No. 18 Cr. 36 (JPO), 2018 WL 3443117, at *1 (S.D.N.Y. 2018), this Court denied a request for particulars regarding the wire transmissions and false statements underlying two wire fraud counts, concluding that the overall scheme was alleged with "reasonable

44

specificity," No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *2 (S.D.N.Y. 2018).  In particular, this Court held that "the [i]ndictment sufficiently advise[d] the [d]efendants of the nature of the charges against them" because "it describe[d] with specificity the acts they allegedly committed and the nature of the conspiracy of which they are accused, and it explain[ed] (in language closely tracking that of the relevant statutes) the crimes alleged. That is sufficient."  *Middendorf*, 2018 WL 3956494, at *1; *accord Block*, 2017 WL 1608905, at *6 (denying for the same reasons a request for a bill of particulars where the defendant was charged with various securities fraud and false statement offenses).  Indeed, as this Court explained in *Block*, requests for particulars of a conspiracy are "routinely denied."  *Id.* at *6.

Benjamin does not address any of the aforementioned cases in his motion.  Instead, he relies principally on *United States v. Siddiqui*, a case in which the defendant—a project officer with the New York School Construction Authority—took cash and in-kind bribes from a contractor in exchange for approving various change orders and other payments relating to a school construction project.  No. 06 Cr. 377 (SWK), 2007 WL 549420, at *1 (S.D.N.Y. 2007).  The district court granted the defendant's request for a bill of particulars identifying, *inter alia*, (i) the date and amount of the alleged cash bribes, and (ii) and the requests for payment and change orders alleged to have been approved as part of the scheme.  *Id.* at **2–3.  But *Siddiqui*, which is not binding on this Court in any event, is distinguishable for two reasons.

*First*, in ordering a bill of particulars identifying the date and amount of the alleged cash bribes, *Siddiqui* relied on three cases (the same cases on which Benjamin relies in his motion) that, although described by *Siddiqui* as involving "analogous circumstances," are plainly distinguishable from the facts of both *Siddiqui* and this case.  *Compare id.* at *2 *with* Mot. 73–74 (citing *United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. 2000); *United*

*States v. McGuinness*, 764 F. Supp. 888 (S.D.N.Y. 1991); *United States v. McCarthy*, 292 F. Supp. 937 (S.D.N.Y. 1968)).

*Lino* was a 26-count racketeering case against 23 defendants arising out of numerous criminal schemes, including securities fraud, wire fraud, commercial bribery, two money laundering conspiracies, and a union pension fund fraud and illegal kickback conspiracy. *See* 2001 WL 8356 at *4. With respect to the acts of bribery, the district court granted limited requests for particulars where, for example, a defendant was not on notice of even the pension fund with which the bribe recipient was affiliated, let alone the individual person that the defendant agreed to bribe. *Id.* at **4, 7, 5. By contrast, the district court denied a request for particulars where the bribery allegations were more specific. *Id.* at *7 ("Paying brokers excessive commissions to promote or hold various securities is allegedly the means by which the enterprise operated on a day-to-day basis. The indictment, in conjunction with the discovery provided to defendants, adequately informs the defendants of the acts charged and further particularization would reveal evidentiary minutiae to which [the defendant] is not entitled."). Here, the bribery allegations are far more specific and straightforward.

*McGuinness* is likewise distinguishable given its complexity, as it involved a 15-plus year scheme in which a union president solicited and received unlawful payments from multiple contractors. 764 F. Supp. at 892–93, 894. More importantly, the district court ordered the Government to specify the date and amount of the unlawful payments in order to cure a duplicity concern—not because the indictment was insufficient under Rule 7(f). *Id.* at 892–93, 894. Benjamin raises no such concern here.

And in *McCarthy*, a union bribery case involving multiple defendants, the district court largely denied the defendants' motions for bills of particulars except for those particulars that the

Government had already agreed to provide.  292 F. Supp. at 940–41.  For these reasons, *Lino*, *McGuiness*, and *McCarthy* do not involve "analogous circumstances" to either *Siddiqui* or the instant case.

*Second*, *Siddiqui* does not support Benjamin's request for a bill of particulars because it involved the proverbial "needle in the haystack" problem:  identifying the payment request and change order approvals alleged to be part of the corrupt bargain when the defendant was involved in countless such approvals, many of which were in fact legitimate.  *Siddiqui*, 2007 WL 549420 at *3 (citing *Bortnovsky*, 820 F.2d at 574–75; *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000)); *see Rose*, 2021 WL 2117119 at *15 (describing *Bortnovsky* and *Nachamie* as "needle in the haystack" cases).  Even then, however, the district court held that "the Government need not allege that particular requests for payment or change orders were approved in return for particular bribery payments [because r]equiring this sort of one-to-one mapping of tainted requests for payment or change orders to particular bribes would improperly restrict the Government's proof at trial."  *Siddiqui*, 2007 WL 549420 at *3.  The "particulars" that the district court ultimately ordered in *Siddiqui* are precisely what is already contained in the S-2:  bribes involving campaign contributions procured by Migdol in exchange for the State Grant.  As even *Siddiqui* recognized, any further detail is not appropriate for a bill of particulars, because it "would improperly restrict the Government's proof at trial."  *Id.*

For these reasons and consistent with this Court's prior decisions in analogous cases, Benjamin's request for a bill of particulars further specifying the bribes at issue in Count One is meritless and should be denied.

47

2.   **Benjamin is Not Entitled to Further Particularity Regarding the Identities of His Co-Conspirators**

Benjamin is likewise not entitled to a bill of particulars identifying any unnamed co-conspirators.  As this Court has recognized, the cases where such requests have been granted "generally involve conspiracies with a large number of co-conspirators over a long period of time." *Block*, 2017 WL 1608905, at *6; *Middendorf*, 2018 WL 3956494, at *1.  In *Middendorf*, this Court found that that threshold had not been met by a conspiracy spanning two-years and six named co-conspirators working for two different organizations.  2018 WL 3956494, at *2.  Here, where the conspiracy involves campaign contributions procured by Migdol for a single candidate (Benjamin) over a two-year period as part of a specific agreement, the threshold for a bill of particulars is likewise unmet.  *See Block*, 2017 WL 1608905 at *6 (denying motion for a bill of particulars identifying unnamed co-conspirators because the conspiracy "focuses on [the defendant's] own conduct and interactions").  Consistent with routine practice in this District, the Government expects to identify unnamed co-conspirators thirty days before trial.

The cases cited by Benjamin in support of his motion provide no reason for this Court to deviate from its prior holdings.  (Mot. 70–71.)  Most involve conspiracies far more expansive than that charged in Count One.  *See United States v. Akhavan*, No. 20 Cr. 188 (JSR), 2020 WL 2555333, at **1–2 (S.D.N.Y. 2020) (extensive multi-year conspiracy involving co-conspirators from multiple organizations who "deceive[d] banks into processing over $100 million of credit and debit card payments to marijuana retailers by disguising the transactions so as to create the false appearance that they were unrelated to the purchase of marijuana"); *United States v. Feola*, 651 F. Supp. 1068, 1134 (S.D.N.Y. 1987) (nineteen-defendant, seventeen-count indictment charging various narcotics conspiracies); *United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. 2008) (five-count indictment charging eight defendants in multiple

48

narcotics conspiracies that "span a number of years and continents"); *Lino*, 2001 WL 8356 at *4 (26-count racketeering case against 23 defendants arising out of numerous criminal schemes, including securities fraud, wire fraud, commercial bribery, two money laundering conspiracies, and a union pension fund fraud and illegal kickback conspiracy); *McGuinness*, 764 F. Supp. at 892–93 (15-plus year scheme in which a union president solicited and received unlawful payments from multiple contractors); *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3, 5 (S.D.N.Y. 2001) (ordering a bill of particulars where the indictment alleged that the defendant "pilfered his client's money through an unspecified series of 'intercompany transfers' without identifying the amounts, dates, means, corporate entities, or co-conspirators involved," and "the number of unindicted co-conspirators is potentially quite large, as no fewer than six corporations, each with its own personnel, was potentially involved in the alleged 'intercompany transfers' [and t]he conspiracy may have spanned up to six years").

Other cases cited by Benjamin simply involved unopposed requests or ordering disclosures to which the Government had already consented. *See United States v. Pinto-Thomas*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) (noting, with respect to the request regarding unnamed co-conspirators, that "[t]he Government does not address this request in its opposition"); *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2017 WL 11490480, at *5 (E.D.N.Y. 2017) (no bill or of particulars ordered with respect to unnamed co-conspirators where Government agreed to provide names of co-conspirators 30 days before trial).

Benjamin also incorrectly suggests that the burden is on the Government to justify non-disclosure and, relatedly, that a bill of particulars is warranted if it would merely "help a defendant focus his investigation and prepare for trial." (Mot. 71–72.)  That is not the standard. To the contrary, "the standard for granting a bill of particulars is not whether it would be *helpful*

49

to [the] defense but, rather, whether it is *necessary*." *Block*, 2017 WL 1608905, at *6 (emphasis in original).  And it is the defendant's burden to make such a showing.  *United States v. Lupoi*, No. 14 Cr. 42 (SJ), 2014 WL 12681632, at *3 (E.D.N.Y. 2014).  Certainly, the Government can tip the balance and demonstrate that disclosure is inappropriate, for example, where it shows that a requested disclosure would place a witness in physical danger.  But Benjamin's proposed standard—that in the absence of such potential harm, disclosures are automatically warranted— cannot be squared with the well-established standard for a bill of particulars.  Indeed, as even a case cited by Benjamin recognizes, disclosure of the identity of unnamed co-conspirators in a bill of particulars "is not warranted as a matter of routine."  *Savin*, 2001 WL 243533, at *5 (citing *Torres*, 901 F.2d at 234).

For these reasons, Benjamin's motion for a bill of particulars identifying unnamed co-conspirators should be denied.

## CONCLUSION

For the foregoing reasons, Benjamin's motions should be denied in their entirety.


Dated:   New York, New York
         July 18, 2022

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney
                                    Southern District of New York

                              By:  _____/s/_____
                                    Celia V. Cohen
                                    Andrea M. Griswold
                                    Jarrod L. Schaeffer
                                    Assistant United States Attorneys
                                    Tel: (212) 637-2466 / -1205 / -2270