UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :

UNITED STATES OF AMERICA,       :

                                          :      Case No. S2 21 Cr. 706 (JPO)

        - against -         :

                                          :

BRIAN BENJAMIN,       :

                                          :

           *Defendant*.       :

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY BRIEF IN SUPPORT OF
## DEFENDANT BRIAN BENJAMIN'S PRETRIAL MOTION TO
## DISMISS THE INDICTMENT, COMPEL DISCOVERY FROM THE GOVERNMENT,
## AND ORDER A BILL OF PARTICULARS

Barry H. Berke
Dani R. James
Darren A. LaVerne

KRAMER LEVIN NAFTALIS & FRANKEL
1177 Avenue of the Americas
New York, NY 10036
Telephone: 212.715.9100

*Counsel for Defendant Brian Benjamin*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .........................................................................................1

ARGUMENT ......................................................................................................................3

I.      The Government's Bribery Theory Is Precluded By Controlling Precedent And
        Fails Even Under The Out-Of-Circuit Authorities Cited By The Government..................3

        A.      In The Second Circuit, *McCormick* Requires That The *Quid Pro Quo*
                Be "Express," Rather Than Implicit Or Inferred ......................................6

        B.      The Indictment Fails To Allege An Explicit *Quid Pro Quo* Under The
                Out-Of-Circuit Cases Cited By The Government....................................15

        C.      The Government Ignores The Relevant Pleading Standard...................26

II.     Counts 4 And 5 Fail To Allege A Violation Of 18 U.S.C. § 1519 And Should
        Therefore Be Dismissed.............................................................................32

III.    The Government Must Comply With Its Obligations Under *Brady* ...............................36

        A.      The Prosecution's Attempts To Defend Their Conduct Are Unavailing..............37

        B.      The Government's Argument That There Is Nothing Remaining That
                Need Be Disclosed Is Similarly Unavailing ......................................44

IV.     The Government Is Improperly Withholding Information The Defense Needs
        Now To Prepare For Trial.........................................................................51

        A.      The Government Has No Basis To Withhold The Names Of Co-
                Conspirators Until 30 Days Before Trial ..............................................51

        B.      The Government's Opposition Provides Information Regarding The
                Scope Of The Conspiracy The Defense Requested Months Ago ........................55

CONCLUSION.....................................................................................................56

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)...................................................................................................25

*Contreras v. Artus*,
    778 F.3d 97 (2d Cir. 2015)..........................................................................................50

*Empress Casino Juliet Corp. v. Johnston*,
    763 F.3d 731 (7th Cir. 2014) ......................................................................................24

*Evans v. United States*,
    No. 90-6105, 1991 WL 527605 (U.S. Sept. 9, 1991) .........................................9 n.2

*Evans v. United States*,
    504 U.S. 255 (1992)............................................................................................*passim*

*Fed. Election Comm'n v. Ted Cruz for Senate*,
    142 S. Ct. 1638 (2022).................................................................................................25

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir.1996)............................................................................................14

*Mahon v. Staff Line, Inc./Cambridge Consulting Grp. Com*,
    No. 02 Civ. 10003 (GEL), 2003 WL 21396660 (S.D.N.Y. June 16, 2003),
    *aff'd sub nom. Mahon v. Staff Line, Inc.*, 100 F. App'x 37 (2d Cir. 2004)............................12

*Mathis v. United States*,
    579 U.S. 500 (2016)......................................................................................................31

*McCormick v. United States*,
    500 U.S. 257 (1991)............................................................................................*passim*

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014).....................................................................................................25

*McDonnell v. United States*,
    579 U.S. 550 (2016).....................................................................................................25

*Newsom-Lang v. Warren Int'l*,
    129 F. Supp. 2d 662 (S.D.N.Y. 2001).......................................................................12

*Patsy's Italian Rest., Inc. v. Banas*,
    508 F. Supp. 2d 194 (E.D.N.Y. 2007) ..............................................................14 n.5

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996)............................................................................................13

*Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*,
    No. 08 Civ. 9710(PGG), 2009 WL 125751 (S.D.N.Y. Jan. 20, 2009) ....................12

*United States v. Ahuja*,
    No. 18-Cr-328 (KPF) (S.D.N.Y. Oct. 20, 2020).....................................................49

*United States v. Ahuja*,
    No. 18-Cr-328 (KPF) (S.D.N.Y. Nov. 11, 2020)....................................................50

*United States v. Ahuja*,
    No. 18-Cr-328 (KPF) (S.D.N.Y. Dec. 17, 2021) ................................39, 41, 43 n.10

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)...................................................... 28, 29 & 29 n.8

*United States v. Baldeo*,
    No. S1 13 Cr. 125 (PAC), 2014 WL 6807833 (S.D.N.Y. Dec. 3, 2014)................................33

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) ...........................................................................22

*United States v. Blandford*,
    33 F.3d 685 (6th Cir. 1994) ................................................................ 15 & 15 n.6

*United States v. Block*,
    No. 16-Cr-595 (JPO), 2017 WL 1608905 (S.D.N.Y. Feb. 28, 2017)...................54

*United States v. Block*,
    No. 16-Cr-595 (JPO), 2017 WL 1608905 (S.D.N.Y. Mar. 21, 2017) ...................54

*United States v. Block*,
    No. 16-Cr-595 (JPO), 2017 WL 1608905 (S.D.N.Y. Apr. 28, 2017)....................54

*United States v. Carpenter*,
    961 F.2d 824 (9th Cir. 1992) .........................................................................4, 17

*United States. v. Cossette*,
    593 F. App'x 28 (2d Cir. 2014) ...................................................................34, 35

*United States. v. Craig*,
    3 F. Supp. 3d 756 (E.D. Ark. 2014)...............................................................33, 34

*United States v. Davis*,
    30 F.3d 108 (11th Cir. 1994) .............................................................................31

*United States v. Davis*,
    841 F. App'x 375 (3d Cir. 2021) ..............................................................16

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021)...........................................................27 n.7, 31

*United States v. Desposito*,
    704 F.3d 221 (2d Cir. 2013)................................................................32

*United States v. Donagher*,
    520 F. Supp. 3d 1034 (N.D. Ill. 2021) ...................................23, 25, 31

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007)................................................... *passim*

*United States v. Garcia*,
    992 F.2d 409 (2d Cir. 1993)................................................... *passim*

*United States v. George*,
    223 F. Supp. 3d 159 (S.D.N.Y. 2016)....................................................31

*United States v. Giffen*,
    326 F. Supp. 2d 497 (S.D.N.Y. 2004)...................................................36

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012)............................................27, 30

*United States v. Hernandez*,
    980 F.2d 868 (2d Cir. 1992)................................................................26

*United States v. Kerik*,
    615 F. Supp. 2d 256 (S.D.N.Y. 2009).................................................30

*United States v. Kincaid-Chauncey*,
    556 F.3d 923 (9th Cir. 2009) ...............................................................10

*United States v. Kiszewski*,
    877 F.2d 210 (2d Cir. 1989)................................................................50

*United States v. Leung*,
    40 F.3d 577 (2d Cir. 1994)..................................................................50

*United States v. Mangano*,
    No. 16-Cr-540 (MA) (E.D.N.Y. Nov. 14, 2017) .................................12

*United States v. Martoma*,
    No. 12-Cr-973 (PGG) (S.D.N.Y. May 20, 2013) ...........................52, 53

*United States v. Martoma*,
   No. 12-Cr-973 (PGG) (S.D.N.Y. June 13, 2013) ..........................................................52, 53

*United States v. McGregor*,
   879 F. Supp. 2d 1308 (M.D. Ala. 2012) .................................................................19

*United States v. Menendez*,
   132 F. Supp. 3d 635 (D.N.J. 2015) .......................................................................23

*United States v. Menendez*,
   291 F. Supp. 3d 606 (D.N.J. 2018) ...................................................................20, 24

*United States v. Middendorf*,
   No. 18-Cr-36 (JPO) (S.D.N.Y. June 29, 2018)...........................................................53

*United States v. Middendorf*,
   No. 18-Cr-36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018)......................................53

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000)......................................................................52

*United States v. O'Keefe*,
   252 F.R.D. 26 (D.D.C. 2008)..............................................................................49

*United States v. Oshatz*,
   912 F.2d 534 (2d Cir. 1990)........................................................................14 n.5

*United States v. Pawlowski*,
   351 F. Supp. 3d 840 (E.D. Pa. 2018) ................................................................16, 17

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000)......................................................................27, 28, 31

*United States v. Pizarro*,
   No. 17-Cr-151 (AJN) (S.D.N.Y. May 17, 2018) .........................................................48

*United States v. Percoco*,
   317 F. Supp. 3d 822 (S.D.N.Y. 2018)....................................................................31

*United States v. Rajaratnam*,
   No. 09-Cr-1184 (RJH) (S.D.N.Y. June 11, 2010) .......................................................53

*United States v. Rodriguez*,
   496 F.3d 221 (2d Cir. 2007)............................................................................47

*United States v. Rosen*,
   No. 12-2249, 2012 WL 3900585 (2d Cir. Aug. 31, 2012) ................................................11

*United States v. Rosen*,
    716 F.3d 691 (2d Cir. 2013)...................................................................10

*United States v. Sampson*,
    898 F.3d 270 (2d Cir. 2018)...........................................................27 n.7

*United States v. Sattar*,
    272 F. Supp. 2d 348 (S.D.N.Y. 2003)....................................................36

*United States v. Scott*,
    979 F.3d 986 (2d Cir. 2020)...................................................................32

*United States v. Siegelman*,
    640 F.3d 1159 (11th Cir. 2011) .................................................18, 19, 21

*United States v. Silver*,
    No. 18-2380, 2018 WL 6039487 (2d Cir. Nov. 14, 2018) ....................11

*United States v. Silver*,
    948 F.3d 548 (2d Cir. 2020)...........................................................10, 11

*United States v. Singh*,
    979 F.3d 697 (9th Cir. 2020) .................................................................35

*United States v. Terry*,
    707 F.3d 607 (6th Cir. 2013) .................................................................21

*United States v. Tomblin*,
    46 F.3d 1369 (5th Cir. 1995) .................................................................16

*United States v. Trie*,
    21 F. Supp. 2d 7 (D.D.C. 1998) ............................................................52

*United States v. Turner*,
    684 F.3d 244 (1st Cir. 2012), *cert. denied,* 568 U.S. 1018 (2012) .........10

**Federal Statutes**

18 U.S.C. § 1504.....................................................................................30

18 U.S.C. § 1519........................................................................... *passim*

26 U.S.C. § 7206(1) ................................................................................28

18 U.S.C. § 1832(a) ........................................................................29 n.8

Federal Election Campaign Act .............................................................35

**Rules**

Fed. R. Civ. P. 26(b)(5) ..................................................................................................49

Fed. R. Evid. 403 ...................................................................................................43 n.10

**Constitutional Provisions**

First Amendment ................................................................................................. *passim*

**Other Authorities**

Charles Alan Wright et al., *Federal Practice and Procedure: Criminal* § 125 (4th
    ed. 2015) ..........................................................................................................31

Defendant Brian Benjamin respectfully submits this reply memorandum in further support of his pretrial motions and in response to the government's memorandum in opposition filed on July 18, 2022.[1]

## PRELIMINARY STATEMENT

The Indictment in this case is precluded by controlling law.  If allowed to stand, it would gut the rule in *McCormick* and render meaningless three decades of Supreme Court jurisprudence warning against government overreach and improper prosecutorial interference in our political system.  The government's opposition confirms how far afield the prosecution has gone in bringing this case, and that their legal position is entirely untenable.  With little discussion, the government blithely characterizes as wrongly decided *United States v. Garcia* and *United States v. Ganim*, the two primary, controlling precedents in this Circuit interpreting *McCormick*, and makes arguments that, as we show below, directly contradict the government's own positions in other recent political bribery cases.  In describing the out-of-circuit cases applying *McCormick*, the government leaves out critical information that makes clear how unprecedented this prosecution is, and how far short the allegations in this Indictment fall from the "explicit" *quid pro quo* standard as applied in any circuit.  The bribery charges in Counts One, Two, and Three are unprecedented and improper, and should be dismissed.

As explained in our opening brief, if the bribery counts are dismissed so too must be Counts Four and Five, alleging that Mr. Benjamin impeded a future, and at the time non-

---

[1]     Citations to "Gov't Opp'n" refer to the government's memorandum in opposition to defendant's pretrial motions, Docket No. 54.  Citations to "Def. Br." refer to the defendant's memorandum in support of his pretrial motions, Docket No. 53.  Citations to "Berke Decl." refer to the declaration of Barry Berke, Esq., submitted with defendant's pretrial motions, Docket No. 52.

existent, federal bribery investigation.  The government dodges this issue, claiming the bribery counts should not be dismissed, and therefore the Court need not consider the due process issues raised in our brief.  The Court can and should consider these issues, given the infirmity of the bribery allegations.  If Mr. Benjamin was engaged in constitutionally protected interactions with constituents, rather than a bribery scheme, he cannot have foreseen a future federal investigation as to which he had no notice, much less intended to obstruct it by accepting campaign contributions and allegedly omitting to mention those interactions on an executive appointment questionnaire.  The government points to no prior case where 18 U.S.C. § 1519 has been applied on so attenuated a basis, and there is none.  Accordingly, Counts Four and Five must be dismissed.

Short on contrition, the prosecution says little about their involvement in the shocking events surrounding Gerald Migdol's plea.  Instead, the prosecution claims they did nothing wrong while offering no defense or explanation for their most egregious actions, including demanding that Migdol read the government's wholly scripted version of his plea, threatening to tell the judge he is a liar if he instead tells his account of events, refusing to negotiate the language, and circumventing their *Brady* obligations by refusing to memorialize claimed inaccuracies.  These are the actions of the prosecution as documented in their own emails summarizing their interactions with Migdol's counsel.  And these deeply concerning revelations about the prosecution's conduct, which were expressly aimed at shoring up their theory of the case against Mr. Benjamin, are undoubtedly exculpatory.  Just like its prior disclosures, the government's opposition continues to ignore significant open issues and unproduced materials and information that only underscores the need for the requested relief.

The government also should be compelled to identify co-conspirators.  In its opposition, the prosecution now says it will identify co-conspirators 30 days before trial.  It offers no justification for withholding this information for the many months prior to then, during the very period the defense needs it most to prepare for trial, including by determining which of the 160 persons and entities the government has subpoenaed we should focus on, and narrowing the relevant portion of the more than one million pages of documents the government has produced to date.  The government is simply trying to conduct trial by ambush and to obtain a litigation advantage by withholding this information until the eve of trial, rather than producing it long before then, as it has done in other cases in this District.  It should be compelled to do so now.

## ARGUMENT

### I.     The Government's Bribery Theory Is Precluded By Controlling Precedent And Fails Even Under The Out-Of-Circuit Authorities Cited By The Government

The government's opposition underscores the truly unprecedented nature of this prosecution and the radical departure from settled law the government is now urging on the Court.  It is clear that in its rush to indict Mr. Benjamin, the government overlooked or cavalierly ignored the Second Circuit's decisions in *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993) and *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), cited in our opening brief.  (*See* Def. Br. at 16, 24).  These decisions require, under *McCormick v. United States,* 500 U.S. 257 (1991), that where the alleged bribe consists solely of campaign contributions, the *quid pro quo* must be "express," and cannot merely be implicit or inferred.  *Ganim*, 510 F.3d at 142; *Garcia*, 992 F.2d at 414.  Remarkably, while the prosecution now disavows this binding precedent as wrongly decided or mere "*dicta*" (neither of which is the case), in prior court filings the government recognized this standard as the law in this Circuit in campaign contribution cases.  *See infra* 11-

12.  Now, reversing its prior position without explanation or principle, the government treats *Garcia* and *Ganim* as cases it is free to ignore or recast as it sees fit to try to defend its unprecedented and unsupportable prosecution of Mr. Benjamin.  It is astounding that the government has indicted a sitting statewide government official in the face of controlling precedent that it previously relied upon and is now scrambling to explain away.

The government does not even attempt to defend its case under the *McCormick* standard as it applies in the Second Circuit.  There is self-evidently no express *quid pro quo* alleged in the Indictment, and the government has staked its case entirely on the claim that it has sufficiently alleged an explicit *quid pro quo* that can be inferred.  It cites out-of-circuit cases in support of this claim, but even these decisions (which the government skips through without careful analysis) do not support the government's position.  The cases the government cites require that "the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain," *United States v. Carpenter,* 961 F.2d 824, 827 (9th Cir. 1992), and not simply built on speculation or inferred from the sequence of solicitation, official action, and campaign contributions.  There is nothing clear or unambiguous about the supposed agreement alleged in this Indictment—it ostensibly begins on March 8, 2019 with the wholly unclear and ambiguous statement "Let me see what I can do" (allegedly made by Mr. Benjamin months before he learned the state funds later allocated to Migdol were even available) and relies on speculative inferences the government asks the Court to draw from the timeline of events that follows. Tellingly, despite a lengthy speaking indictment that it acknowledges sets forth in detail its bribery theory and the factual allegations on which it is based, the government cannot even articulate *when* in its view the supposed *quid pro quo* agreement was entered into.  It does not

cite a single case, in or out of this Circuit, where a court found the *McCormick* standard satisfied on even remotely so thin a basis—and there is none.

The government characterizes as "generic quotations" and "lofty rhetoric," (Gov't Opp'n at 15), the summary in our opening brief of Supreme Court decisions since *McCormick* and as recently as this year warning against the dangers of government overreach in the campaign contributions context, (Def. Br. at 15-16, 18-20).  The government's dismissive attitude toward these cases says it all.  The Supreme Court has held that to protect the First Amendment and core democratic principles, there must be a clear standard separating what the law considers to be corrupt agreements from legitimate fundraising.  The touchstone of that standard in the context of a bribery prosecution based solely on campaign contributions is an explicit *quid pro quo*.  In continuing to defend this Indictment, the government disregards the very purpose of the standard, and proposes to dilute and obscure the rule in *McCormick* so as to render it meaningless.

In this section, we also elaborate on the precedent we cited in our opening brief requiring courts to dismiss an indictment that fails to allege a crime under the charged statute.  In its opposition, the government misconstrues our argument and cites the wrong pleading standard. We are not arguing the government has failed to provide proper notice of the charged offenses, challenging (for present purposes) the factual allegations in the Indictment, or relying on facts outside the Indictment.  Where, as here, the government has filed a speaking indictment that sets forth the alleged basis for the charged statutory violations, and where that basis, even if true, does not constitute a violation of the charged statutes, the indictment must be dismissed as a matter of law.  In addition, under any standard, the Indictment's failure to allege an explicit *quid*

*pro quo* is fatal, given that this is a required element of the offense under *McCormick* that must be clearly pleaded in the Indictment.

> A.     In The Second Circuit, *McCormick* Requires That The *Quid Pro Quo* Be "Express," Rather Than Implicit Or Inferred

Rather than follow the law of this Circuit, the government tries to explain away that law, and to invent a new standard for campaign contribution cases that ignores the First Amendment principles undergirding the explicit *quid pro quo* standard set forth by the Supreme Court in *McCormick*. The lynchpin of its effort to do so is its flawed interpretation of *Evans v. United States*, 504 U.S. 255 (1992), which is directly at odds with the Second Circuit's interpretation. The government claims that *Evans* modified the *McCormick* standard as it applies in cases where the alleged bribe is campaign contributions, so that what the government must prove is that "such contributions were provided 'in exchange for a specific requested exercise of . . . official power.'" (Gov't Opp'n at 16 (quoting *Evans,* 504 U.S. at 258)). The government further claims that it may prove the requisite *quid pro quo* simply by proving an "implicit" agreement that may be inferred under the circumstances. (*Id.* at 10). But this is precisely the interpretation of *Evans* that the Second Circuit has rejected.

In *Garcia*, decided the year after *Evans*, the Second Circuit reversed a Hobbs Act extortion conviction of a public official because the district court had held that the government need not prove a *quid pro quo* at all. The district court recognized that *McCormick* required the government to prove a *quid pro quo*, but concluded that its holding was limited to cases where the alleged bribe consisted of campaign contributions. 992 F.2d at 414. On appeal, the Second Circuit clarified that in *Evans*, the Supreme Court had extended the *quid pro quo* requirement to non-campaign contribution cases, albeit under a lesser standard. After noting *McCormick*'s requirement of an "explicit promise or undertaking by the official to perform or not to perform

an official act," the Second Circuit held that *Evans* had "modified this standard *in non-campaign contribution cases* by requiring that the government show only 'that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *Id*. at 414 (quoting *Evans,* 504 U.S. at 268) (emphasis added).  The court found that, as the defendant in *Garcia* was not alleged to have received campaign contributions as bribes, the district court could have properly refused to instruct the jury, under the higher *McCormick* standard, that the defendant must have "received the money in return for an express promise."  *Id*. at 414.  But the district court was nonetheless required to give an instruction under the lesser *Evans* standard, which provided that "[t]he official and the payor need not state the *quid pro quo* in express terms."  *Id*. at 414 (internal quotation marks and citations omitted).

     In *Ganim*, the Second Circuit again confirmed that *McCormick*'s "express" standard applies in campaign contribution cases, while the lesser standard under *Evans* applies in non-campaign contribution cases.  The defendant challenged his conviction for extortion and bribery on the ground that the jury was improperly instructed that it could convict if it found that he received payment in return for a "future, but unspecified, official act."  510 F.3d at 141-42.  Writing for the court, then-Judge Sotomayor rejected the defendant's challenge, again concluding that the *McCormick* standard—which the court determined required "proof of an express promise" (and thus, if applicable, would have been at odds with the jury instruction at issue)—applied only in the "special context of campaign contributions."  *Id.* at 142.  In reviewing the holdings of *McCormick* and *Evans*, the court found that it had "harmonized" the two decisions in *Garcia* by making clear that the standard articulated in *Evans* applies only in non-campaign contribution cases.  *Id.* at 143.  Because the bribes the defendant received in

*Ganim* were not campaign contributions, *Evans* rather than *McCormick* controlled, and it was not necessary for the *quid pro quo* in that case to have been express.

In its opposition, the government seeks to downplay and obscure the relevance of *Garcia* and *Ganim*, describing *Garcia* as "clearly incorrect," *Ganim* as simply repeating *Garcia*, and both as *dicta* insofar as they discussed *McCormick* and *Evans*.  (*See* Gov't Opp'n at 11-13).  The government's argument is highly presumptuous and wrong, and exactly the opposite of the position the very office bringing this case has taken in prior public corruption cases where it addressed this issue.  First, rather than being incorrect, *Garcia* and *Ganim* faithfully applied Supreme Court precedent in a manner that protects the First Amendment interests at issue in cases solely involving campaign contributions.  The government wrongly criticizes the Second Circuit for distinguishing *Evans* from *McCormick*, describing the former as also "involv[ing] campaign contributions."  (Gov't Opp'n at 10).  But the truth is that the defendant in *Evans*, a county official who had been bribed to influence a zoning application, was alleged to have received a payment that was not a campaign contribution and thus did not implicate the concerns raised in *McCormick*.  As the *Evans* decision makes clear, an undercover FBI agent gave the defendant two payments—one a $1,000 check made out to the defendant's campaign, the other (handed to the defendant at the same time as the check) $7,000 in cash.  504 U.S. at 257.  Importantly, the defendant reported the check on the relevant campaign-finance disclosure forms, but not the cash.  *Id.*  The government claimed that the cash was not a campaign contribution and should have been reported on his income tax return.[2]  *Id.*  The Supreme Court's opinion in *Evans* focused on the cash payment.  At the outset of the opinion, the Court wrote:

---

[2]     The defendant was tried and convicted on two counts, one for Hobbs Act extortion, and the other for failing to report the $7,000 as income.  504 U.S. at 257.  The jury convicted on both counts, finding that the $7,000 cash payment was not a campaign contribution, but rather

> Viewing the evidence in the light most favorable to the Government, as we must in light of the verdict, we assume that the jury found that petitioner *accepted the cash* knowing that it was intended to ensure that he would vote in favor of the rezoning application and that he would try to persuade his fellow commissions to do likewise.  Thus, although petitioner did not initiate the transaction, his acceptance of the bribe constituted an implicit promise to use his official position to use his official position to serve the interests of the bribegiver.

*Id.* at 257 (emphasis added).

Accordingly, the Second Circuit's decision to distinguish *Evans* as applying to non-campaign contribution cases was correct and consistent with the facts of that case.  Whether or not *Evans* also involved a campaign contribution, there was evidence of a much larger personal cash payment that the government alleged, and the jury concluded, was not a campaign contribution.[3]  Because such a payment was involved, the concerns addressed in *McCormick*— and which are very much at issue in this case, where the alleged bribes were undisputedly campaign contributions, reported as such—were not present, and there was no need that proof of the *quid pro quo* be "express" so as to clearly distinguish legitimate campaign contributions from illicit bribes.

---

personal income that should have been reported.  *Id.* at 257-58.  While, at trial, the defendant argued that both were campaign contributions, the government contested that claim and the jury rejected it.  In its Supreme Court brief, the government explained how the tax conviction proved that the jury disbelieved the defendant's claim that the $7,000 payment was a campaign contribution, a conclusion that was consistent with the fact that the defendant "did not treat it in that manner," as he "did not report it; he did not record it among his contributions; and he did not use it to retire current campaign expenses."  Government's Brief, *Evans v. U.S.*, No. 90-6105, 1991 WL 527605, at *45 (U.S. Sept. 9, 1991).

[3]      This is to be contrasted with the payments in *McCormick*.  There, the Court specifically rejected the government's argument that the jury concluded that the payments were not campaign contributions.  500 U.S. at 275-76.

While the government portrays the Second Circuit's understanding of *Evans* as an outlier, other circuits have taken the same view.[4]  Both the First and the Ninth Circuits agree that *Evans* applies only in non-campaign contribution cases.  *See United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012), *cert. denied,* 568 U.S. 1018 (2012) ("*Outside of the campaign contribution context*, the Supreme Court set the requirement in [*Evans*], that 'the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'") (quoting *Evans*, 504 U.S. at 268) (emphasis added); *United States v. Kincaid-Chauncey,* 556 F.3d 923, 936-37 (9th Cir. 2009) ("It is well established that to convict a public official of Hobbs Act extortion for receipt of property *other than campaign contributions*, '[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.'") (citing *Evans*, 504 U.S. at 274) (Kennedy, J., concurring) (emphasis added).

Since *Ganim*, and as recently as 2020, the Second Circuit has cited and relied upon the holding that *Evans* applies only in non-campaign contribution cases, and that *McCormick* requires an "express" *quid pro quo*.  In *United States v. Rosen*, the court noted, "Outside the unique context of campaign contributions [citing *McCormick*] we have not, in the context of bribery cases, required proof of an express promise regarding the specific official acts to be undertaken as part of the exchange."  716 F.3d 691, 701 (2d Cir. 2013).  In ruling against the defendant, the court held that it "decline[d] [his] invitation to expand *McCormick* by requiring proof of an express promise in this [non-campaign contribution] case."  *Id*.  In *United States v. Silver*, citing *Garcia*, the court found again that in *Evans*, the Supreme Court had

---

[4]     The government wrongly claims that the Second Circuit's interpretation of *Evans* has "been rejected by every Circuit" to have considered the issue.  (Gov't Opp'n at 8-9).

"modified [*McCormick*'s 'explicit promise'] standard in non-campaign contribution cases."  948
F.3d 538, 548 (2d Cir. 2020) (alteration in original).

In fact, the prosecution's current position directly contradicts this same office's
previous recognition, prior to its unexplained flip-flop in this case, that *McCormick* requires
proof of an express *quid pro quo* in campaign contribution cases, and that *Evans* only applies in
non-campaign contribution cases.  In *Rosen*, the government (the same office that is pursuing
this case) agreed that in campaign contribution cases the government must prove an "express"
*quid pro quo* agreement, contrasting it with the "implied" agreement applicable in other cases.
Government's Brief, *United States v. Rosen*, No. 12-2249, 2012 WL 3900585, at *30 (2d Cir.
Aug. 31, 2012) ("Additionally, since 1993, this Court has rejected the notion that, *outside the
campaign finance context*, the Government must prove an express, rather than an implied, quid
pro quo agreement.") (emphasis added).  In *Silver*, the government (again this same office)
described *Evans* as "the seminal case framing the quid pro quo requirement in *the non-
campaign-contribution context*."  Government's Brief, *United States v. Silver*, No. 18-2380,
2018 WL 6039487, at *34 (2d Cir. Nov. 14, 2018) (emphasis added).  The government also cited
to *Garcia*—the very same case it now calls "clearly incorrect" (*see* Gov't Opp'n at 11 n.7)—in
"explaining that *Evans* modified the *McCormick* standard in *non-campaign contribution cases* by
requiring that the government show only that a public official has obtained a payment to which
he was not entitled, knowing that the payment was made in return for official acts."
Government's Brief, *Silver*, No. 18-2380, 2018 WL 6039487, at *23 n.5 (citing *Garcia*¸ 992
F.2d at 414) (emphasis added) (internal quotation marks omitted).  As further support for this
proposition, the government also cited to the portion of *Ganim*, (*see id.* (citing *Ganim,* 510 F.3d
at 143)), that it now dismisses as "*dicta*," *see* Gov't Opp'n at 12-13.

Prosecutors in the Eastern District of New York have similarly recognized that "in the context of campaign or similar political contributions, the quid pro quo must be express as opposed to implied," noting that "the law as it relates to a quid pro quo involving political contributions is different and much more stringent than when the quid pro quo involves bribes that personally benefit the public official." Government's Brief, *United States v. Mangano*, No. 16-Cr-540 (MA) (E.D.N.Y. Nov. 14, 2017), ECF No. 90 at 73; *see also id*. at 20 ("Indeed, the Second Circuit has rejected the notion that the government must prove an express, rather than an implied, quid pro quo agreement *outside the campaign finance context*.") (emphasis added).

It is astounding that in bringing this case the government has not only disregarded what is clearly the law in this Circuit, but in fact reversed its own position (without even acknowledging its prior position, much less offering a justification for doing so) in order to try to defend an indictment that it acknowledges fails to allege an element it previously recognized was clearly required. The government, like every other litigant, is bound by Second Circuit case law and cannot bring an indictment in the face of that law, in the hopes that it will someday change. *See, e.g.*, *Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, No. 08 Civ. 9710(PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009) ("This Court is bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed."); *Newsom-Lang v. Warren Int'l*, 129 F. Supp. 2d 662, 664 (S.D.N.Y. 2001) ("Defendant urges this Court to break with this Second Circuit precedent and, instead, follow certain other circuits that have found the Title VII provision to establish a jurisdictional prerequisite. This the Court clearly cannot do; lower courts in this Circuit are bound by applicable Circuit precedent."); *Mahon v. Staff Line, Inc./Cambridge Consulting Grp. Com*, No. 02 Civ. 10003 (GEL), 2003 WL 21396660, at *2 (S.D.N.Y. June 16, 2003), *aff'd sub nom. Mahon v. Staff Line, Inc.*, 100 F. App'x 37 (2d Cir. 2004) (Plaintiff's

"arguments are all to the effect that the Second Circuit is wrong and the Ninth Circuit correct. Those arguments cannot prevail in this Court, which must follow the law in this Circuit.").

The government's characterization of the Second Circuit's clearly stated conclusions on this issue as "*dicta*" is also wrong, (*see* Gov't Opp'n at 12-13), and again at odds with the government's prior citations of *Ganim* and *Garcia*. Where legal reasoning is necessary to a decision's result it is not *dicta*. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). The Second Circuit's reasoning concerning the application of the respective standards of *McCormick* and *Evans* was necessary to, and intertwined with, the result in *Ganim* and *Garcia*. In *Ganim*, the court was required to determine, as a threshold matter, what standard should have been applied to the extortion and bribery charges in that case. 510 F.3d at 142-44. Citing *Garcia* (which also made a threshold determination as to the relevant standard), *Ganim* drew its critical distinction between *McCormick* and *Evans*, holding that the "express" standard in *McCormick* governed campaign contribution cases, while *Evans* controlled non-campaign contribution cases. *Id*. at 142. Applying *Evans* based on this distinction, the court upheld the "as specific opportunities arise" theory presented in that case, describing the viability of that theory as "a natural corollary" of the standard adapted in *Evans*. *Id*. at 145. It is clear that if the court had held that *McCormick*'s "express" standard applied, the *Evans* standard would not, and the conviction would have been reversed. Accordingly, the government's portrayal of the Second Circuit's analysis of *McCormick* and *Evans* as an aside or irrelevancy is simply self-serving and inaccurate.[5] *See also*

---

[5]      Even if there were somehow a basis to claim that the relevant portions of *Garcia* and *Ganim* were *dicta*, which there clearly is not, the language would still be the kind of well-considered *dicta*—twice considered at length by the court, and relied on in subsequent

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 508 (2d Cir. 1996) (portion of decision not *dicta* where it could not "have been deleted without seriously impairing the analytical foundations of the holding").

   In the Second Circuit, *McCormick*'s "explicit" standard requires the government to prove in a campaign contribution case, as here, that the *quid pro quo* was "express," and not simply implicit or inferred.  The government does not even attempt to defend its case under this standard, as it cannot.  Instead, it urges the Court to dispose of the requirement to show "some spoken or written exchange," and to simply infer an explicit *quid pro quo* from "a course of conduct or the surrounding circumstances."  (Gov't Opp'n at 8).  This is precisely what the law proscribes where the alleged bribe consists solely of campaign contributions.  As demonstrated in our opening brief, there is nothing "explicit" or "express" about the supposed *quid pro quo* alleged in the Indictment—Migdol is not alleged to have asked Mr. Benjamin for the state grant, Mr. Benjamin is not alleged to have promised to obtain it for him, and neither is alleged to have explicitly or expressly tied the grant to Migdol's campaign contributions, much less agreed that one would be exchanged for the other.

---

decisions—that courts have held are entitled to "great weight."  *See Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 209 (E.D.N.Y. 2007) ("[A]s a general principle, a federal district court is required to give great weight to the pronouncements of its Court of Appeals, even though those pronouncements appear by way of dictum."); *cf. United States v. Oshatz*, 912 F.2d 534, 540 (2d Cir. 1990) ("Even if the [Second Circuit] panel's disapproval is regarded as dictum, we think it important to make clear that this is dictum that should have been followed in this case and in subsequent cases. . . . [I]n some contexts expressions of views by an appellate court must be regarded as the law of the circuit, even though not an announcement of a holding or even of a necessary step in the reasoning leading to a holding.").

B.     The Indictment Fails To Allege An Explicit *Quid Pro Quo* Under The
       Out-Of-Circuit Cases Cited By The Government

In its effort to escape the law in the Second Circuit, the government cites certain

out-of-circuit authorities for the proposition that while the *quid pro quo* needs to be "explicit," it

need not be express.  Although the government does not note it in its opposition, many of the

cases it cites did not in fact involve campaign contributions, or also involved personal benefits—

thus taking them outside the scope of *McCormick*.  Moreover, while some of these cases define

"explicit" differently from the Second Circuit, they recognize that the term requires much more

than the kind of generalities and supposition relied on by the government in this case.  They

require, at a minimum, a clear *agreement*—the critical "pro" in a corrupt *quid pro quo*—that a

specific requested use of official power is to be exchanged for specific campaign contributions.

For example, the government cites *United States v. Blandford* for the proposition

that "[e]xplicit, as explained in *Evans*, speaks not to the form of the agreement between the payor

and the payee, but to the degree to which the payor and payee were aware of its terms, regardless

of whether those terms were articulated."[6]  33 F.3d 685, 696 (6th Cir. 1994).  The government

omits to mention that *Blandford* was not a campaign contribution case at all; it involved cash

bribes, and the court recognized that "no campaign contributions had in fact been made."  *Id.* at

698.

Other cases cited by the government involved personal payments and benefits, in

addition to campaign contributions, which take them outside the ambit of *McCormick*.  In *United*

---

[6]     Notably, *Blandford* recognized that its analysis of *McCormick* and *Evans* differed from
the Second Circuit's interpretation, citing *Garcia* as among the decisions concluding that *Evans*
"establishes a modified or relaxed *quid pro quo* standard to be applied in non-campaign
contribution cases," while "the comparatively strict standard of *McCormick* still would govern
when the alleged Hobbs Act violation arises out of the receipt of campaign contributions by a
public official."  *Blandford*, 33 F.3d at 695 (citing *Garcia*, 992 F.2d at 414).

*States v. Davis*, the defendant bribed a public official by, among other things, hiring his wife to work at one of his companies and buying the official a home to live in rent-free. 841 F. App'x 375, 377 (3d Cir. 2021). The court emphasized that to the extent the defendant also made campaign contributions (including "more than $65,000 in cash and over $148,000 in free advertising services"), "[t]hese contributions came within the context of a larger stream of benefits" that the defendant provided to the public official. *Id.* at 380. And in *United States v. Tomblin*, the defendants bribed a public official by providing him with a $250,000 personal loan through two shell corporations, paying for his campaign treasurer's trip to Texas, and promising a stake in companies they controlled. 46 F.3d 1369, 1374-75 (5th Cir. 1995).

Similarly, in *United States v. Pawlowski*, the defendant (the former mayor of Allentown, Pennsylvania) was alleged to have engaged in a long pattern of pay-to-play bribery involving numerous donors in seven different schemes, some of which included non-campaign contribution bribes like football tickets and a steak dinner. 351 F. Supp. 3d 840, 856-57 (E.D. Pa. 2018). The court distinguished these bribes involving personal benefits, because "no proof of an explicit quid pro quo is required . . . [o]utside of the campaign contribution context." *Id.* at 857-58 (citation omitted). However, the court made clear that "more is required in the campaign contribution context." *Id.* at 871. And in fact, the court granted the defendant's motion for a judgment of acquittal on counts alleging that he had solicited campaign contributions from two attorneys in exchange for awarding legal work to their firm, on the basis that the government had not established an explicit *quid pro quo*. *Id.* at 871. The defendant's conversations with the attorneys "fail[ed] to show any agreement between the parties or elucidate the terms of any alleged agreement." *Id.* at 870-71. The court explained that "[a]t most, the evidence suggests that [the attorneys] agreed to contribute to [the defendant] in exchange for the possibility of

16

receiving unspecified legal work from the City at some point in the future," which did not suffice in that context. *Id.* at 871.

While the court in *Pawlowski* upheld convictions on other counts involving contributions, it made clear the standard it was applying required far more than inference, temporal proximity, or speculation. It found the evidence supported a finding of an explicit *quid pro quo* where a corrupt real estate developer had specifically agreed to make campaign contributions "contingent on" the defendant's assistance with an inspection on his property. *Id.* at 854. In a tape-recorded meeting, the developer stated he could contribute up to $45,000 to the defendant's senate campaign, "but made clear he expected [the defendant's] help with the upcoming Sherman Street inspection in exchange." *Id.* The defendant confirmed that "he was working on the issue," and a few days later, "personally involved himself in the matter . . . to ensure that the inspection would take place without any complications." *Id.* The defendant understood that this arrangement was unlawful, having "joked about going to prison" during the meeting with the developer, as well as taking "additional precautionary measures," including "sweeping his office for electronic eavesdropping devices" and "using burner phones." *Id.* at 847, 854.

Other cases outside the Second Circuit involving only campaign contributions that the government cites also require far more than what the Indictment alleges here. In *Carpenter*, cited by the government, the court required that "the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain." 961 F.2d at 827. There, the *quid pro quo* could hardly have been stated more clearly and unambiguously, as an undercover FBI agent posing as a businessman directly asked the defendant's aide "what it's going to cost" to change a state law, and the aide in turn "responded with a figure of $20,000." *Id.* at 828. Having learned

of these terms, the defendant confirmed he would carry out his end of the bargain by "assist[ing] the bill through the Senate." *Id.* In the course of its decision, the court noted that under *McCormick* the mere "soliciting of contributions from constituents who had recently benefited from legislation" was not intended to be criminal. *Id*. at 827. In *United States v. Siegelman*, also cited by the government, the court interpreted "explicit" to require that "the acceptance of the campaign donation be in return for a *specific* official action," 640 F.3d 1159, 1171 (11th Cir. 2011) (emphasis in original), and recognized that the law "require[s] more for conviction than merely proof of a campaign donation followed by an act favorable toward the donor." *Id.* at 1170.

The Indictment's allegations do not come close to meeting even the standard in the out-of-circuit cases cited by the government. In our opening brief, we included a timeline that reviewed in detail each of the government's allegations purportedly supporting the existence of an explicit *quid pro quo* agreement between Mr. Benjamin and Migdol. (Def. Br. at 10-11). We then demonstrated how all of these allegations—starting with the March 8, 2019 meeting, and continuing through the request for the grant three months later, the announcement of the grant, the July 8, 2019 meeting between Mr. Benjamin and Migdol, and statements Mr. Benjamin allegedly made in October 2019—fail to allege a *quid pro quo* agreement at all, much less one that was explicit. (*Id.* at 28-29). Ignoring these sections of our brief, the government claims the defense is "focusing myopically on the March 2019 meeting," and then spends a total of one sentence addressing the specific factual allegations in the Indictment. (*See* Gov't Opp'n at 17). The government says:

> As the S-2 alleges, after Benjamin learned of available funds, he promptly called Migdol to say he intended to procure a grant for his organization; later allocated that funding; and then, in a meeting where Benjamin received fraudulent campaign contributions from

> Migdol, reminded Migdol of the grant—which was allocated, but
> not yet paid—and made clear that he still expected Migdol to
> procure further contributions.

(*Id.* (citations omitted)).  Even in the government's telling, the Indictment does not allege Migdol

and Mr. Benjamin reached an explicit agreement to exchange a specifically requested exercise of

official power for campaign contributions.  Rather, the Indictment only alleges that after Mr.

Benjamin learned of the funding he simply told Migdol that he intended to seek it (without

Migdol having even requested it), and then *after* allocating it told Migdol that he "expected" him

to obtain campaign contributions.  (Ind. ¶¶ 13-17).  Migdol did not request that Mr. Benjamin

obtain the grant, Mr. Benjamin did not seek the grant contingent on a promise by Migdol to

obtain campaign contributions, and neither is alleged to have linked the two.  In fact, what the

prosecution relies on in its opposition is exactly what all the cases, even those it cites, warn

cannot be done without violating the First Amendment and our core democratic principles—

basing a prosecution on the request for campaign contributions before or after an official act

benefits a donor.  *See, e.g.*, *Siegelman*, 640 F.3d at 1169-71 ("It would be particularly dangerous

legal error from a civic point of view to instruct a jury that they may convict a defendant for his

exercise of either of these constitutionally protected activities, [free political speech and the right

to support issues of great public importance]. . . . The Supreme Court has guarded against this

possibility by interpreting the federal law to require more for conviction than merely proof of a

campaign donation followed by an act favorable toward the donor. . . . In the absence of such an

agreement on a specific action, even a close-in-time relationship between the donation and the

act will not suffice."); *United States v. McGregor*, 879 F. Supp. 2d 1308, 1314 (M.D. Ala. 2012)

("The Supreme Court recognized that an extortion conviction for receiving campaign

contributions was fraught with constitutional and pragmatic concerns. . . . Thus, a mutuality of

interest or a close-in-time connection between a donation and an official act is insufficient to

sustain a conviction under the Hobbs Act."); *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) ("A close temporal relationship between political contributions and favorable official action, without more, is not sufficient to prove the existence of an explicit *quid pro quo*.").

It is extraordinary that, even now, the government cannot identify *when* Mr. Benjamin is alleged to have reached a *quid pro quo* agreement with Migdol.  The government resists citing the March 8, 2019 meeting as the date of the alleged *quid pro quo*, recognizing, as also pointed out in our opening brief, that Mr. Benjamin "had not yet learned of funding available for the State Grant."  (Gov't Opp'n at 17).  It follows that the vague statement purportedly made by Mr. Benjamin at that meeting, "Let me see what I can do," could not have conveyed a promise to allocate that funding to the non-profit Migdol supported.  (*See* Ind. ¶ 9). The government cannot and does not claim that the *quid pro quo* agreement was reached three months later on May 31, 2019, when Mr. Benjamin purportedly told Migdol that he "intended to procure a $50,000 grant" for Migdol's supported non-profit—without any reference to campaign contributions whatsoever, (*id.* ¶ 14)—or on June 20, 2019, when Mr. Benjamin purportedly texted Migdol to tell him that the Senate had approved the allocation of funding to the non-profit, much to his surprise, (*id.* ¶ 17).  At that point, Mr. Benjamin had already performed the "particular official action" the government identifies as the *quo*—namely, "allocating $50,000 in state funding" to the non-profit.  (Gov't Opp'n at 17).  And while the government says that Mr. Benjamin "reminded" Migdol of the grant at a meeting on July 8, 2019, and "made clear that he still expected" Migdol to procure campaign contributions, these statements self-evidently did not manifest a *quid pro quo* agreement between the two.  (*Id.*).

Tellingly, the government cites no campaign contribution case where a court has upheld a bribery charge on a theory as thin as the one set forth in this Indictment.  In *United States v. Terry,* the defendant, a state court judge, was alleged to have accepted campaign contributions from a local power broker in return for his agreement to do the donor's bidding, including by denying summary judgment in two foreclosure cases without ever reviewing the case file or motion papers—which the defendant did without any plausible reason other than that he had been bribed.  707 F.3d 607, 610 (6th Cir. 2013).  The alleged agreement between the parties was, in fact, so clear that "[n]o subtle winks and nods were needed;" the donor had "straight up asked [the defendant] to deny the bank's motions for summary judgment in the two cases, and with [the defendant's] tape-recorded reply ('Got it.'), [the defendant] agreed to do just that."  *Id.* at 615 (internal citation omitted).  In addition to this evidence, the court took note that the defendant's rulings were "highly irregular" and "not an everyday occurrence in the judicial branch."  *Id.*

In *Siegelman*, the defendant, the governor of Alabama, was alleged to have accepted a $500,000 contribution from the CEO of a healthcare company to a state lottery ballot initiative the defendant was supporting, in return for his agreement to appoint the executive to the board of a state agency.  640 F.3d at 1164.  Among other things, the defendant told a lobbyist for the company that the executive had to give at least $500,000 in order to "make it right" in light of the $350,000 he had given to the campaign of the defendant's opponent in the prior election.  *Id.* at 1166.  The executive informed others at his company that he "would be assured" a board seat by doing so.  *Id.*  Upon receiving a check for $250,000, the defendant told a confidante that the executive wanted the board seat in return for the contribution and was "halfway there."  *Id.* at 1167.

In *United States v. Blagojevich*, the defendant, the governor of Illinois, was alleged, among other things, to have asked then President-Elect Barack Obama to "find someone to donate $10 million and up to a new 'social-welfare' organization that he would control," in return for the appointment of his favored successor to the Senate.  794 F.3d 729, 733 (7th Cir. 2015).  The defendant had made clear that he would not proceed unless he was compensated, even later stating, "They're not willing to give me anything except appreciation. F[***] them." *Id.*  The defendant then offered to appoint Jesse Jackson, Jr. to the vacant Senate seat, in return for a $1.5 million "campaign contribution" from Jackson's supporters.  *Id.* at 733.  As noted by the court, the defendant had served two terms and determined not to run for a third, and thus "[the] jury was entitled to conclude that the money was for his personal benefit rather than a campaign."  *Id.*  The indictment also charged the defendant with "other attempts to raise money in exchange for the performance of official acts," including advising hospital lobbyists that "he would approve an extra $8 to $10 million of reimbursement in exchange for a 'campaign contribution' of $50,000."  *Id.* at 733-34.

These cases (none of which the government discusses in any detail) make clear how truly anomalous and unsupportable its prosecution of Mr. Benjamin is here.  All of them involved allegations of a corrupt agreement beyond vague statements and temporal proximity, clearly distinguishing the charged conduct from ordinary course interactions between public official and constituent.  The Indictment in this case puts the concerns raised in *McCormick* and its progeny in sharpest relief, as none before it has—a sitting elected official has been charged for allegedly accepting campaign contributions from a constituent in return for providing legitimate constituent services in the form of a grant to a non-profit serving the educational needs of his district.  The allegations are based purely on inferences the government seeks to draw from

the timing and sequence of events, rather than any explicit agreement between the official and constituent.

At the same time, the government fails to distinguish the cases we cited where courts have found the government's allegations to be deficient under *McCormick*, even under the standard applicable outside the Second Circuit.  Contrary to what the government suggests, the court in *United States v. Donagher* considered the detailed allegations in the indictment and determined those allegations did not necessarily imply that campaign contributions had been made in return for an explicit promise or undertaking—on that basis, the court dismissed the indictment.  520 F. Supp. 3d 1034, 1045-46 (N.D. Ill. 2021).  The court acknowledged that (i) the indictment alleged that defendants paid the official "'for the purpose of seeking favorable treatment for [their business] in the award, allocation, and retention of debt collection work,'" and (ii) "certainly, a reader of the indictment might reasonably conclude that the campaign contributions were made in exchange for the [official's] decisions to provide debt collection contracts to [defendants' business]."  *Id*. at 1046.  Despite these plausible inferences, the court concluded that "it is not enough that such an inference be reasonable; it must be necessary."  *Id*.

And while, in *United States v. Menendez*, the court dismissed counts from the indictment on the ground that they alleged campaign contributions were made in return for a "generalized expectation of some future favorable action" (and thus failed the *McCormick* standard), nothing in the court's opinion limited *McCormick* to that context.  132 F. Supp. 3d 635, 643-44 (D.N.J. 2015).  The government criticizes the defense for citing the second opinion in *Menendez* because the government's case was dismissed after trial.  (Gov't Opp'n at 19 n.10).  But as is clear in our brief, we cited *Menendez* for the *legal* proposition (which applies at any stage of the proceedings) clearly set forth in the opinion, that context and temporal proximity are

23

not enough to infer an explicit *quid pro quo*.  (Def. Br. at 29-30 (citing *Menendez*, 291 F. Supp.

3d 606 at 623-35)).  Critically, in that case, the court rejected the government's effort to "to

fashion speculative inferences under the conclusory generalizations of context, chronology,

escalation, concealment, and a pattern of corrupt activity," *Menendez*, 291 F. Supp. 3d at 633,

concluding that "no case furnished by the Government or found by this Court has permitted a

jury to infer an explicit quid pro quo without factual evidence connecting the *quid* and the *quo*,"

*id.* at 629.  *Menendez* thus stands for the proposition that, as a legal matter, *McCormick* requires

far more than what the government has alleged in this Indictment—i.e., "the factual evidence

connecting the *quid* and the *quo*."

      The same is true of *Empress Casino Joliet Corp. v. Johnston*, which, while

decided on summary judgment in a civil racketeering case, held as a matter of law that inferences

to be drawn from a purportedly suspicious series of events were not enough under *McCormick*.

763 F.3d 731 (7th Cir. 2014).  In affirming the decision below, the Seventh Circuit relied on the

principle that is of equal relevance here:

> To hold illegal an official's support of legislation furthering the
> interests of some constituents shortly before or after campaign
> contributions are solicited and received "would open to prosecution
> not only conduct that has long been thought to be well within the
> law but also conduct that in a very real sense is unavoidable so long
> as election campaigns are financed by private contributions or
> expenditures, as they have been from the beginning of the Nation."

*Id.* at 731 (citing *McCormick*, 500 U.S. at 272).  While the government seeks to distinguish these

cases on the ground that "this Court has not yet seen and heard the evidence in this case" (Gov't

Opp'n at 19), it does not dispute (and in fact has confirmed) that its bribery theory is laid out in

detail in the Indictment.  As shown in our opening brief, (Def. Br. at 17-18), accepting all of the

allegations in the Indictment as true, if what the government has alleged does not constitute a

crime, the Indictment must be dismissed now as a purely legal matter, prior to trial.

*   *   *

If the allegations in this Indictment are deemed to meet the standard in

*McCormick*, the government will have succeeded in eliding the distinction between prosecutions

based on campaign contributions and cases where the defendant is alleged to have been bribed

with cash, travel expenses, or other personal benefits—a result entirely at odds with the Supreme

Court's reasoning in *McCormick*, as well as with the principles set forth in that seminal ruling

and the Court's subsequent decisions in *Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct.

1638 (2022); *McDonnell v. United States*, 579 U.S. 550, 575 (2016); *McCutcheon v. Fed.

Election Comm'n*, 572 U.S. 185, 192 (2014); and *Citizens United v. Fed. Election Comm'n*, 558

U.S. 310, 359 (2010).  (*See* Def. Br. at 19-20).  The government criticizes the defense for what it

calls "generic quotations and lofty rhetoric about protecting legitimate political activity," (Gov't

Opp'n at 15), apparently a reference to our summary and quotation of the three decades of

Supreme Court jurisprudence recognizing the unique First Amendment issues involved in

criminal prosecutions based on campaign contributions.  These decisions do not simply contain

"lofty rhetoric"—rather, they set forth rules the Supreme Court has deemed necessary to protect

political speech and our democratic process from government overreach that would otherwise

chill lawful interactions between public officials and the people they serve.  *See Donagher*, 520

F. Supp. 3d at 1046 ("[E]nsuring that the grand jury considered the explicit *quid pro quo* element

in the context of campaign contributions is anything but a technicality; to the contrary, given the

controlling law, doing so is necessary to shield ordinary, constitutionally protected campaign

financing activities from criminal prosecution.").  The government's dismissive characterization

of these rules is emblematic of the low regard in which it holds *McCormick* and the rights

*McCormick* is intended to protect.

25

In fact, by its own admission, the government proposes to shrink the rule in *McCormick* in this Circuit so that it would serve only to prohibit the use of an "as opportunities arise" theory in campaign contribution cases. (Gov't Opp'n at 11-12). Of course, *McCormick* says nothing of the sort, and the government's proposal entirely ignores the Court's animating concern in *McCormick* that legislators not be criminally prosecuted where "they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries." *McCormick*, 500 U.S. at 272. The point of requiring an "explicit" agreement is to ensure that there be a clear line between proper and improper conduct, and that a crime not be inferred based on vague statements, or the timing and sequence of official acts, solicitations, or contributions. The government's case here is constructed precisely on such inferences, and accordingly is based on an improper theory that does not constitute a crime under the charged bribery statutes.

      C.      <u>The Government Ignores The Relevant Pleading Standard</u>

In its opposition, the government does not address the relevant pleading standard or respond substantively to the cases we cited regarding its application here. Instead, it cites the wrong standard, relying on the fact that the Indictment "track[s] the language of the statute[s] charged and state[s] the time and place (in approximate terms) of the alleged crime[s]." (*See* Gov't Opp'n at 3-4 (internal quotation marks and citation omitted)). The cases cited by the government stand for the principle that a defendant is entitled to "adequate notice of the charges to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense." (*See id.* at 2 (citing *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992)) (internal quotation marks omitted)). This is not the basis for our motion to dismiss the Indictment.

Rather, as our opening brief makes clear, the basis for our motion is that the allegations in the Indictment, even if true, fail to charge Mr. Benjamin with bribery under the relevant statutes. (*See* Def. Br. at 17-18). While the government says in a footnote that the Indictment "does not set forth all of [the] evidence the Government would offer at trial," (Gov't Opp'n at 4 n.3), it does not dispute what it has previously confirmed: The Indictment "lays out clearly the prosecution's theory" and "contains detailed allegations specifying the crimes charged." (Def. Br. at 18 (internal quotation marks and citations omitted)). The government relies further in its opposition on the "more than fourteen pages of speaking allegations . . . which provide additional details regarding the charged crimes." (Gov't Opp'n at 5). As in the cases we cited where courts have granted motions to dismiss in this context, "the basis for the motion to dismiss the Indictment is neither a pretrial challenge to the evidence nor a claim that the indictment is not pled with sufficient specificity, but rather is an argument that the facts alleged do not constitute an offense as a matter of law." *See United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012) (emphasis added). Since, under *McCormick*, the allegations here do not constitute an offense as a matter of law, the Indictment must be dismissed.[7]

---

[7]   The government also cites to cases, irrelevant here, where granting a defendant's motion would require the court to weigh the sufficiency of the government's evidence prior to trial, or look beyond the factual allegations pleaded in the indictment. (*See* Gov't Opp'n at 3-4). *See, e.g.*, *United States v. Sampson*, 898 F.3d 270, 278 (2d Cir. 2018) (declining to make "a premature adjudication as to the sufficiency of the government's evidence," which was "improper at the Rule 12(b) stage"); *United States v. Dawkins*, 999 F.3d 767, 797 (2d Cir. 2021) (declining to "consider, before trial, whether the Government would be able to prove the defendants' guilt based on the factual allegations in the indictment"). None of these cases apply here, as granting our motion does not require the Court "to resolve [any] dispositive fact-based evidentiary disputes." *See Sampson*, 898 F.3d at 281. As noted, our motion accepts the factual allegations as true for these purposes, and does not rely on facts outside the indictment. (*See* Def. Br. at 2, 17, 27, 34).

The government does not address, much less rebut, any of the controlling precedent we have cited in support of this proposition.  In *United States v. Pirro* (*see* Def. Br. at 17), for example, the defendant was charged with violating 26 U.S.C. § 7206(1), a statute that prohibits willfully making and subscribing a federal income tax return with the knowledge that it was "false as to a material matter."  212 F.3d 86, 89 (2d Cir. 2000) (internal quotation marks and citations omitted).  The relevant portion of the indictment substantially tracked the language of this statute, alleging the defendant had "willfully and knowingly made and subscribed a false 1992 tax return" for a corporation by failing to report the "ownership interest" held in the corporation by the chairman of a local hospital board.  *Id.* at 87-88.  Nonetheless, the Second Circuit affirmed the dismissal of the portion of the count relying on these allegations.  *Id.* at 94. The court found that under the terms of the relevant tax filing and applicable law, the defendant was required only to report the ownership interests of *shareholders* in the corporation.  *Id.* at 90-91.  While the indictment alleged that the hospital chairman had an "ownership interest," it did not allege that the chairman was a shareholder.  *Id.* at 91.  As the court observed, "the problem is that the government's allegation might or might not make the return incorrect, and in violation of [the applicable statute]."  *Id*. at 93.  The indictment had therefore failed to allege a "crucial background fact that gives rise to the duty to disclose the [ownership interest] that was omitted," and accordingly to allege that the statute had been violated.  *Id*.

The Second Circuit found an indictment insufficient on the same basis in *United States v. Aleynikov* (*see* Def. Br. at 17), where the court, citing *Pirro*, again applied the principle that "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."  676 F.3d 71, 75-76 (2d Cir. 2012).  The defendant was charged with violating the National Stolen Property Act, which prohibits "transport[ing],

28

transmit[ting], or transfer[ring] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." *Id.* at 74 (internal quotation marks omitted) (citing 18 U.S.C. § 2314). Again, the allegations in the indictment tracked the language of the statute, adding that the defendant had, without authorization, uploaded to a server and downloaded to his personal device his former employer's proprietary high frequency trading source code, which he then brought to a meeting with his new employer. *Id.* at 73-74. Even so, the court held that the indictment was deficient because the facts alleged—namely, that the defendant had violated the statute by stealing and transporting source code—did not constitute a crime. *Id.* at 76. As the court found, the source code was "purely intangible property embodied in a purely intangible format," and "[t]here was no allegation that [the defendant] physically seized anything tangible" (*id.* at 78), as required to "constitute[] stolen 'goods,' 'wares,' or 'merchandise' within the meaning of the [statute]." *Id.* at 76. Accordingly, the district court should have dismissed the indictment.[8]

The government entirely ignores *Pirro* and *Aleynikov*, as well as the district court decisions we cited where courts have dismissed indictments based on the insufficiency of their factual allegations. In these decisions, the courts rejected the same argument the government makes here: that the indictment is sufficient merely because it recites the statutory language and makes boilerplate allegations that the statute was violated, even if the factual allegations in the

---

[8]     The court reached the same conclusion regarding the other count in the indictment, which charged the defendant with violating the Economic Espionage Act, 18 U.S.C. § 1832(a). Again, while the indictment tracked the language of the statute, the court found it to be "insufficient as a matter of law" because, based on the facts alleged, the source code was not a product "related to or included in a product that is produced for or placed in interstate or foreign commerce," as required under the statute. *Aleynikov*, 676 F.3d. at 79, 82.

indictment indicate otherwise.  In *United States v. Heicklen* (*see* Def. Br. at 17), the defendant

was charged with "attempting to influence the actions or decisions of a juror of a United States

Court in violation of 18 U.S.C. § 1504, a federal jury tampering statute."  858 F. Supp. 2d at 259.

The indictment recited the relevant statutory language, alleging that the defendant had

"attempted to influence the actions and decisions of a grand and petit juror of a court of the

United States . . . upon an issue and matter pending before such juror . . . by writing and sending

to him a written communication in relation to such issue or matter," and further alleged that he

had done so by "distribut[ing] pamphlets urging jury nullification" in front of the entrance to a

courthouse.  *Id.* at 261.  The district court determined the defendant's alleged activities—simply

handing out pamphlets in front of the courthouse—did not in fact violate the statute because his

pamphlets, as alleged, generically "discuss[ed] the role of juries in society and urge[d] jurors to

follow their consciences regardless of instructions on the law."  *Id.* at 275.  Thus,

notwithstanding the government's boilerplate allegation that the defendant had attempted to

influence jurors on an "issue" pending before them, the Court held that this element had not

sufficiently been alleged, and accordingly dismissed the case.  *Id*; *see also United States v. Kerik*,

615 F. Supp. 2d 256, 271 (S.D.N.Y. 2009) (dismissing false statement charge because, accepting

factual allegations in the indictment as true, the alleged conduct did not violate the statute as a

matter of law).

　　　　In light of the above, the government's claim that its Indictment is sufficient

merely because it says the words "in exchange for" (*see* Gov't Opp'n at 5-6) in recounting the

charged crimes is wrong, given that the facts alleged in the Indictment do not constitute a *quid

pro quo*, much less one that was explicit.  Indeed, even under the standard relied on by the

government—which requires, at a minimum, that the government allege the elements of the

charged offense (*id.* at 3 (citing *Dawkins*, 999 F.3d at 779))—the Indictment fails.  An "element"

is "what the jury must find beyond a reasonable doubt to convict the defendant."  *United States*

*v. George*, 223 F. Supp. 3d 159, 164 (S.D.N.Y. 2016) (citing *Mathis v. United States*, 579 U.S.

500, 504 (2016)).  As set forth in Section I.A., above, *McCormick* requires that to prevail, the

government must prove beyond a reasonable doubt that the *quid pro quo* agreement was

explicit—meaning, in this Circuit, that it was explicit and express.  *See also United States v.*

*Davis*, 30 F.3d 108, 109 (11th Cir. 1994) ("[U]nder United States Supreme Court precedent, an

explicit promise by a public official to act or not act *is an essential element* of Hobbs Act

extortion, and the defendant is entitled to a reasonably clear jury instruction to that effect.")

(emphasis added); *cf. United States v. Percoco*, 317 F. Supp. 3d 822, 834 n.18 (S.D.N.Y. 2018)

("[A]n explicit agreement, demand, or other form of inducement is not an element of extortion

under color of official right *outside of the campaign contribution context.*") (emphasis added).

   The Second Circuit has held that where, as here, an "element of the offense is

implicit in the statute," an indictment "fails to allege an offense" just by "track[ing] the language

of the statute" without "alleg[ing] the implicit element explicitly."  *Pirro*, 212 F.3d at 93

(emphasis added) (internal quotation marks and citations omitted); *see also* Charles Alan Wright

et al., *Federal Practice and Procedure: Criminal* § 125 (4th ed. 2015) ("If the statute itself does

not state an essential element of the offense or includes it only by implication, a pleading that

merely repeats the statutory language will be insufficient—the missing element must be directly

alleged.").  Since the term "explicit" does not appear in the words of the statutes charged in

Counts One through Three, the Indictment does not properly allege this element by merely

reciting the statutory language.  *See Donagher*, 520 F. Supp. 3d at 1044-45 ("[T]he government

must allege an explicit quid pro quo, *as an implied element of the offense*, where the 'thing of

value' under § 666(a)(2) consists of a campaign contribution.") (emphasis added).  The government does not allege anywhere in the Indictment that the *quid pro quo* in this case was "explicit" or "express"—it does not use these words, and the factual allegations, as discussed, fall far short of this standard.  *See id.* at 1045 ("[I]t is *not* enough for an indictment to possibly or even plausibly imply an essential element. Rather, the element must be '*necessarily* implied.' This requirement is needed to 'ensure that the grand jury [has] found probable cause' that an explicit *quid pro quo* has in fact occurred.") (emphasis in original) (citations omitted).

For these reasons, Counts One, Two, and Three must be dismissed.

## II.  Counts 4 And 5 Fail To Allege A Violation Of 18 U.S.C. § 1519 And Should Therefore Be Dismissed

In our opening brief, we set forth the reasons why if Counts One through Three are dismissed, so too must be Counts Four and Five.  If the conduct ascribed to Mr. Benjamin in the Indictment does not constitute bribery, the government has alleged no basis for the charge that Mr. Benjamin contemplated, much less intended to impede, a future investigation into bribery.  The Second Circuit has interpreted § 1519 to require that a defendant "knowingly act with the intent to impede an investigation."  *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020).  Given that the government has not alleged that Mr. Benjamin committed bribery, that he was aware of an investigation, or that he engaged in conduct indicating that he was aware of or intended to impede an investigation, the government has failed to alleged a violation of § 1519.  Otherwise, the application of the statute under these circumstances would violate due process under the void-for-vagueness doctrine, which requires that a statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id*. at 993; *see also United States v. Desposito*, 704 F.3d 221, 229 (2d Cir. 2013) ("Due process provides a

criminal defendant with the right to fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.") (internal quotation marks and citation omitted).

In its opposition, the government entirely dodges this issue. It disputes that the Indictment fails to allege bribery, and then says, in a footnote, "Thus, the Court need not decide whether it would violate due process to allow the Government to proceed on these allegations under § 1519 even where they have failed to allege bribery." (Gov't Opp'n at 22 n.11 (citing Def. Br. 39 (internal quotation marks and alterations omitted))). But, as set forth in Section I, above, the government has failed to allege bribery. Accordingly, the Court must decide whether or not the government's application of § 1519 under these circumstances is lawful, and the government's effort to sidestep this issue indicates that it has no convincing argument that it is.

It is not a sufficient answer for the government to point to cases where courts have held that a "conviction of obstructing justice by impeding an investigation does not require that the investigation itself lead to a conviction." (Gov't Opp'n at 22 (quoting *United States v. Baldeo*, No. S1 13 Cr. 125 (PAC), 2014 WL 6807833, at *2 (S.D.N.Y. Dec. 3, 2014))). In *Baldeo*, which the government cites for this point, the defendant did not commit the substantive offense, but he knew about the existence of an ongoing investigation, told other witnesses about it, and encouraged them not to cooperate with it. 2014 WL 6807833, at *1-2. That decision, and cases like it, stand for the uncontroversial proposition that where a defendant with knowledge of an investigation acts to impede it, the elements of the offense are met and he is guilty of obstruction even if he did not commit the underlying crime. Here, of course, no actual investigation is alleged. Moreover, the conduct that is alleged to have constituted obstruction had no demonstrable connection to an investigation, current or future. *See United States. v.*

*Craig*, 3 F. Supp. 3d 756, 759-60 (E.D. Ark. 2014) (granting judgment of acquittal where defendant falsified a document in connection with a state prosecution, and could not have foreseen that the document would later become relevant to a federal investigation).  With regard to Count Four, Mr. Benjamin is alleged to have accepted campaign contribution checks from Migdol, given him forms to fill out with regard to those contributions, and instructed him to provide certain information regarding his family members.  With regard to Count Five, he is alleged to have omitted Migdol's name from a form he filled out in connection with his appointment as Lieutenant Governor.  Unlike threatening a witness, suborning perjury, or destroying documents responsive to a subpoena, accepting campaign contribution checks and filling out an executive appointment questionnaire do not self-evidently relate to an investigation.  If Mr. Benjamin was not committing a crime, there is nothing about these alleged acts to suggest that he was intending to impede an investigation, current or future, and nothing that could have put him on notice that he was violating § 1519.

   The government claims there is "nothing unusual" about the application of § 1519 to Mr. Benjamin's alleged conduct.  (*See* Gov't Opp'n at 22).  But the cases it cites in support of this argument prove the exact opposite.  *United States v. Cossette*, like the cases we cited in our opening brief where § 1519 is typically charged, (*see* Def. Br. at 37-39), was a case where the defendant, a law-enforcement officer, falsified a report regarding a use-of-force incident.  593 F. App'x 28 (2d Cir. 2014).  Rather than supporting the government's position here, the Second Circuit's decision undermines it.  In rejecting the defendant's due process challenge to his conviction, the court pointed to "the jury's finding that [the defendant] willfully used excessive force on a detainee," as well as the defendant's "own acknowledgement that it was common knowledge amongst police officers that if they use excessive force, the FBI might investigate it."

*Id.* at 31 (internal quotation marks and citation omitted).  The court thus affirmed the application of § 1519, but only because the defendant had committed the underlying crime and conceded that he knew his conduct could be investigated by the FBI.

The government also cites *United States v. Singh*, 979 F.3d 697, 708 (9th Cir. 2020).  There, the Ninth Circuit affirmed the defendant's § 1519 conviction for impeding an investigation where, like the defendant in *Cossette*, he was convicted of committing the underlying substantive crime—in that case, conspiring to violate the Federal Election Campaign Act by facilitating unlawful campaign donations from a foreign national.  *Id.*  The case is thus distinguishable from this one, in that the government has failed to allege that Mr. Benjamin committed any underlying crime.  In fact, like *Cossette*, the case actually supports our motion to dismiss.  The government omits to say that in *Singh* the court dismissed one of the § 1519 convictions against the defendant because his alleged conduct was too attenuated to make out a violation of the statute.  The defendant's § 1519 convictions were premised on the theory that he caused certain California political campaigns to file false disclosures by withholding and concealing information necessary to make them accurate—namely, that the political consulting work he was performing for them for free was financed by a foreign national.  *Id.* at 716.  The court dismissed one of those charges, concluding that the defendant's statement that his fees had been "taken care of," without saying more, could not "reasonably be construed" as willfully causing the campaign to file false reports.  *Id.* at 719.

The government thus fails to point to any precedent that even remotely supports its application of § 1519 to this case, where it has failed to allege the underlying crime and has not alleged conduct indicating that Mr. Benjamin was aware of or intended to obstruct any current or future investigation by the federal government.  As with Counts One through Three,

given that the factual allegations on which Counts Four and Five are based are set out in detail, it is not sufficient that these counts simply track the language of the statute.  Counts Four and Five must be dismissed since it is clear that the factual allegations, taken as true, do not constitute a violation of the charged statutes.  (*See supra* Section I.C.).

Alternatively, if application of the statute to the facts alleged in the Indictment would violate due process and the void-for-vagueness doctrine, they can and must be dismissed at the indictment stage, as courts have done in numerous other cases.  *See, e.g.*, *United States v. Giffen*, 326 F. Supp. 2d 497, 506-07 (S.D.N.Y. 2004) (dismissing honest services fraud charges where statute was unconstitutionally vague as applied to the alleged scheme to bribe foreign government officials to secure oil and gas contracts); *United States v. Sattar*, 272 F. Supp. 2d 348, 358-61 (S.D.N.Y. 2003) (dismissing charges of providing and conspiring to provide material support and resources to a foreign terrorist organization where statute was unconstitutionally vague in "criminalizing the mere use of phones and other means of communication" and "the provision of personnel").  Mr. Benjamin was engaged in lawful, constitutionally protected interactions with a constituent and could not have known that accepting campaign contributions in the name of Migdol's relatives, or omitting to mention Migdol in an executive appointment questionnaire could possibly violate a statute designed to prevent tampering with a federal investigation.  Therefore, § 1519 would be unconstitutionally vague as applied to Mr. Benjamin's conduct.

For these reasons, Counts Four and Five must be dismissed.

## III.   The Government Must Comply With Its Obligations Under *Brady*

The government's response to our motion for further discovery concerning Migdol's plea allocution is most remarkable for what it does not say.  While the government claims the defense "implies—without basis or justification—that the Government's conduct with

respect to Migdol's allocution was improper," (Gov't Opp'n at 31), the government studiously avoids any discussion of the details of that conduct as memorialized in the email circulated among the prosecution team the night before Migdol's plea, (*see* Internal USAO Notes (Berke Decl. Ex. C); *see also* Gov't Allocution Draft (Berke Decl. Ex. D)).  And based on that purposeful avoidance, the government contends there is nothing more to disclose.  But those details show the material we seek plainly constitutes *Brady*, and the prosecution's continued failure to address them shows why we are entitled to relief.

    A.    <u>The Prosecution's Attempts To Defend Their Conduct Are Unavailing</u>

    The prosecution quite remarkably claims their actions "were in no way improper," (*see* Gov't Opp'n at 32), despite not contesting that the former prosecution team wholly drafted Migdol's plea allocution, threatened to tell the judge he was lying if he used his version of events, resisted substantiating their claim that Migdol's proposed allocution was inaccurate purportedly to avoid creating *Brady* material, and failed to disclose their role in drafting the allocution at the time of the plea, (*see* Def. Br. at 42-48; Internal USAO Notes (Berke Decl. Ex. C); Gov't Allocution Draft (Berke Decl. Ex. D)).  Tellingly, the prosecution makes no mention of the most egregious aspects of their conduct and tries to gloss over others in an effort to avoid answering the troubling questions raised by their conduct:

- The prosecution does not challenge that they called their star cooperator a liar in a heated last-minute exchange and threatened to tell the judge to reject his plea if he read the allocution they claimed was riddled with inaccuracies.  Yet nowhere in their opposition does the prosecution identify a single inaccuracy in Migdol's proposed allocution.  The only issue the government identified (both then and now) is its failure to identify the specific campaign to which Migdol allegedly contributed $25,000.  (*See* Gov't Opp'n at 40 n.20; Internal USAO Notes (Berke Decl. Ex. C) ("I noted that in the reference to a $25,000 contribution 'to his campaign,' it appears that 'campaign' refers to the Comptroller campaign, because that is the campaign previously mentioned [in the draft].")). But any ambiguity could easily have been cured by a minor one-word edit to the

proposed allocution or a follow-up question during the plea colloquy. It is simply not credible for the prosecution to claim it constitutes the type of "factual inaccuracy" that would warrant threatening to tell the judge to reject Migdol's plea in its entirety and thereby torpedo his attempted cooperation.

- The prosecution claimed they should not disclose the purported inaccuracies in Migdol's statements to his counsel because they did not want to create *Brady* material they would have to disclose to Mr. Benjamin and his counsel. Strikingly, the prosecution's opposition makes no mention of this expressed desire to avoid creating *Brady* material; nor does it disclose the purported *Brady* material the prosecution sought to shield by failing to memorialize it.

- The prosecution threatened Migdol's cooperation agreement if he did not capitulate, contending that his proposed allocution did not satisfy the elements of the crimes charged. In their opposition, however, the government studiously avoids addressing the fact that the Indictment against Mr. Benjamin relies on the very same series of events detailed in the draft allocution.

- The prosecution also does not explain, address, or attempt to defend their refusal to negotiate with Migdol and his counsel about the factual details of *his* plea allocution, which they unilaterally redrafted and required *him* to swear to under oath the following day during his plea.

- In their opposition, the prosecution also says nothing whatsoever about the fact that they sat silently by when in response to Judge Wang's request that Migdol explain in his own words what he did that made him guilty of a crime, Migdol read the script the prosecution had drafted for him and demanded he read the prior evening.

Not surprisingly, the prosecution does not cite a single case where a court accepts as proper the government drafting a cooperator's plea allocution in its entirety, let alone threatening that cooperator if he does not read that script, refusing to negotiate the language, or engaging in the other conduct involved here. Instead, the prosecution claims there is nothing extraordinary in their actions here because Judge Failla noted in *Ahuja* "there is nothing *per se* improper in the involvement of prosecutors in drafting, editing, shaping the plea allocutions of its

cooperating witnesses." (Gov't Opp'n at 24-25, 32 (citing <u>Transcript</u>, *United States v. Ahuja*, No. 18-Cr-328 (KPF) (S.D.N.Y. Dec. 17, 2021), ECF No. 457 at Tr. 27)). But in citing that language, the government ignores the rest of Judge Failla's opinion in which she specifically singles out the problematic conduct present here:

> . . . allocutions and prosecutors' involvement therewith exist on a continuum, and I can think of circumstances in which either the fact of the prosecutor's involvement, or the comparison of the before and after allocutions, can constitute appropriate impeachment evidence for the jury. ***These circumstances include instances in which the prosecutor scripts the allocution in its entirety, or where the cooperator's initial allocution minimizes the cooperator's conduct or suggests that the cooperator does not truly believe himself to be guilty of the offense to which he is pleading***, or where the initial allocution contains flat-out false statements. And after considering what has happened in this case, ***I think it also includes instances in which the prosecutor edits the substance of the allocution in order to preempt arguments that the government knows are at the heart of the trial defendants' defense.***

*Ahuja*, No. 18-Cr-328 (KPF), ECF No. 457 at Tr. 27:8-23 (emphasis added). And, of course, there also is nothing in Judge Failla's opinion or any other decision that excuses the government's other actions in connection with Migdol's plea allocution.

The government's continued inability to identify any so-called inaccuracies in Migdol's draft allocution based on his proffers with the government supports that what in fact caused the prosecutors to threaten Migdol's counsel into accepting the allocution they scripted is that Migdol's own version of the events did not satisfy the elements of a crime, as the prosecution recognized at the time. (*See* Gov't Allocution Draft (Berke Decl. Ex. D)). But that is not a fault of drafting; it is one of proof. None of the purported facts relayed by Migdol during his many "hours long" interviews with the government demonstrate an explicit or express agreement with Mr. Benjamin to exchange campaign contributions for the grant to the nonprofit he supported—far from it. Migdol never claimed that he and Mr. Benjamin agreed to anything.

Instead, he claimed ████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ (*See* December 10 Migdol Interview at 2 (Berke Decl. Ex. B); Notes from G. Migdol Interview at 1 (Berke Decl. Ex. N)).  But even if Migdol truly ████████████████████████ ████████, and was not simply telling the prosecutors what he thought they wanted to hear as he searched for a solution to his own criminal conduct that did not involve Mr. Benjamin, that does not make Mr. Benjamin guilty of any crime.  Indeed, if Migdol's tortured account of his interactions with Mr. Benjamin were sufficient to support charges of bribery against Mr. Benjamin, then any politician who provided constituent services and later received campaign contributions from a donor who benefitted from those services could find him or herself ensnared in a bribery prosecution based on little more than the donor's subjective belief that he or she needed to "repay" those services through campaign contributions.  That decidedly is not the law in this or any other Circuit.  *See supra* Section I.A. & I.B.  The prosecution tried to obscure this fundamental defect in their case against Mr. Benjamin by inserting the words "quid pro quo agreement" and redrafting Migdol's allocution to focus on Mr. Benjamin's alleged conduct and state of mind:

| Migdol's Draft Allocution<br>(Berke Decl. Ex. A) | The Prosecution's Draft Allocution<br>(Berke Decl. Ex. D) |
|---|---|
| In March, 2019, in New York County, Elected Official-1 told me he intended to run for New York City Comptroller and wanted money for his campaign.  I told him that I needed my money for my charity, the Friends of Public Schools Harlem.<br><br>He <u>later</u> informed me that he had arranged a New York State grant for the charity in the sum of $50,000, some of which I would have to share with a music group.<br><br>I <u>subsequently</u> went to his State office and unlawfully gave him checks totaling $25,000 payable to his campaign, <u>in corrupt exchange for his having arranged the grant</u>. | In 2019, <u>I entered into a quid pro quo agreement with Brian Benjamin</u>, who was then a State Senator.<br><br>Specifically, <u>he agreed to obtain</u> a $50,000 state grant for my charitable organization <u>in exchange for</u> campaign contributions that I gave him and procured for him. |

While the prosecution claims "the allocution [it drafted on Migdol's behalf] merely reflected what Migdol had already told the Government in prior interviews," (Gov't Opp'n at 35 n.18), that is simply not the case.  None of the purported facts relayed by Migdol during his many proffers with the government—as opposed to any gratuitous label assigned to them in retrospect—demonstrate an explicit or express *quid pro quo*, or manifest an agreement by Mr. Benjamin to do anything, which is no doubt why the prosecution deemed the allocution prepared by Migdol and his counsel (that actually focused on those purported facts) insufficient to support the crimes charged.  (*See* Gov't Allocution Draft (Berke Decl. Ex. D) ("The allocution is also not legally sufficient because it does not hit the elements for each of the offenses.")).  And though the prosecution now contends the reference to "corrupt exchange" in Migdol's original draft allocution is somehow reflective of an agreement or Mr. Benjamin's purported state of mind, (Gov't Opp'n at 34-35), they obviously thought otherwise at the time of Migdol's plea when they rejected it as not satisfying the elements of the crime.  "In exchange" does not mean "in agreement" and merely reflected Migdol's purported state of mind.  The prosecution conceded as much when they advised Migdol's counsel that the draft allocution "d[id] not hit the elements for each of the offenses."  (Gov't Allocution Draft (Berke Decl. Ex. D)).  By rewriting Migdol's allocution to suggest an explicit agreement where none in fact existed, the government sought to "preempt arguments that the government knows are at the heart" of Mr. Benjamin's anticipated defense.  *Ahuja*, No. 18-Cr-328 (KPF), ECF No. 457 at Tr. 27:8-23.

Apparently believing the best defense is a good offense, the government accuses the defense of selectively quoting from Migdol's proffers to create a picture inconsistent with the government's evidence.  (*See* Gov't Opp'n at 35).  But nothing the prosecution points out demonstrates an actual *quid pro quo* agreement between Migdol and Mr. Benjamin.  In fact, their

citations only substantiate our position that this entire case is premised on alleged after-the-fact

assumptions by Migdol and not anything that Mr. Benjamin actually said or did.  The sum total

of Migdol's statements the prosecution highlights in their opposition is as follows (including in

brackets, for context, the segments to which the defense had cited):



---

9    We do not understand how the prosecution believes this statement ⬛⬛⬛⬛ will be
admissible at trial.  But the fact the government has resorted to relying on it in support of its
opposition to our motion only showcases the infirmity of the government's theory of the case.
Based on the discovery to date, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ is wholly irrelevant to any issue in this case.



These limited citations—presumably the government's best—do not provide any *facts* supporting a legally sufficient basis for charging Mr. Benjamin with bribery offenses.  They simply confirm the prosecution's theory is not based on an explicit *quid pro quo*, which the law requires.

The circumstances surrounding Migdol's plea, and the prosecution's role in rejecting his version of events and providing an entirely revised allocution, at odds with Migdol's prior proffers, are thus powerful evidence of Mr. Benjamin's innocence and constitute *Brady* that is required to be disclosed.  All that Migdol said—and more importantly, all that he did not say—evidences Mr. Benjamin's innocence, a fact the prosecution recognized at the time but tried to obscure by insisting that Migdol read a script drafted by them, on the basis of claimed inaccuracies it has been unwilling (or as appears more likely, unable) to identify.[10]

---

[10]     Throughout its opposition, the government suggests it may move to preclude evidence of the government's involvement in Migdol's allocution, but there is no credible basis for any such motion.  In making that suggestion, the government again relies on an incomplete and misleading excerpt from Judge Failla's opinion in *Ahuja* to argue that "any use of such information must be balanced against countervailing concerns under Federal Rule of Evidence 403 and 'in many cases, the probative value of the [G]overnment's involvement in the allocution won't overcome those concerns.'"  (Gov't Opp'n at 27 n.12 (citing *Ahuja*, No. 18-Cr-328 (KPF), ECF No. 457 at Tr. 27:8–28:6)).  But the remainder of Judge Failla's opinion makes clear that under circumstances like these, where the prosecution has scripted the allocution to foreclose arguments that go the heart of a defendant's anticipated defense, "counsel for a trial defendant may be permitted to probe these issues in cross-examination, and to make credibility arguments in jury addresses. . . . The content of the[] changes, and the fact that the cooperators acceded to them, [are] fair subjects for cross-examination."  *See Ahuja*, No. 18-Cr-328 (KPF), ECF No. 457 at Tr. 29:1-31:11.

B.    <u>The Government's Argument That There Is Nothing Remaining That Need Be Disclosed Is Similarly Unavailing</u>

Although the prosecution asserts—without any declaration in support—that their disclosures are complete and there is nothing more that need be produced, the prosecution's continued failure in their production and again in their opposition to address the most significant open issues underscores the need for the very relief the defense seeks.

As an initial matter, the prosecution implies that they produced all of the reports of Migdol's interviews by their own good grace under the auspices of *Giglio*, when in fact the full set of proffers taken together are powerful proof of Mr. Benjamin's innocence that they were obligated to produce as exculpatory evidence. The government's opposition also suggests there were at least two supervisors involved in the discussions about Migdol's plea, yet nowhere are they referenced in any of the government's disclosures.[11] While the government maintains it has twice reviewed its files, the issue here is not the failure to undertake such a review. The issue is what the government has chosen to disclose as a result of those reviews, as well as what information needs to be disclosed even if the prosecution chose not to memorialize it.

While the government tries to dismiss our request for an additional search of their files as a "broad and blind fishing expedition," (Gov't Opp'n at 34), the trickle of disclosures in

---

[11]    The identity of the unit supervisors that were "directly or indirectly" involved "in discussions with Migdol or his counsel concerning Migdol's allocution," (*see* Gov't Opp'n at 27), is unclear, as none appear to be listed on the materials disclosed to the defense. The individuals listed ███████████████████ and in the internal emails summarizing conversations in connection with Migdol's plea, include AUSAs Abramowicz, LaMorte, Moe, and Schaeffer. (████████████████████████████████████████ (*see* Gov't Opp'n Ex. 3 at 1)). Meanwhile, AUSAs Cohen and Griswold appear to have replaced AUSAs Abramowicz, Moe, and LaMorte, and it is unclear whether they were previously involved. The government asserts that its search for *Brady* material included the files of its supervisors, but has not disclosed any information regarding their role, communications regarding Migdol's allocution or the unaddressed issues, or involvement with Migdol and/or his counsel.

this case plainly reveals that it is not.  Indeed, contrary to the government's assertion that its May 27, 2022 production disclosing the circumstances of Migdol's plea along with Migdol's proffers was "made prior to any requests from" the defense, (*id.* at 28), those disclosures came only weeks after we submitted a detailed discovery request on May 11, 2022 that called precisely for such information, (*see* Letter from Barry Berke to U.S. Attorney's Office (May 11, 2022); attached hereto as Ex. Q to the Reply Declaration of Barry H. Berke, Esq.).  In that letter, we specifically requested "all exculpatory or impeaching material in the government's possession, custody or control, or otherwise known to the government, including but not limited to . . . [a]ny statement by any person (or their counsel) which is inconsistent with the allegations in the indictment" and "[a]ll documents concerning presentations or proffers made to the government by counsel for any person or entity which may tend to exculpate Mr. Benjamin or may tend to affect the weight or credibility of the evidence to be presented against him."  (*Id.* at 13-14).  The Migdol proffer statements and plea materials that were included in the government's May 27 production were plainly responsive to this request.

But the government's May 27 production of *Brady* material was far from complete.  As reflected in the prosecution's email memorializing their extraordinary conversation with Migdol's counsel on the night before his scheduled plea, there had been prior occasions on which Migdol and his counsel had resisted the prosecution's entreaties about what they were demanding for the allocution.  (Internal USAO Notes (Berke Decl. Ex. C) ("I responded, with annoyance, that we have said multiple times that we believe the allocution should track the elements and not include excess narrative, and [Migdol's counsel] has repeatedly resisted that position.")).  Yet notes of those conversations were nowhere to be found in the government's production.  The government's production likewise failed to identify any

purported inaccuracies in Migdol's draft allocution, which the prosecution claimed were so significant they would warrant telling the Judge it was untruthful.  (*Id*.).  And there is nothing reflecting the involvement of the prosecution team's supervisors who we have only just learned were involved in these discussions.

By letter dated June 1, we asked the government to produce any remaining *Brady* material and spelled out in detail precisely what such material entailed.  (June 1 Migdol Requests (Berke Decl. Ex. L)).  Two weeks later, on June 16, 2022, after conducting what it describes in its opposition as a searching review of its files, the government produced the content of a previously undisclosed conversation with Migdol's counsel on the morning of his plea (which had not previously been memorialized), unredacted notes of their April 10 meeting with Migdol and his counsel, and a redacted version of Migdol's plea agreement.  (June 16 Gov't Response (Berke Decl. Ex. M)).  But these largely self-serving disclosures did not address the significant questions raised by the prosecution's summary of their April 10 call with Migdol's counsel. Nevertheless, the prosecution assured us they had "reviewed [their] files cognizant of the disclosure obligations imposed by *Brady*, *Giglio*, and their progeny, and have found no additional materials required to be produced."  (*Id*. at 2).

But there was more.  Consistent with local rules, the defense had a meet and confer with the government on June 23.  We noted, among other things, that the government had yet to produce any notes or summaries of meetings with Migdol and his counsel reflecting how he "repeatedly resisted" the prosecution's demands for the allocution.  Within hours, despite their earlier representation—made in response to our June 1 letter that called for this exact

information[12]—that they had conducted a thorough review of their files and produced all materials required to be disclosed, the government penned a letter disclosing an April 8 conversation with Migdol's counsel in which the prosecution rejected Migdol's request "to tell his story" at his plea proceeding and insisted on their version instead.  (June 23 Gov't Response (Berke Decl. Ex. I)).

 The government makes no mention in its opposition that it was the defense's pointed question that resulted in this additional disclosure.  But rather than allaying our concern there is additional *Brady* that has yet to be disclosed, this latest disclosure only exacerbates it.  While the government claims in its opposition that its disclosures are now complete, (*see, e.g.*, Gov't Opp'n at 33), the government made that same representation on June 16, when they clearly were not.  More significantly, the prosecution has continued to avoid addressing or producing in its *Brady* letter responses and opposition, information regarding the most pressing issues we have identified.

 That *Brady* information may not be memorialized in writing does not relieve the government of its obligation to produce it.  *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form.").  Indeed, that is particularly true in this instance given the prosecution's expressed desire to avoid creating *Brady/Giglio* in the first place.  (*See* Internal USAO Notes (Berke Decl. Ex. C) ("I said I did not want to engage in a back and forth about ways in which it was inaccurate, and I noted that if I did

---

[12] *See* June 1 Migdol Requests at ¶ 18 (Berke Decl. Ex. L) (requesting production of "[a]ll documents and external and internal communications concerning the government's statement that Joel Cohen, Esq. and/or Gerald Migdol 'repeatedly resisted' the government's directives to say there was a quid pro quo and/or track the elements of the crime of bribery, including but not limited to identifying what the government claims that Mr. Cohen or Mr. Migdol resisted . . . .").

engage in such a back and forth, I would need to memorialize what I told him in the file, and that would be disclosed to the defense and could potentially be used on cross-examination")).  Under these circumstances, we respectfully submit the Court should not rely on the prosecution's latest assertion without subjecting it to further scrutiny.  *See* <u>Conference</u>, *United States v. Pizarro*, No. 17-Cr-151 (AJN) (S.D.N.Y. May 17, 2018), ECF No. 135 at Tr. 7:7-14 (where prosecutors had turned over *Brady* materials late and made misstatements to the court about the disclosures, Judge Nathan commented on the "countless cases in which defense counsel have made motions or requests for *Brady* and *Giglio* material and the assistants stood up, as they did here, or wrote in a submission to the Court that they're fully aware of their *Brady* obligations" the credibility of those assertions now having taken a hit, "not only with me but with many of my colleagues who are aware of this case and the others that I have mentioned").  Particularly given the many open issues we have identified, we respectfully request that the Court direct the prosecution to review their internal and external communications (whether written or oral), notes and other documents for any further material and information bearing on any of the events and issues relating to Migdol's plea, including the veracity of his proffer statements and proposed allocution based on "his story," the prosecution's role in pressuring Migdol to read the version they drafted, Migdol's repeated resistance to that demand, the prosecution's claim that Migdol's version of events contained inaccuracies and did not satisfy the elements of the crime, and their claim that they would tell the judge to reject his plea based on his drafted and desired allocution.

            In addition, we respectfully request that the Court direct the prosecution to further produce any information regarding other conversations with Migdol and/or his counsel in and around his proffers or allocution, or internal communications regarding such discussions with Migdol and/or his counsel, indicating directly or indirectly that:  (i) the government pressed

Migdol and/or his counsel at the time of his proffers or thereafter to adopt any particular view of the facts; (ii) Migdol and/or his counsel resisted any such efforts by the prosecution; (iii) the prosecutors reported up to their supervisors any additional pushback from Migdol or his counsel inconsistent with their theory of the case against Mr. Benjamin or Migdol's ultimate plea allocution; or (iv) any other communications or information indicating that the prosecution pushed or encouraged Migdol to say he had entered into an agreement with Brian Benjamin, or that Migdol and/or his counsel previously resisted saying that he had entered into such an agreement.

All of the above requested information is *Brady* material that must be produced even if it also informed the government's deliberative process and/or was not memorialized in writing.  As the government itself agrees, "where the Government is in possession of information favorable to the defense and material to guilt or punishment, it must disclose those facts, even if the information is found in internal communications, work product, or deliberative process materials."  (Gov't Opp'n at 38).

If the prosecution is withholding any such materials based on a claim of privilege or work product, we also would respectfully request that the prosecution be required to produce a detailed log identifying the basis for withholding those materials.  *See* Order, *United States v. Ahuja*, No. 18-Cr-328 (KPF) (S.D.N.Y. Oct. 20, 2020), ECF No. 412 at 5 (ordering government to produce a log identifying documents withheld on privilege or other grounds); *United States v. O'Keefe*, 252 F.R.D. 26, 29 (D.D.C. 2008) (borrowing the requirements of Fed. R. Civ. P. 26(b)(5) and requiring the government to produce a privilege log that "describe[s] the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties

to assess the claim").  And to the extent the prosecution claims that it is not required to produce materials in its file regarding the issues identified above and in our original motion, we respectfully submit the prosecution should submit those files to the Court for *in camera* review to determine whether any additional disclosure is required.  *See United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir. 1989) (trial court erred in refusing to order *in camera* review of potential *Brady* material relevant to the credibility of the government's witness); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[I]n some circumstances the trial court should not rely on the Government's representations as to the materiality of potential impeachment evidence, but should instead undertake an independent in camera review of relevant Government files to determine materiality."); *Contreras v. Artus*, 778 F.3d 97, 114–15 (2d Cir. 2015) (in certain circumstances the defense is not required to depend "solely on the representations of the government," whose views of their *Brady* obligations may be "supplement[ed] . . . with the impartial view provided by the trial judge"); *see also United States v. Ahuja*, No. 18-Cr-328 (KPF) (S.D.N.Y. Nov. 11, 2020), ECF No. 418 at 4-5 (ordering government to produce for *in camera* review "all communications withheld based on a claim of deliberative process privilege or attorney work product" where government's privilege log lacked information required to meaningfully evaluate the privilege claims).

Despite the prosecution's attempt to recast its interactions with Migdol and his counsel as the type of routine back-and-forth between the government and its cooperators, there is nothing routine about the conduct revealed in the government's April 10 email summarizing their conversation with Migdol's counsel.  Perceived threats.  (Internal USAO Notes (Berke Decl. Ex. C) ("JC asked if that was a threat . . . .")).  Repeated resistance.  (*Id.* (". . . we have said multiple times that we believe the allocution should track the elements and not include excess

50

narrative, and JC has repeatedly resisted that position")).  Refusals to negotiate.  (*Id*. ("I said that this is not a negotiation.")).  The express desire to avoid creating *Brady/Giglio* material.  (*Id*.). These are not, or at least certainly should not be, the hallmarks of routine government conduct. For all these reasons, we respectfully request that the Court grant our motion for discovery and other relief on these issues given the unique and troubling circumstances of this case.

## IV.   The Government Is Improperly Withholding Information The Defense Needs Now To Prepare For Trial

### A.   The Government Has No Basis To Withhold The Names Of Co-Conspirators Until 30 Days Before Trial

Previously, in response to our requests, the government refused entirely to identify co-conspirators, forcing us to file a motion to compel it to do so.  In its opposition, the government now agrees to identify co-conspirators, but says that it will only do so 30 days before trial.  (Gov't Opp'n at 48).  There is no justification for withholding this information until the eve of trial and the prosecution is unable to provide any reason.  In order to conduct our own investigation, effectively review discovery, and prepare for trial based on the identified scope of the alleged conspiracy and co-conspirators, the defense needs the names of the alleged co-conspirators immediately.  Rather than conduct trial by ambush, the government should be compelled to provide this information far in advance of trial, as it has done in other cases tried in this District.

The government does not dispute that the discovery in this case is voluminous and that it complicates, rather than clarifies, the defense's task in ascertaining who the government alleges, other than Mr. Benjamin and Migdol, was part of the charged conspiracy.  Since we filed our motion, the government has produced hundreds of thousands of additional documents and over 180 gigabytes of additional data (on top of the 800,000 documents and 2.6 terabytes previously produced).  Knowing the alleged co-conspirators will allow the defense to search for

relevant information, as well to focus our investigation on the most important of the 160 persons and entities the government has subpoenaed, and the dozens of witnesses it has interviewed. (*See* Def. Br. at 68). Conversely, permitting the government to produce this information just weeks before trial will hamstring the defense, forcing us to go back through the discovery and conduct last minute investigative work while finalizing trial preparation.

The government does not dispute that there are no witness safety concerns that might otherwise justify delayed disclosure. Contrary to the government's assertions, witness safety is not relevant simply when it favors the government and tips the scales towards non-disclosure; rather, it is a factor to be considered along with all of the others in determining whether and when the government should be compelled to identify co-conspirators. *See United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000) (identifying "the potential danger to co-conspirators and the nature of the alleged criminal conduct," as one of six factors to be considered in deciding whether to grant a bill of particulars). It is of course not the only factor, but where, as here, the other factors point toward disclosure, the government is not entitled to withhold the identities of co-conspirators without justification. *See, e.g.*, *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (rejecting the government's offer to disclose co-conspirators two months before trial and ordering "immediate disclosure" where the government had not provided evidence that defendant would attempt to tamper with witnesses).

The government claims its "routine practice" is to identify co-conspirators 30 days before trial. (Gov't Opp'n. at 48). Yet it does not address, much less distinguish, the cases Mr. Benjamin cites, (Def. Br. at 69–70), in which the government identified co-conspirators, without court intervention, *months* before trial. *See United States v. Martoma*, No. 12-Cr-973 (PGG) (S.D.N.Y Dec. 21, 2012), ECF Nos. 27 at 7-8 & 32 at 16 (government agreed to identify

all known co-conspirators, three months before scheduled trial date, in a case the court did not

view as a "particularly complicated case"); Government's Brief, *United States v. Rajaratnam*,

No. 09-Cr-1184 (RJH) (S.D.N.Y. June 11, 2010), ECF No. 110 at 2 (government agreed to

identify alleged co-conspirators for each count, four months before scheduled trial date).

Contrary to the government's claims about its usual practice, there is no one-size-fits all remedy.

Thirty days might suffice in a relatively simple case, but where, as here, discovery is voluminous

and the allegations span years of conduct, involving dozens of potential witnesses, 30 days is

clearly inadequate, as the government itself has recognized in prior cases.

   The government cites the Court's decisions in *United States v. Middendorf* and

*United States v. Block*, claiming they are inconsistent with granting relief in this case.  (Gov't

Opp'n. at 48).  In *Middendorf*, however, the Court found that the alleged conspiracy was "limited

to employees of two entities," and "focuse[d] on the conduct of six named co-conspirators."  No.

18-CR-36 (JPO), 2018 WL 3956494, at *2 (S.D.N.Y. Aug. 17, 2018).  The government's brief in

that case makes clear there was a fraction of the discovery produced here, and that the

government had provided the defense with extensive information regarding the participants in

the conspiracy.  In total, the discovery consisted of only "97,000 electronically-searchable

documents."  Government's Brief, *United States v. Middendorf*, No. 18-Cr-36 (JPO) (S.D.N.Y.

June 29, 2018), ECF No. 107 at 2.  The government had previously "responded by telephone,

email, and letter to numerous requests for information to assist the defendants in reviewing

discovery," including by producing a "list of the individuals and entities anonymized in the

Indictment" eight months before the set trial date.  *Id.* at 3.  To enable the defense to parse the

discovery, the government also produced a chart listing details on the companies involved in the

defendants' conspiracy, as well as "the names of certain individuals and the subject matter of statements they made" relevant to certain issues of the case.  *Id.*

Similarly, in *Block*, the conspiracy spanned the "relatively narrow" timeframe of "only a few months" and "focuse[d] on [the defendant's] own conduct and interactions."  *United States v. Block*, No. 16-Cr-595 (JPO), 2017 WL 1608905, at *6 (S.D.N.Y. Apr. 28, 2017).  The government's discovery in *Block* also obviated the need for a bill of particulars.  The production amounted to only 214,000 documents, Defendant's Brief, *United States v. Block*, No. 16 Cr. 595 (JPO) (S.D.N.Y. Feb. 28, 2017), ECF No. 25 at 4, the "vast majority" of which were produced "just two weeks after the initial pretrial conference," and which "principally contained the records of [the defendant's] own company."  Government's Brief, *United States v. Block*, No. 16 Cr. 595 (JPO) (S.D.N.Y. Mar. 21, 2017), ECF No. 31 at 27.  In contrast here, the government's most recent discovery production (last week) by itself amounted to over 300,000 documents, and the total production – now running to over one million documents – includes material from many more entities' than just Mr. Benjamin's own.

The conspiracy allegation in this case spans at least two years and refers cryptically to "others" as having participated in the alleged bribery scheme, while identifying only Migdol as a co-conspirator.  The government's disclosures to date indicate there are dozens of others who it may consider to be co-conspirators, yet keep the defense in the dark as to who the government intends to argue at trial was in fact a member of the alleged conspiracy.  The government should not be permitted to withhold this information simply to obtain a litigation advantage and ambush the defense shortly before trial.  Accordingly, we respectfully submit the Court should order the government to provide a list of all alleged co-conspirators without further delay.

B.      The Government's Opposition Provides Information Regarding The Scope Of The Conspiracy The Defense Requested Months Ago

As stated in our opening brief, we filed our motion in order to compel the government to confirm that it is not alleging any "bribes" or official acts as part of the conspiracy beyond those identified in Count Two and Three—i.e., the alleged bribes are limited to campaign contributions from Migdol, and the official act is the $50,000 state grant to Organization-1.  (Def. Br. at 73).  The motion was necessitated by the government's prior refusal, in response to our May 11, 2022 letter, to confirm the scope of the conspiracy, including whether there are additional bribes or official acts alleged as part of Count One.  Now that the defense has filed its motion, the government confirms the bribes it has charged as part of the conspiracy are limited to the campaign contributions from Migdol, and the sole official act is the state grant.  (Gov't Opp'n at 43).  In particular, it clarifies that Mr. Benjamin's alleged "offer of assistance to Migdol regarding a zoning variance" as described in paragraph 25 of the Indictment, is not an official act charged as part of the conspiracy.  (*Id.* at 43 n.21).  After doing so, the government goes on for an additional four pages arguing the defense is not entitled to additional particulars we never sought in the first place.

The government does not explain why it refused to provide the requested information in response to the defense's prior letter, rather than forcing us to spend time and resources filing a motion.  In any event, in light of the government's confirmation of the scope of the conspiracy in its opposition, we do not seek further information at this time.

55

## <u>CONCLUSION</u>

For the foregoing reasons, and those stated in our opening brief, Mr. Benjamin respectfully requests that all counts of the Indictment be dismissed, the government produce discovery regarding Migdol's plea allocution and the surrounding circumstances, and the government be compelled to identify alleged co-conspirators.

Dated:   New York, New York            Respectfully submitted,
         August 4, 2022

                                     KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                     By:  /s/ Barry H. Berke
                                         Barry H. Berke
                                         Dani R. James
                                         Darren A. LaVerne
                                       1177 Avenue of the Americas
                                       New York, NY 10036
                                       Telephone: 212.715.9100

                                     *Attorneys for Defendant Brian Benjamin*