# Kramer Levin



**Barry H. Berke**
Partner
T 212.715.7560
F 212.715.7660
bberke@kramerlevin.com

1177 Avenue of the Americas
New York, NY 10036
T 212.715.9100
F 212.715.8000

**November 22, 2022**

<u>**BY ECF AND EMAIL**</u>

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. Benjamin</u>, No. S2 21 Cr. 706 (JPO)

Dear Judge Oetken:

      On behalf of our client Brian Benjamin, we respectfully submit this letter in reply to the government's November 17, 2022 letter and in further support of our November 9, 2022 discovery motion.[1]  Our motion raised a simple question:  Why did the government withhold for so long close to 100,000 documents obtained from its principal cooperator, and only disclose their existence when pressed by the defense in recent weeks?  We made no accusation of bad faith and instead simply sought the Court's assistance in getting to the bottom of a serious and unexplained discovery failure that will prejudice the defense, and in obtaining appropriate relief.  Rather than explaining what went wrong, the government accuses the defense of "hyperbole" and responds to arguments we did not make.  In fact, its response only raises more questions.  The government reveals *for the first time* that it obtained Migdol's consent seven months ago, in April 2022 – around the time of Mr. Benjamin's indictment – to review the non-privileged documents that did not hit on its initial "relevance" terms, which were focused on Migdol's straw-donor scheme.  Yet nowhere does the government explain why it failed to undertake any review of these documents for Rule 16 or *Brady* material relating to the charges it brought against Mr. Benjamin until just last month, and only after repeated inquiries by the defense.

      Yesterday evening brought yet another revelation:  The government filed a supplemental letter retracting its claim that the defense had overstated the number of documents

---

[1]     Citations to "Gov't Ltr." refer to the government's letter in opposition to the defense's discovery letter motion, Docket No. 72.  Citations to "Def. Ltr." refer to the defense's discovery letter motion, Docket No. 68.  Citations to "Gov't Supp. Ltr." refer to the government's supplemental letter in opposition to the defense's discovery letter motion, Docket No. 73.



at issue, and indicating that, having had these documents for more than a year, as of last week it could not even provide the Court with a reliable assessment of the number of documents, much less describe what is in the documents (which it has never reviewed).  This is further evidence that there has been a total breakdown in the government's discovery process with regard to its chief cooperator's documents, and underscores the need for the government to provide declarations with straight answers to the questions raised in our motion.  The government's intransigence, slow dribble of belated disclosures, and "nothing to see here" attitude is particularly troubling in light of this Office's recurrent discovery failures in recent years, for which it has been repeatedly rebuked by the courts.  Equally important, the Court should order disclosure of 3500 material and witness and exhibit lists – which are necessary to help the defense focus its efforts in reviewing these materials for those most relevant to trial – to mitigate the harm caused by the government's late disclosure.

           In its letter, the government also provides no legitimate basis for withholding from the defense documents from Migdol's laptop, iCloud account, or Gmail account that are discoverable under Rule 16.  The government does not dispute that these documents are within its control, or that Rule 16, by its terms, requires the government to produce relevant material in its "possession, custody, or control."  Instead, the government, relying on inapposite case law, declines to produce these materials because, it says, Migdol is not a member of the "prosecution team."  That is not the correct standard.  As set forth in our motion and explained further below, the correct standard was articulated by Judge Kaplan in *United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) and should govern the discovery of documents here.

           Finally, the government's position on the alternative relief we seek – issuance of a so-ordered Rule 17(c) subpoena to Migdol – makes clear that its primary concern is not the vindication of any legal principle relating to its discovery obligations, but that the defense, as a practical matter, be blocked from reviewing these materials altogether.  The documents we seek are clearly relevant to defending the case, and should have been obtained and reviewed by the government long ago.  Courts in this District have so-ordered Rule 17(c) subpoenas seeking similar information in other cases, including at the behest of the government.  Should the Court decline to order the government to produce the Migdol materials to the defense, we respectfully request that the Court issue the subpoena attached to our motion requiring Migdol to produce them prior to trial.[2]

I.  **The Government Has Not Explained Why It Failed To Produce The Documents**

           The government does not dispute the timeline set forth in our November 9, 2022 letter.  In August 2021 it seized approximately 100,000 emails from the accounts of Gerald Migdol, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ It designated all of the

---

[2]  Migdol has indicated that he plans to file today a separate response to our motion, presumably focused on the proposed subpoena to him.  As of this writing no such response has been filed.  To the extent Migdol's counsel files a response that raises additional arguments to those in the government's letter, we reserve the right to file a supplementary reply addressing those arguments.



emails as "potentially privileged"[3] and ran a limited set of search terms to identify "relevant" documents, although it admits that the terms were limited to the scope of its July 2021 search warrant application, and did not include terms relating to the charged bribery scheme, including the $50,000 grant to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ that is at the heart of this case.  (*See* Gov't Ltr. at 1 ("[T]he scope of the MigdolNYC Emails Warrant was limited to evidence of [Migdol]'s involvement in a straw donor scheme and evidence of the defendant's knowledge of or participation in the same.")).  In May 2022 – *i.e.*, eight months after it seized the emails – the government produced to the defense 13,420 emails from this set, without disclosing how many remained.  The defense heard nothing further from the government on this issue for another five months, until October 2022, when we pressed the government to ensure that it had produced all materials relating to Migdol.  Only then did the government disclose that (i) there were 3,740 additional documents that hit on its search terms, which had been provided to counsel for the Migdols nearly a year earlier, but still not yet reviewed for privilege, and (ii) another 87,000 documents that had not hit on its terms and still had not been reviewed at all.  After we filed this motion, on November 17, we received 1,898 documents, which apparently represent the subset of the 3,740 over which the Migdols are not asserting privilege.  As of this writing we still have not received the non-privileged documents among the 87,000.

   The government says that the factual background in its letter was previously conveyed "in sum and substance" to the defense.  (Gov't Ltr. at 1 n.1).  Not so.  Buried in its letter are disclosures, not previously shared with the defense, that only raise further serious questions.  Significantly, the government discloses for the very first time in its letter that in April 2022 – *i.e.*, *seven months ago* – Migdol provided the government with his consent to search all of the non-privileged seized documents, including those among the 87,000 that had not hit on the government's narrow, pre-indictment search terms.  (*Id.* at 3).  Yet the government does not explain why it did not run any further searches of these materials in April, or at any other time, or even advise the defense it was in possession of these documents until its recent disclosures in response to the defense's inquiries.

   The government is too entrenched in its litigation position to acknowledge that something went seriously awry in its discovery process.  Rather than simply explaining what happened, the government engages in misdirection by claiming that it is "the defense's position . . . that it was somehow improper for the Government to allow the Migdols' counsel to review the Migdol NYC Emails and make privilege claims in the first instance."  (*Id.* at 2 n.7).  But the defense never suggested that counsel for the Migdols should not have been afforded the opportunity to conduct such a review.  The issue raised by our motion is the government's wholesale failure to ensure that such a review was timely conducted by counsel so that the

---

[3] As noted in our motion, the government's search warrant affidavit ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  In its opposition, the government does not proffer that the Migdols participated personally in this program.  Instead, the government offers a new, *post-hoc* justification for its sweeping "potentially privileged" designation:  Ten years ago, ▆▆▆▆▆▆▆▆ acted as counsel for the Migdol organization in one lawsuit.  *See Capital One, N.A. v. 201 W 134 St LLC*, 12-cv-5025 (JMF) (S.D.N.Y. 2012).  This is an equally thin basis for designating the entirety of ▆▆▆ ▆▆▆▆▆▆▆▆▆ emails as potentially privileged, much less those of Gerald Migdol ▆▆▆▆▆▆▆▆▆.

3



materials over which counsel is not asserting privilege could be timely reviewed by the government for Rule 16 and *Brady* material. Indeed, the government apparently did not provide to the Migdols' counsel any of the 87,000 withheld documents to review, even after Migdol gave his consent for them all to be searched in April 2022. While the government claims its "conduct with respect to the MigdolNYC Emails was born out of efforts to respect the attorney-client and attorney work product privileges" (*id.* at 6), respect for the attorney client-privilege, of course, does not explain why the materials obtained by the search warrant were not reviewed for privilege for so long. Nor does respect for the attorney-client privilege explain why 87,000 documents were not promptly reviewed for relevant material after the government received Migdol's permission to search all non-privileged emails seven months ago in April 2022.

        The government's other response is to attempt to minimize the prejudice that it has caused. It cavalierly says it has "no reason to believe" that the 87,000 documents "contain anything of significance" that has not already been turned over (*id.* at 5), despite the fact that the government has no idea what is in the 87,000 documents because it has never reviewed them. This is not a random collection of documents from some peripheral figure – they pertain to the primary cooperator in the case and ████, also expected to be a government witness, and cover a period of time within the charged conspiracy. In its supplemental filing, the government repeats its misleading claim that in light of the search terms used, there was "no reason to believe" that these 87,000 documents "contain anything of significance." (Gov't Supp. Ltr. at 2). The government ignores the fact that these limited search terms were from over a year ago, when it was focused on collecting evidence of the straw-donor scheme, and that it never bothered to run additional searches after obtaining permission from Migdol to do so. The government has no basis to downplay the significance of the unsearched, unreviewed, and unproduced 87,000 documents.

        The government also claimed in its November 17 response that the "number of unique documents" in the 87,000 is "approximately half" of the total amount. (Gov't Ltr. at 3). But we now know, based on last night's supplemental filing, that this claim was totally false; yet again, the government had its facts wrong and the number of unique documents is indeed 87,000. (Gov't Supp. Ltr. at 1). Over a year after it obtained these documents, and over seven months after it had obtained permission to search them, the government could not even reliably tell us whether or not they had been de-duped. Tellingly, the prosecution team blames the situation on the filter team. But as another court recently reminded the government regarding a similar breakdown involving a filter team, "It is the trial team's responsibility to make sure that everything is being done the way it's supposed to be done." *United States v. Hwa,* No.-18-cr-538 (MKB) (S.D.N.Y. 2022) (quoted in *'Total Institutional Failure': Adjournment of Former Goldman Sachs Banker's Trial is Extended*, N.Y.L.J. (Feb. 25, 2022), https://www.law.com/newyorklawjournal/2022/02/25/total-institutional-failure-adjournment-of-former-goldman-sachs-bankers-trial-is-extended/).[4] The trial team has clearly failed to do that

---

[4]    *See also* U.S. Attorney's Office for the Southern District of New York Discovery and Disclosure Policy, at 11 (Oct. 15, 2010), https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/nys_discovery_policy.pdf ("[T]he prosecutor is ultimately responsible for compliance with discovery obligations. Accordingly, the prosecutor should develop a process for review of pertinent information to



here.  And whether the source of the error is the trial team or the filter team, the fault lies with the government, and the harm falls solely and unfairly on the defense.

   The government argues that it has not acted in bad faith, and accordingly should not be required to submit declarations or provide any other relief. (Gov't Ltr. at 4).  But we have not at this point made a claim of bad faith, and no such showing is necessary to obtain the relief we seek.  The purpose of requiring declarations is to compel the government to share with the defense and Court the truth behind its discovery failures, given that it has resisted freely providing this information, including in its response to our motion, so that the Court can fashion an appropriate remedy.  In *United States v. Jain*, cited in our opening letter, the court under similar circumstances required the government to submit sworn statements, and in fact conducted a hearing, even though it ultimately found no bad faith.  No. 19-Cr-59 (PKC), 2020 WL 6047812, at *1 (S.D.N.Y. Oct. 13, 2020).  Instead, the court found that the government had acted negligently by failing to produce documents in a timely fashion.  *Id.*  At a minimum, the same relief is warranted here, particularly in light of the government's flip-flops and continued reluctance to provide the facts.

   If the government can continue to bury the facts about its conduct and hide behind the false claim that the defense has not been prejudiced, there will be little if no incentive to ensure that it does better in the future.  We respectfully submit that the Court should view the government's conduct here in the context of a string of recent cases marred by similar discovery failures, following which this Office has repeatedly promised, and been directed to, take corrective measures to ensure the same does not happen again.  Clearly, whatever measures it has taken are still not working, to the great prejudice of the people, like Mr. Benjamin, the Office has chosen to prosecute.  *See id.* at 12 (directing the government to "meet and confer on the corrective actions [it would] undertake to ensure that this sorry chapter cannot be repeated"); *see also United States v. Wynder,* No. 20-CR-470 (PKC), 2022 WL 3572881, at *5 (S.D.N.Y. Aug. 19, 2022) (directing the government to report to Judge Castel by October 14, 2022 regarding its "review of ameliorative measures to reduce the risk of recurrence in other cases") (internal quotation marks and citations omitted).

   In one of these recent cases, *United States v. Wynder*, the court found that while the government's late production of documents was an "unseemly mess," it was not a product of bad faith, and on that basis adjourned the trial and required to government to provide early disclosure of 3500 material and witness and exhibit lists.  *Id.*  The government argues here that our request for 3500 materials and witness/exhibit lists is "unrelated" to the prejudice caused by its late production.  But in *Wynder*, the court found that this relief was related and warranted.  While in *Wynder* the government (unlike here) did the right thing and in its response to the defendant's motion agreed to provide 3500 material and witness/exhibit lists long before the adjourned trial date, the court said it would "accept[] the government's offer and w[ould] hold it to that commitment."  *Id.*

---

ensure that discoverable information is identified.  Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling.").



In its letter, the government quibbles with whether this was in fact an "order" of the court. The point is that in *Wynder* both the government and the court recognized that it was an appropriate remedy for the late production of a large volume of potentially relevant documents that should have been produced long ago. It is the government's fault that we are receiving these materials at this late date, and the defense should not suffer for the government's failure to follow the rules. Knowing who the government intends to call, what those witnesses are expected to say, and what evidence the government intends to present at trial will of course help focus our review on which documents among the tens of thousands the government plans to produce in these final weeks are most relevant. Accordingly, we respectfully request that the Court, at a minimum, order this relief here.[5] *See also* Order at 3, *United States v. Daugerdas*, No. S3 09-Cr-581 (WHP) (S.D.N.Y. Oct. 14, 2010), ECF No. 180 (ordering the government to disclose a witness list and 3500 material more than three months before the start of trial, in light of late disclosure of documents).

**II.    The Government Provides No Basis For Resisting The Production Of Relevant Materials From Migdol's Laptop, iCloud Account, and Gmail Account**

In our motion we noted that Rule 16, by its very terms, requires the government to produce all documents that are material to preparing the defense that are in its "possession, custody, or control." Fed. R. Crim. P. 16. In its response, the government does not dispute that Migdol's laptop, iCloud account, and Gmail account are within its control. Nor can it: Migdol and the government are parties to a binding legal contract that requires Migdol to provide to the government any document it requests. Instead, the government claims that it is not required to search for relevant information in these materials because they are not in its physical possession and Migdol is not a member of the "prosecution team." The case law the government relies on, however, applies when defendant seeks production of documents in the possession of a separate government agency or other third party, over which the U.S. Attorney's Office does not have control for purposes of Rule 16. It thus does not address the situation here, where, as in *United States v. Stein*, the U.S. Attorney's Office indisputably is aware of and has control over the documents at issue, yet is declining to take physical possession of them as part of its litigation strategy.

For example, the government cites *United States v. Hunter*, 32 F.4th 22 (2d Cir. 2022); *United States v. Blondet*, No. S5 16-CR-387 (JMF), 2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019); *United States v. Lobo*, No. 15 CR 174 (LGS), 2017 WL 1102660 (S.D.N.Y. Mar. 22, 2017); and *United States v. Chalmers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006). All of these cases involved documents in possession of other government entities (some of them foreign or non-federal entities, *see Lobo* (government of Honduras) and *Blondet* (Puerto Rico Police Department)), that were not legally bound to provide information to the U.S. Attorney's Office.

---

[5]    As noted in our motion (Def. Ltr. at 5), the government previously committed to producing Rule 3500 material eight weeks before trial, which is November 28, 2022. By the time this motion is fully briefed and argued, that date will be upon us. With regard to 3500 material, then, we are simply asking that the Court hold the government to its commitment, as Judge Castel did in *Wynder*.



None of them involved a cooperating witness over whose documents the U.S. Attorney's Office prosecuting the case indisputably had control.[6]

One of the cases cited by the government – *United States v. Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999) – actually undermines the government's argument here, as it considered relevant in defining the scope of Rule 16 "whether or not the prosecution *has access* to the materials." *Id.* at 221 (emphasis added). The court found that the prosecution in that case did not have access to the materials in question. *See id*. ("The question presented here is whether statements by the defendant to which the prosecution has no access are discoverable under Rule 16(a)(1)(A)."). Here, there is no question that the government has access to Migdol's documents; in fact, it has far more than just access, it has control, *i.e.*, the legal right to direct him to turn the documents over.

Only two of the government's cited cases involved information in the possession of cooperating witnesses, albeit in circumstances that do not apply here. In *United States v. Barcelo*, 628 F. App'x 36 (2d Cir. 2015), the defendant argued that, under *Brady*, he should receive a new trial and a suppression hearing should be reopened because, he claimed, the government had failed to disclose to him the statements of its cooperating witness, whose account of a traffic stop was different from that of two DEA agents who testified at the suppression hearing. *Id.* at 38. As the court pointed out in rejecting the defendant's appeal, the government had not questioned the cooperating witness about the traffic stop prior to the hearing, and thus did not know what the cooperator had to say about the matter. *Id.* Nor could what was in the cooperator's head be imputed to the government. *Id.* This is a far cry from the circumstances here, where we seek discovery, under Rule 16, of documents that the government knows are in the possession of its cooperating witness. The court in *Barcelo* had no occasion to address the meaning of "control" under Rule 16, and did not do so.

Similarly, in *United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013), another *Brady* case relied on by the government, the court specifically distinguished *Stein* on the ground that it concerned Rule 16, and not *Brady*. The defendant argued that the government's cooperating witness was a member of the "prosecution team" for purposes of *Brady*, and that, for this reason, the government was required to produce to the defense the cooperator's social media posts. *Id.* at 437. In rejecting this claim, the court concluded that the rule in *Stein* did not create a constitutional mandate under *Brady*, finding that "*Stein* does not address the Government's *Brady* obligations." *Id*. at 443. The defendant did not argue that he was entitled to the materials under Rule 16, and the court did not discuss the meaning of "control" under Rule 16, much less reject the holding in *Stein*.

---

[6] *United States v. Avellino*, also cited by the government, involved a post-plea *Brady* claim concerning an unopened box of materials from a state investigation present in the office of an Assistant U.S. Attorney in the District where the case was being prosecuted. 136 F.3d 249, 256 (2d Cir. 1998). The court did not discuss the government's obligations under Rule 16, and in any event found that the undisclosed evidence was not material under *Brady*. Notably, the court stated that but for this finding, it would have "likely remand[ed] for further proceedings" to explore the defendant's "troublesome questions" about the government's nondisclosure. *Id*.



The government's remaining cases are equally irrelevant. It cites *United States v. Avenatti*, 559 F. Supp. 3d 274, 280 (S.D.N.Y. 2021), for the proposition that "the Government has no obligation, under *Brady* or otherwise, to seek out information like a private investigator and valet gathering evidence and delivering it to opposing counsel." In that case, however, the defense sought from the government information in the possession of a *victim*-witness, over whom the government did not have control by virtue of a cooperation agreement or otherwise. *Id.* In citing *Avenatti* and related cases, the government sets up a straw man, claiming that a finding that Migdol's documents are in its control for purposes of Rule 16 would "grind[] criminal prosecutions to a halt," because the government "could, in theory, ask nearly any third-party to voluntarily provide it with information or documents, and those parties might choose to comply." (Gov't Ltr. at 8).

These arguments entirely miss the point. We are not arguing that the government has an obligation to search for or obtain information from other government agencies or witnesses over which it has no control. We are simply saying that the government cannot pretend it does not have custody or control for purposes of Rule 16 where, as here, (i) it has a binding legal agreement with its primary cooperating witness that requires that witness to turn over documents upon the government's request; (ii) it has previously directed the witness to turn over certain of these documents and he has complied; and (iii) the defense has good reason to believe that the cooperator has relevant information that the government is aware of but has avoided obtaining.

This is true as a matter of the text of Rule 16, but also as a matter of basic fairness. The government benefits enormously from the provision in its cooperation agreement requiring Migdol to produce documents upon request – it can obtain without subpoena or other process any information from him that it seeks. The government should not be permitted to reap the benefit of this provision while preserving the fiction that it lacks control over Migdol's documents for purpose of Rule 16, so as to block the defense from obtaining relevant evidence. As Judge Kaplan wrote 15 years ago in *Stein*, "if [the government] is uncomfortable with the consequences of such provisions, it need not insist upon them in future cases." 488 F. Supp. 2d at 364. The government decided to include a provision in its cooperation agreement giving it control over Migdol's documents, and it cannot now avoid the consequence of that decision simply because it would prefer not to provide material information to the defense.

### III.     In the Alternative, The Court Should Issue The Proposed Rule 17(c) Subpoena

The government complains that in our motion we did not include a lengthy discussion of the basis for the alternative relief we seek, namely the issuance of a so-ordered Rule 17(c) subpoena to Migdol. We did not do so because, in our experience, courts issue such subpoenas upon application, and it is then incumbent on the subpoenaed party, or another party who can demonstrate standing, to move "promptly" to quash the subpoena if there is any basis, as Rule 17 itself provides. Fed. R. Crim. P. 17(c)(2) ("On motion made promptly, the court may quash or modify the subpoena . . . ."). That said, given that the government has questioned the basis for the subpoena, we briefly address here the arguments raised in the government's letter.



The government claims that the subpoena falls short of the standard articulated in *United States v. Nixon*, 418 U.S. 683 (1974), requiring that the proponent of a subpoena show that it seeks documents that are not simply relevant, but sufficiently specific and evidentiary. The government is wrong; as set forth further below, the proposed subpoena clearly satisfies *Nixon*. We note, however, that there is good reason, and recent precedent in this District, for the Court to consider the subpoena under a different standard, which adheres more closely to the text of Rule 17, the evolution of the law on this issue, and modern discovery practice. In *Nixon* itself, the Supreme Court expressly declined to decide whether the standard it described applied to subpoenas served by the defense on third parties, as here, rather than on the government. *Id.* at 699 n.12 ("The Special Prosecutor suggests that the [standard applied in *Nixon*] not apply in its full vigor when the subpoena duces tecum is issued to third parties rather than to government prosecutors. . . . We need not decide whether a lower standard exists because we are satisfied that the relevance and evidentiary nature of the subpoenaed tapes were sufficiently shown as a preliminary matter to warrant the District Court's refusal to quash the subpoena."). Since then, courts and commentators have questioned whether the *Nixon* standard applies to such subpoenas, noting that the text of Rule 17(c) provides simply that the "court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2); *see United States v. Weigand*, 520 F. Supp. 3d 609, 611-13 (S.D.N.Y. 2021); *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008); *Stein*, 488 F. Supp. 2d at 364-65; *United States v. Nachamie*, 91 F. Supp. 2d 552, 562-63 (S.D.N.Y. 2000). As the government notes, in *United States v. Tucker*, the court declined to quash a defense subpoena served close to trial on a third party, where the defendant had "an articulable suspicion that the documents may be material to his defense," the request sought documents material to the defense, and it was not unduly oppressive for the producing party to respond. 249 F.R.D. at 66.

The government casts *Tucker* as an outlier and suggests it has been universally rejected in subsequent district court decisions (albeit not by the Second Circuit). The government, however, ignores Judge Rakoff's recent decision in *United States v. Weigand*, decided last year. After considering *Nixon*, the cases that have interpreted it, the text of Rule 17, and "modern principles of liberal discovery," Judge Rakoff adopted the *Tucker* standard in evaluating the propriety of a defense subpoena to a third party. 520 F. Supp. 3d at 611-13. We respectfully request that the Court do the same here.

The documents we seek are clearly relevant and thus subject to subpoena under the standard adopted in *Weigand*:

- The first category of the subpoena seeks materials that are self-evidently relevant and material to preparing the defense: documents concerning Mr. Benjamin, the subject matter of this case, the investigation of the case, or Migdol's cooperation in the case.

- The second category seeks from Migdol documents concerning fundraising, campaign contributions, or other support or assistance to candidates for public office. We seek this information as it will establish that the manner in which Migdol provided support to Mr. Benjamin's campaign did not differ from the manner in which he supported other campaigns, and to rebut the allegations that



- certain of his actions were intended to conceal the charged bribery scheme. Evidence that Migdol provided contributions in the same manner to other campaigns will rebut this allegation.

- Similarly, the third category of the subpoena seeks documents concerning public funding or grants requested or received by Migdol, the Migdol Organization, or █████████████████████ (identified as "Organization-1" in the indictment). These documents will demonstrate that there was nothing nefarious or unusual about Migdol soliciting grants for Organization-1 or involving political figures, like Mr. Benjamin, who identified with the causes he supported, for fundraising purposes, and thus rebut the government's claim that Migdol's interactions with Mr. Benjamin regarding the $50,000 grant described in the indictment are evidence of a corrupt bargain.

- The fourth category of the subpoena seeks documents and communications between (a) Migdol and his counsel and (b) the U.S. Attorney's Office, FBI, or Manhattan District Attorney's Office. In our motion to dismiss we described the evidence regarding the government's rewriting of Migdol's allocution and threats to reject his plea. For this reason, among others, there is a strong basis to believe that communications between Migdol and the government will provide evidence bearing on Migdol's motives in testifying against Mr. Benjamin, and the falsity of the allegation that Migdol entered into a *quid pro quo* agreement with Mr. Benjamin.

Additionally, Migdol cannot show that compliance with the subpoena would be "oppressive." He has retained experienced, capable counsel, who, at the government's request, has searched for and reviewed documents. There is no reason why Migdol and his counsel cannot similarly review and search for documents that are responsive to our requests.

      Even were the Court to apply the *Nixon* standard, the subpoena should be enforced. The requested documents are relevant for the reasons identified above. Moreover, there is every reason to believe that the materials requested will be admissible, as the subpoena seeks relevant documents demonstrating, among other things, the manner in which Migdol has contributed to, and sought grants from, other public officials. *See United States v. Bergstein*, No. 16-cr-746 (PKC), 2018 WL 9539846, at *2 (S.D.N.Y. Jan. 24, 2018) (finding materials relevant under *Nixon* where defendant's "showing permits a rational inference as to the relevance of [the] materials and sufficiently preliminarily demonstrates admissibility"). Emails reflecting Migdol's communications with other campaigns and public officials would be admissible to prove the fact that he had interactions similar to those he had with Mr. Benjamin and his campaign, and thus contextualize the interactions that the government claims were nefarious. As in *Bergstein*, the court may at trial "address the issues of relevance and admissibility further if and when a party moves to admit materials subpoenaed" under the requests. *Id.*; *see also Nixon*, 418 U.S. at 700 (requiring a "sufficient *preliminary* showing" of admissibility) (emphasis added).

      The requests in the subpoena are also reasonably tailored and sufficiently specific: They identify discrete categories of documents, and seek such documents beginning from 2017,



which is the date that the indictment alleges Migdol began interacting with Mr. Benjamin (Indictment ¶ 5). The government is incorrect that a subpoena seeking "all documents and communications" in each category cannot satisfy the specificity requirement under *Nixon*. (*See* Gov't Ltr. at 10). For example, in *United States v. Rajaratnam*, 753 F. Supp. 2d 317 (S.D.N.Y. 2011), the court upheld under the *Nixon* standard a Rule 17(c) subpoena request that called for "[a]ll documents or other communications" reflecting payments made or for the benefit of eight named individuals, rejecting the argument that "[t]he language of the request itself makes clear that it is being used as a discovery device." *Id.* at 323. The court upheld another request calling for "all documents reflecting communications" by and between the third party who moved to quash the subpoena and eight named individuals or any agent or employee of a particular company. *Id.* As the court noted, "requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity." *Id.* at 320 n.1.

Indeed, contrary to its position here, the government itself has served subpoenas under Rule 17(c) seeking similar categories of evidence and argued that they are sufficiently specific under *Nixon*. In *United States v. Zahavi*, the government's Rule 17(c) subpoena, served on an accounting firm, sought "all documents" on which it relied in drafting a particular portion of an audit report. Government's Brief, *United States v. Zahavi*, No. 12 CR 288 (JPO), 2012 WL 13081327 (S.D.N.Y. Oct. 25, 2012). In defending the subpoena against the defendant's claim that it was too broad, the government argued that the defendant "exaggerates the specificity required of a Rule 17(c) subpoena," and that a subpoena need not "itemize each particular document sought." *Id.* In the government's view, "[a]s long as a Rule 17(c) subpoena is sufficiently narrowly focused on a group of records likely to contain helpful documents, the subpoena is proper." *Id.* (internal quotation marks and citation omitted). Your Honor denied the motion to quash and upheld the subpoena in *Zahavi*. Order, *United States v. Zahavi*, No. 12-CR-288 (JPO) (S.D.N.Y. Oct. 29, 2012), ECF No. 56. We respectfully submit the Court should uphold the subpoena at issue here on the same basis.

## IV.    Conclusion

For the foregoing reasons, we respectfully request that the Court grant the relief set forth in our November 9, 2022 letter.

Respectfully submitted,

Barry H. Berke
Dani R. James
Darren A. LaVerne

11