22-3091
*United States v. Benjamin*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 08 2024

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

————————

AUGUST TERM 2022
No. 22-3091

**UNITED STATES OF AMERICA,**
*Appellant,*

v.

**BRIAN BENJAMIN,**
*Defendant-Appellee.*\*

————————

On Appeal from the United States District Court
for the Southern District of New York

————————

ARGUED: MAY 2, 2023
DECIDED: MARCH 8, 2024

————————

Before:    KEARSE, JACOBS, and MENASHI, *Circuit Judges.*

Brian Benjamin was indicted on charges of federal funds bribery, honest services wire fraud, conspiracy to commit each of those offenses, and falsifying records. The U.S. District Court for the Southern District of New York dismissed three of the charges—

———————

\* The Clerk of Court is directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 03/08/2024

federal funds bribery, honest services wire fraud, and conspiracy to commit these two crimes—on the ground that the indictment failed to allege an explicit *quid pro quo* between Benjamin and his campaign donor. We conclude that the indictment sufficiently alleged an explicit *quid pro quo*. Therefore, we reverse the judgment of the district court and remand for further proceedings.

———————

HAGAN SCOTTEN, Assistant United States Attorney (Jarrod L. Schaeffer, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellant*.

BARRY BERKE (Dani R. James, Darren LaVerne, *on the brief*), Kramer Levin Naftalis & Frankel LLP, New York, NY, *for Defendant-Appellee*.

———————

MENASHI, *Circuit Judge*:

Brian Benjamin served as a state senator in New York from 2017 to 2021. In early 2019, Benjamin decided to run for New York City comptroller. Early in his campaign, Benjamin allegedly agreed to allocate $50,000 in state funds to a non-profit organization that was controlled by Gerald Migdol, a real estate developer in Benjamin's district, in exchange for campaign contributions that Migdol provided. Benjamin allegedly attempted to conceal the arrangement by falsifying campaign forms, misleading regulators, and providing false information during his background check when he was nominated to be lieutenant governor of New York.

2

On April 11, 2022, a grand jury returned an indictment with five charges. Count One charged Benjamin with conspiracy to commit bribery and honest services wire fraud in violation of 18 U.S.C. § 371. Count Two charged Benjamin with soliciting bribes in violation of 18 U.S.C. § 666(a)(1)(B). Count Three charged Benjamin with honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. Counts Four and Five charged Benjamin with falsifying records in violation of 18 U.S.C. § 1519.

Prior to trial, Benjamin moved to dismiss the indictment, claiming that the government had not sufficiently alleged an explicit *quid pro quo*, as required to sustain a charge of bribery against a public official in connection with campaign contributions. The district court agreed and dismissed Counts One, Two, and Three on December 5, 2022. The government appealed, and the trial on Counts Four and Five was adjourned pending this appeal.

We conclude that the indictment sufficiently alleged an explicit *quid pro quo* for the purposes of Counts One, Two, and Three. Therefore, we reverse the judgment of the district court and remand for further proceedings.

## BACKGROUND

### A

"In reviewing the district court's dismissal of the indictment, we accept as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). Benjamin served as a state senator from 2017 to 2021. In 2019, Benjamin decided to run for New York City comptroller. Gerald Migdol, a real estate developer in Benjamin's district, had previously made contributions to Benjamin's campaign for state senator, and Benjamin had attended events associated with Migdol's non-profit organization, Friends of Public

School Harlem ("FPSH"). In March 2019, Benjamin informed Migdol of his plan to run for comptroller and sought Migdol's help in obtaining small-dollar campaign contributions. Migdol expressed concern that soliciting campaign contributions for Benjamin would displace donations to FPSH. Benjamin responded by stating, "Let me see what I can do."

About two months later, Benjamin discovered that he had the authority as a state senator to allocate up to $50,000 in state grants to school districts, libraries, and non-profit organizations in his district. On or about May 31, 2019, Benjamin informed Migdol that he would be allocating the full $50,000 to FPSH. Migdol later stated that he understood Benjamin to be offering the grant allocation in return for Migdol obtaining contributions to Benjamin's campaign.

At Benjamin's request, the New York State Senate allocated $50,000 to FPSH in June 2019. The following day, Benjamin texted Migdol to notify him that the grant had been allocated, although the grant still needed the approval of the administering state agencies before it would be disbursed. On July 8, 2019, Benjamin and Migdol met in Benjamin's senate office, and Migdol gave three checks to Benjamin, totaling $25,000, to be paid to "Benjamin for New York," Benjamin's senate campaign. Two of the checks, for $10,000 each, were made out in the name of one of Migdol's relatives. A third check for $5,000 was made out on behalf of a limited liability company that Migdol controlled. Migdol communicated to Benjamin that the money came from Migdol himself, despite the names on the checks. Benjamin accepted the checks, and Migdol completed the required campaign finance forms in Benjamin's presence. Benjamin reminded Migdol about the grant and his expectation that Migdol would procure small-dollar donations on behalf of his comptroller campaign.

4

In September 2019, Benjamin attended a fundraising event for FPSH. At the event, he presented Migdol and FPSH with an oversized novelty check in the amount of $50,000. Benjamin called Migdol the next month to clarify that—in order to qualify for the public funds matching program for New York City municipal races, which matched donations at a ratio of 8 to 1—the contributions to his comptroller campaign should be no larger than $250 and paid by check or money order.

In October 2019, Migdol began providing contributions to Benjamin's comptroller campaign, often falsifying donor names or covertly funding the contributions himself by reimbursing the listed donors. Benjamin remained in contact with Migdol regarding his efforts and encouraged Migdol to provide more contributions. At one point, according to the indictment, "Benjamin met with [Migdol] on the street to collect a bundle of [Migdol] contributions." App'x 10. Meanwhile, FPSH proceeded through the administrative process to ensure the disbursement of the grant. FPSH halted its efforts to obtain the grant in January 2021, following a news story about Migdol's participation in fraudulent contributions to Benjamin's campaign.

In June 2021, Benjamin lost his campaign for New York City comptroller. Later that year, Governor Kathy Hochul considered Benjamin for lieutenant governor. During the vetting process, Benjamin attempted to conceal his arrangement with Migdol. In doing so, he denied to regulators that Migdol had procured contributions to his campaign. In his background check, Benjamin also stated that he had never exercised legislative authority in any matter concerning someone from whom he solicited contributions. On September 9, 2021, Benjamin became lieutenant governor. He resigned his post on April 12, 2022, when he was indicted.

## B

Before the U.S. District Court for the Southern District of New York, Benjamin moved to dismiss Counts One, Two, and Three, arguing that the counts failed to allege an explicit "*quid pro quo*," as required by *McCormick v. United States*, 500 U.S. 257 (1991). The district court agreed with Benjamin and dismissed these counts of the indictment.

In its decision, the district court stated that "the Indictment fails to allege an explicit *quid pro quo*, which is an essential element of the bribery and honest services wire fraud charges brought against Benjamin." *United States v. Benjamin*, No. 21-CR-706, 2022 WL 17417038, at *1 (S.D.N.Y. Dec. 5, 2022). It noted that under *McCormick*, a *quid pro quo* "must involve a payment made in return for an explicit promise or undertaking." *Id*. at *6 (internal quotation marks omitted). The district court also held that the standard of *Evans v. United States*, 504 U.S. 255 (1992), was inapposite because that standard applied only to cases not involving campaign contributions. *Benjamin*, 2022 WL 17417038, at *6-8. The district court described *Evans* as holding that a *quid pro quo* "can be proven inferentially, based on the implication that an official has knowingly accepted a payment intended to compensate him for an official act." *Id*. at *6. In so holding, the district court relied on dicta from our opinions in *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), and *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993). Although neither *Ganim* nor *Garcia* involved campaign contributions, we said in those cases that *Evans* "modified [*McCormick*'s] standard in non-campaign contribution cases by requiring that the government show only that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Ganim*, 510 F.3d at 143 (internal quotation marks omitted) (quoting *Garcia*, 992 F.2d at 414).

Because it determined that *Evans* was inapposite, the district court examined *McCormick*'s requirement of an "explicit" *quid pro quo*. According to the district court, "if one thing is clear, it is that an 'explicit' promise cannot be satisfied by implication, as it would be contradictory to hold that a *quid pro quo* agreement could be simultaneously 'explicit' and 'implicit.'" *Benjamin*, 2022 WL 17417038, at *9. The district court noted the distinction in Justice Kennedy's concurring opinion in *Evans* "between an 'express' agreement and one 'implied from words and actions.'" *Id.* (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment)). The district court explained that, under *McCormick*, "the *pro* itself [that is, the agreement] must be clear and unambiguous—and characterized by more than temporal proximity, winks and nods, and vague phrases like 'let me see what I can do.'" *Id.* at *10. The district court held that *McCormick* requires this sort of unambiguous *quid pro quo* in the campaign contribution context. Because the indictment did not allege an agreement that was expressly stated, the district court dismissed Counts One, Two, and Three for "failure to charge an essential element." *Id.* at *15.[1]

Finally, the district court observed that concerns about freedom of speech and due process "weigh[ed] in favor of a stricter interpretation of the 'explicit' *quid pro quo* requirement," *Benjamin*, 2022 WL 17417038, at *13, and that it was best "to err on the side of

---

[1] In addition, the district court held that, to establish an explicit *quid pro quo*, "the explicit agreement must precede the official conduct." *Benjamin*, 2022 WL 17417038, at *16. The district court based this holding on the Supreme Court's statement in *McCormick* that prohibited conduct occurs when "the official asserts that his official conduct *will be controlled* by the terms of the promise." *Id.* (quoting *McCormick*, 500 U.S. at 273). According to the district court, the indictment did not allege a clear and unambiguous agreement prior to Benjamin's conduct in awarding the $50,000 grant.

protecting political speech rather than suppressing it," *id*. (quoting *McCutcheon v. FEC*, 572 U.S. 185, 209 (2014)). Because there was "confusion among the courts" as to the standard in campaign contribution cases—and because of the language in *Ganim* and *Garcia*—the district court held that Benjamin could not have had fair warning that he could be charged for conduct that "did not clearly involve an 'explicit' *quid pro quo*." *Id*.

## LEGAL STANDARDS

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted). We review the dismissal of an indictment *de novo*, *United States v. Gonzalez-Roque*, 301 F.3d 39, 44 (2d Cir. 2002), accepting "as true all of the allegations of the indictment" and disregarding "[c]ontrary assertions of fact by the defendants," *Goldberg*, 756 F.2d at 950.

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Rule 7 of the Federal Rules of Criminal Procedure implements that constitutional guarantee by requiring that the indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Supreme Court has held that an indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "An indictment, however, need not be perfect, and

common sense and reason are more important than technicalities." *De La Pava*, 268 F.3d at 162. Therefore, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)).

## DISCUSSION

An explicit *quid pro quo* under *McCormick* need not be expressly stated but may be inferred from the official's and the payor's words and actions. The district court believed that *McCormick* and *Evans* set out two different standards that apply in two different contexts. In fact, *Evans* is an application and clarification of *McCormick*. Both cases describe a single *quid pro quo* requirement that applies regardless of whether the case involves purported campaign contributions. The allegations of an illicit agreement in this case satisfy the *quid pro quo* requirement described in those cases.

## I

The indictment charged Benjamin with federal funds bribery and honest services wire fraud. The federal funds bribery statute makes it a crime when "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof," "accepts or agrees to accept[] anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). The Supreme Court has emphasized that "[t]he prohibition is not confined to a business or transaction which affects federal funds." *Salinas v. United States*, 522 U.S. 52, 57 (1997).

The honest services statute prohibits the use of the mail or the

9

wires to further "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346; *see* 18 U.S.C. §§ 1341, 1343. "[T]he honest-services statute," the Supreme Court has said, "covers only bribery and kickback schemes." *Skilling v. United States*, 561 U.S. 358, 368 (2010).

As the district court noted, these statutes "do not, on their face, contain any requirement to show an explicit *quid pro quo* agreement." *Benjamin*, 2022 WL 17417038, at *13. But in *McCormick* and *Evans*, the Supreme Court held that the government must prove a *quid pro quo* to establish criminal liability under the Hobbs Act, which prohibits extortion "under color of official right." 18 U.S.C. § 1951(b)(2). Relying on the Supreme Court's reasoning, the district court held that "an explicit *quid pro quo* is an 'implicit element' of each statutory offense charged here." *Benjamin*, 2022 WL 17417038, at *13.

The Supreme Court has explained, however, that the *quid pro quo* requirement "is derived from the statutory language 'under color of official right,' which has a well-recognized common-law heritage." *Evans*, 504 U.S. at 268 n.20; *see also id.* at 275 (Kennedy, J., concurring in part and concurring in the judgment) ("I agree with the Court[] that the *quid pro quo* requirement … is derived from the statutory requirement that the official receive payment under color of official right as well as the inducement requirement.") (citation omitted). The statutes at issue here lack the "under color of official right" language. Nevertheless, both parties proceed on the assumption that the *quid pro quo* requirement applicable to Hobbs Act extortion "under color of official right" also applies to federal funds bribery and honest services wire fraud. Other circuit courts have proceeded on the same

10

assumption.[2] We therefore assume without deciding that the charges against Benjamin require proof of a *quid pro quo*.

## II

The district court held that, pursuant to *McCormick*, an "explicit *quid pro quo*" must be "clear and unambiguous" such that "(1) the link between the official act and the payment or benefit—the *pro*—[is] shown by something more than mere implication, and (2) there [is] a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are conditioned upon each other." *Benjamin*, 2022 WL 17417038, at *7, *12. While we agree that the *quid pro quo* must be clear and unambiguous, there is no reason why it cannot be implied from the official's and the payor's words and actions. In other words, "the agreement must be *explicit*, but there is no requirement that it be *express*." *Siegelman*, 640 F.3d at 1171. An "explicit" agreement is one that is plainly evident but not necessarily expressly stated:

> The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is

---

[2] *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) ("[W]e assume without deciding a proposition that [the defendant] appears to take for granted: that *McCormick*, which concerned extortion, extends to honest-services fraud."); *United States v. Siegelman*, 640 F.3d 1159, 1171-74 (11th Cir. 2011) (assuming, "[w]ithout deciding," that "a *quid pro quo* must be proved in an honest services bribery prosecution" but concluding that "even if a *quid pro quo* instruction was required, such an instruction was given" and any error was harmless); *see also United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act.").

> implied from his words and actions, so long as he intends
> it to be so and the payor so interprets it.

*Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment).

Every other circuit to have considered this question has held, as we do today, that the *McCormick* explicit *quid pro quo* requirement may be met by implication from the official's and the payor's words and actions and need not entail an express statement. *See United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022) (holding that "it was well within the jury's province … to infer the existence of an explicit quid pro quo" despite the lack of an express agreement); *United States v. Allinson*, 27 F.4th 913, 925 (3d Cir. 2022) (agreeing with jury instructions that "[t]he explicitness requirement does not require an official's specific statement that he will exchange official action for a contribution, but rather requires that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain"); *United States v. Davis*, 841 F. App'x 375, 379 (3d Cir. 2021) ("Davis asserts that the words 'express' and 'explicit' mean the same thing, but he is incorrect. … [A]n explicit arrangement need not be 'memorialized in a writing' or spoken aloud. … Thus, 'direct and circumstantial evidence,' including the context of the arrangement, may be used to prove that there was a 'clear and unambiguous' promise of official action in exchange for payment."); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("'Nudge, nudge, wink, wink, you know what I mean' can amount to extortion under the Hobbs Act."); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("What is needed is an agreement, full stop, which can be formal or informal, written or oral. As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully

12

equipped to assess."); *Siegelman*, 640 F.3d at 1171 ("[T]here is no requirement that this agreement be memorialized in a writing, or even … be overheard by a third party. Since the agreement is for some specific action or inaction, the agreement must be *explicit*, but there is no requirement that it be *express*."); *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994) ("[B]y 'explicit' *McCormick* did not mean 'express.'"); *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) ("The jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds on a quid pro quo. As we read *McCormick*, the explicitness requirement is satisfied so long as the terms of the quid pro quo are clear and unambiguous."); *United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011) ("An official may be convicted without evidence equivalent to a statement such as: 'Thank you for the $10,000 campaign contribution. *In return for it*, I promise to introduce your bill tomorrow.' The connection between the explicit promise of official action and the contribution must be proved, but the proof may be circumstantial, under the test as it is stated in *McCormick* and elaborated in *Carpenter*."); *United States v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995) ("The explicitness requirement is satisfied … so long as the terms of the quid pro quo are clear and unambiguous.") (alteration omitted) (quoting *Carpenter*, 961 F.2d at 827).

## III

The district court reached a contrary conclusion based on a misunderstanding of the relationship between *McCormick* and *Evans*, which apply the same rather than different standards for establishing a *quid pro quo*, and in reliance on dicta from two of our prior cases.

**A**

In *Evans*, the Supreme Court applied the *quid pro quo* requirement first articulated in *McCormick*. Accordingly, *Evans* is an elaboration of *McCormick* rather than a separate test.

In *McCormick*, a member of the West Virginia House of Delegates—who was seeking re-election—received cash payments from a lobbying group that he did not report as campaign contributions. *See McCormick*, 500 U.S. at 260. After winning re-election, McCormick sponsored legislation that benefited the lobbying group. The legislation passed, and the group gave McCormick another cash payment. McCormick was convicted of extorting payments under color of official right in violation of the Hobbs Act. *See id.* at 261.

The Supreme Court considered whether, in addition to showing that the payments were not intended as legitimate campaign contributions, the prosecution also needed to establish a *quid pro quo* between McCormick and the lobbyists. The Supreme Court held that the prosecution did need to make that showing, and the Court vacated McCormick's conviction because the jury had not been so instructed. In reaching that conclusion, the Court offered the following observation:

> Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are

> solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right."

*Id.* at 272. The Court held that a payment that could have been a campaign contribution violates the Hobbs Act only if the payment was either "induced by the use of force, violence, or fear" or "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id*. at 273. The Court emphasized that, because "McCormick's sole contention in this case is that the payments made to him were campaign contributions," the Court did "not decide whether a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at 274 n.10.

One year later in *Evans*, the Court considered whether an affirmative act of inducement by the official was an element of extortion under color of official right under the Hobbs Act. John Evans, a member of the Board of Commissioners of Dekalb County in Georgia, received $7,000 in cash and $1,000 in campaign contributions from an undercover FBI agent. *See Evans*, 504 U.S. at 257. At Evans's trial, the district court instructed the jury that "if a public official demands *or accepts* money in exchange for a specific requested exercise of his or her official power, such a demand *or acceptance* does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." *Id*. at 258 (alteration omitted) (emphasis added).

On appeal, Evans argued that the jury instructions did not "properly describe the *quid pro quo* requirement for conviction" because the jury heard that it could convict based on Evans's passive acceptance of contributions. *Id*. at 268. The Supreme Court rejected

the "criticism of the instruction" and concluded that the instruction "satisfies the *quid pro quo* requirement of *McCormick v. United States* because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense." *Id.* (citation omitted). The Court explained that while Evans "did not initiate the transaction, his acceptance of the bribe constituted an *implicit promise* to use his official position to serve the interests of the bribegiver," establishing the *quid pro quo*. *Id.* at 257 (emphasis added). As Justice Kennedy elaborated in his concurrence, to satisfy the *McCormick quid pro quo* requirement, "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Id.* at 274 (Kennedy, J., concurring in part and concurring in the judgment). Instead, "[t]he inducement from the official is criminal if it is express or *if it is implied from his words and actions*, so long as he intends it to be so and the payor so interprets it." *Id.* (emphasis added).

Nothing in the Court's opinion suggests that *Evans* altered the *McCormick* standard; *Evans* applied that standard. In applying the *quid pro quo* requirement of *McCormick*, *Evans* clarified the requirement in three ways. First, *Evans* clarified that an explicit *quid pro quo* does not need to be expressly stated or memorialized and may be inferred from words and actions. Some courts, suggesting that *McCormick*'s requirement of an "explicit" *quid pro quo* cannot encompass the implicit promise described in *Evans*, have sought to distinguish the cases. But *McCormick* and *Evans* do not conflict. The agreement constituting the *quid pro quo* must be "explicit" in the sense that it must be clear that the official "obtained a payment … knowing that the payment was made in return for official acts." *Evans*, 504 U.S.

at 286. However, the jury may *infer* such an agreement based on evidence of the official's "implicit promise to use his official position to serve the interests of the bribegiver." *Id*. at 257. Because "the agreement is for some specific action or inaction, the agreement must be *explicit*, but there is no requirement that it be *express*." *Siegelman*, 640 F.3d at 1171.

Second, *Evans* clarified that a *quid pro quo* may exist even if the official took no affirmative steps to induce the bribe—by, for example, making a threat—but simply accepted the bribe with the knowledge that it was intended as consideration for his official acts. *See Evans*, 504 U.S. at 266-68. Third, because *Evans* involved *both* campaign contributions and personal payments to the official, *Evans* clarified that *McCormick*'s explicit *quid pro quo* requirement applies to non-campaign-contribution payments. Indeed, the Court approved the jury instruction that "if a public official demands or accepts money in exchange for a specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act *regardless of whether the payment is made in the form of a campaign contribution*." *Id*. (alteration omitted) (emphasis added).

*McCormick* and *Evans* both apply to cases involving an illicit payment to a public official, even if the payment is given as a campaign contribution. The showing of a *quid pro quo*, assuming it is required, may be based on inference and need not involve an express statement.

## B

In reaching this conclusion about the relationship between *McCormick* and *Evans*, we agree with most other circuits to have considered the question. The Third, Fourth, Fifth, Seventh, and Eleventh Circuits have all held that *Evans* applies to cases involving

17

campaign contributions. *See Allinson*, 27 F.4th at 925 (explaining, in a campaign contribution case, that "bribery can occur through 'knowing winks and nods'" and still qualify as "an explicit *quid pro quo*") (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment)); *Siegelman*, 640 F.3d at 1171 (explaining that "*McCormick* does not impose such a stringent standard" as to require "only *express* words of promise" as *Evans* clarified); *United States v. Whitfield*, 590 F.3d 325, 349 (5th Cir. 2009) ("In *McCormick*, the Supreme Court held that a conviction under the Hobbs Act for extortion under color of official right requires a showing of an explicit *quid pro quo* when the alleged illegal payments take the form of campaign contributions. … In *Evans v. United States*, the Supreme Court clarified that no overt act is required on the part of the official."); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001) (concluding that *Evans* clarified that "the *quid pro quo* requirement applies in all extortion prosecutions under the Hobbs Act" and that "the government need not show an explicit agreement, but only that the payment was made in return for official acts"); *Tomblin*, 46 F.3d at 1379 (explaining that "[u]nder the bribery statutes, the government must prove a quid pro quo, that is, that the official took money in return for an exercise of his official power" and citing both *McCormick* and *Evans*); *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993) ("Any payment to a public official, whether it be a legitimate campaign contribution or a bribe, is made because of the public office he holds. *Evans* makes clear that the public official must obtain 'a payment to which he was not entitled, knowing that the payment was made in return for *official acts*.'"); *United States v. Martinez*, 14 F.3d 543, 553 (11th Cir. 1994) ("We construe this language from *Evans* as adopting the *quid pro quo* requirement of *McCormick*.").

The Sixth and Ninth Circuits have suggested in dicta that an alternative reading of *McCormick* and *Evans* might be appropriate,[3] but in more recent cases involving campaign contributions, both circuits have treated *Evans* as an application of *McCormick*. *See Terry*, 707 F.3d at 613 (applying *McCormick* and *Evans* in a campaign contribution case); *Inzunza*, 638 F.3d at 1020 (same).[4] We agree with the majority view.

---

[3] The Sixth Circuit has offered contradictory interpretations. *Compare Blandford*, 33 F.3d at 696 ("Our reading of *Evans*—as limited to the campaign contribution context—is bolstered by the fact that the case, after all, involved campaign contributions."), *with United States v. Abbey*, 560 F.3d 513, 517-18 (6th Cir. 2009) ("*Evans* modified the standard in non-campaign contribution cases by requiring that the government show only that the official obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.") (internal quotation marks and alteration omitted). The Ninth Circuit has indicated that *Evans* might be limited to the non-campaign-contribution context, the opposite of the Sixth Circuit's suggestion in *Blandford*. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 937 (9th Cir. 2009) ("[T]o convict a public official of Hobbs Act extortion for receipt of property other than campaign contributions, '[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.'") (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment)).

[4] Some statements from the First and Eighth Circuits also suggest an alternative view. *See United States v. Chastain*, 979 F.3d 586, 591 (8th Cir. 2020) ("Outside of the campaign contribution context, an explicit quid pro quo is not required."); *United States v. McDonough*, 727 F.3d 143, 155 n.4 (1st Cir. 2013) (declining "to follow *McCormick v. United States*" because "we have held that *McCormick* applies only in the context of campaign contributions").

## C

In Hobbs Act extortion cases, we have suggested in dicta that *McCormick*'s requirement of an explicit *quid pro quo* is limited to campaign contribution cases and that *Evans* allows an implicit *quid pro quo* to establish guilt only in non-campaign-contribution cases. *See Ganim*, 510 F.3d at 143 ("*Evans* modified this standard in non-campaign contribution cases by requiring that the government show only that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.") (internal quotation marks omitted) (quoting *Garcia*, 992 F.2d at 414). [5] The implication of these dicta is that, when campaign contributions are involved, the requirement to show an "explicit" *quid pro quo* means that the agreement must be expressly stated. However, we have never made such a statement in a case that involved campaign contributions. To the extent that a statement in an opinion "referred not just to circumstances similar to those presented by the facts before it, but also to potential circumstances that were not before it, the panel was of course offering dicta." *Ming Shi Xue v. BIA*, 439 F.3d 111, 121 (2d Cir. 2006) (internal quotation marks omitted); *see also Carroll v. Carroll's Lessee*, 57 U.S. 275, 286-87 (1853) ("[I]f [an issue] might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so, there must have been an application of the judicial mind to the precise question necessary to be determined to fix the rights of the parties."); *Xiao Ji Chen v. DOJ*, 471 F.3d 315, 338 (2d Cir. 2006)

---

[5] *See also United States v. Silver*, 948 F.3d 538, 548 (2d Cir. 2020) (quoting *Garcia*, 992 F.2d at 414); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) (citing *Ganim*, 510 F.3d at 148).

("Holdings—what is necessary to a decision—are binding. Dicta—no matter how strong or how characterized—are not.") (quoting *United States v. Garcia*, 413 F.3d 201, 232 n.2 (2d Cir. 2005) (Calabresi, J., concurring)).

Because we now consider the issue in the context of a campaign contribution case, we conclude that *Evans* applies to such cases.

We recognize that campaign contributions implicate the First Amendment, which "requires us to err on the side of protecting political speech rather than suppressing it." *McCutcheon*, 572 U.S. at 209 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)). "[C]ampaigns must be run and financed," and a public official may permissibly "act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries." *McCormick*, 500 U.S. at 272. But "[i]t is the corrupt *agreement* that transforms the exchange from a First Amendment protected campaign contribution … into an unprotected crime." *Siegelman*, 640 F.3d at 1173 n.21. If "Congress may permissibly seek to rein in 'large contributions [that] are given to secure a political *quid pro quo* from current and potential office holders,'" *McCutcheon*, 572 U.S. at 207 (quoting *Buckley v. Valeo*, 424 U.S. 1, 26 (1976)), it certainly may prohibit the *quid pro quo* itself. The *quid pro quo* requirement, as elaborated above, alleviates the First Amendment concern.

## IV

Having clarified the scope of the *quid pro quo* requirement, we conclude that the district court erred in dismissing the indictment for failure to state a claim.

**A**

The indictment alleged a *quid pro quo* in paragraphs 1 and 40. Paragraph 1 alleged as follows:

> From at least in or about 2019, up to and including at least in or about 2021, Brian Benjamin, the defendant, participated in a scheme to obtain campaign contributions from a real estate developer [Migdol] *in exchange for* Benjamin's agreement to use, and actual use of, his official authority and influence as a New York State senator to obtain a $50,000 grant of state funds [for Organization-1].

App'x 1 (emphasis added). And Paragraph 40 alleged that "Benjamin solicited and received campaign contributions from [Migdol] *in exchange for* Benjamin's agreement to use, and actual use of, his official authority and influence to obtain the State Grant for Organization-1." *Id.* at 19 (emphasis added).

This language sufficiently alleged an explicit *quid pro quo*. We agree with the government that the phrase "in exchange for" in both paragraphs satisfied the *quid pro quo* requirement of *McCormick* because it alleged an unambiguous agreement to exchange an official public act by Benjamin for financial contributions from Migdol. The fact that the agreement was never stated expressly is immaterial because the existence of the agreement, and the clarity of its terms to Migdol and Benjamin, could be inferred from their words and actions. In fact, the language of the indictment parallels the jury instruction that the Supreme Court upheld in *Evans*. *See* 504 U.S. at 258 ("[I]f a public official demands or accepts money *in exchange for* a specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign

contribution.") (alteration omitted) (emphasis added). The district court therefore erred when it held that the indictment failed to allege an explicit *quid pro quo*.

**B**

The district court also erred insofar as it held that the indictment failed to allege a crime because it failed to establish that contributions *followed* the promise to perform an official act. Under *McCormick* and *Evans*, "a *quid pro quo* with the attendant corrupt motive can be inferred from an *ongoing course of conduct*." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment) (emphasis added). "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268 (majority opinion).

The course of conduct alleged in the indictment described a corrupt *quid pro quo* that satisfies *McCormick* and *Evans*. At the conclusion of the March 2019 meeting, Benjamin asked for Migdol's assistance in collecting small-dollar campaign contributions. Migdol said he would be unable to do so because such contributions would displace donations to his non-profit. Benjamin said "Let me see what I can do,"[6] and afterward he informed Migdol that he would allocate a state grant to the non-profit. These facts allow the inference that Benjamin promised to perform an official act in exchange for monetary payments. Following that promise, Benjamin allegedly accepted money from Migdol knowing that it was offered in return

---

[6] *Cf. McCormick*, 500 U.S. at 260 ("Vandergrift told McCormick that he would contact the doctors and see what he could do."); *Garcia*, 992 F.2d at 412 ("Moreno informed the Congressman that 'my financial situation was not that good at that time, but that I was going to see what I could do.'").

23

for his decision to allocate the state grant. The fact that the grant had not yet been disbursed when Benjamin accepted the money—because state agencies still needed to approve the disbursement—does not indicate a lack of an agreement between Benjamin and Migdol. "[F]ulfillment of the *quid pro quo*" through actual disbursement of the grant "is not an element of the offense." *Id.*; *see also Ganim*, 510 F.3d at 142-43.

## C

We agree with the district court that "principles of due process require 'fair warning … in language that the common world will understand' as to what conduct is prohibited by law." *Benjamin*, 2022 WL 17417038, at *13 (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). But the applicable statutes, as well as *McCormick* and *Evans*, provided sufficient notice that the alleged exchange in this case was prohibited. Benjamin had fair warning that his alleged agreement with Migdol was illegal and that it would not become legal if he simply avoided memorializing it expressly in words or in writing.

## CONCLUSION

We reverse the judgment of the district court dismissing Counts One, Two, and Three of the indictment and remand for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit